UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
---------------------------------------------------X

IN Re: ROSS ULBRICHT, *et al*           Docket No. 18 - _____

                           Petitioner,      PETITION FOR WRIT OF
                                            MANDAMUS ON BEHALF OF
                                            ROSS ULBRICHT

              - v -

KATHERINE B. FORREST, DISTRICT JUDGE,

              Respondent.

United States of America, Real Party in Interest.

---------------------------------------------------X

Paul Grant
Law Office of Paul Grant
19501 E. Mainstreet, # 200
Parker CO 80138
303-909-6133


Counsel for Petitioner Ross Ulbricht

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Ross Ulbricht requests oral argument on this Petition.


## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Local Rule 26.1, Petitioner submits the following disclosures: Ross Ulbricht is a natural person.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT     i

CORPORATE DISCLOSURE STATEMENT     i

RELIEF SOUGHT     1

ISSUES PRESENTED     1

STATEMENT OF FACTS     3

    I.     MOTION FOR RECUSAL     3

    II.     REQUEST TO EXTEND TIME TO SUBMIT RULE 33 MOTION     10

    III.     MOTION FOR PARTIAL UNSEALING OF MAGISTRATES' RECORDS     16

    IV.     MOTION TO ADD DOCUMENTS TO PUBLIC DOCKET     17

    V.     MOTION TO ACCESS COURT RECORDS     18

REASONS WHY THE WRIT SHOULD ISSUE     21

    I.     THE ANONYMOUS JURY AND SECRET JURY SELECTION PROCEEDINGS     22

    II.     JUDICIAL INTERVENTION AT TRIAL DENIED OR COMPROMISED MR. ULBRICHT'S RIGHT TO THE PRESUMPTION OF INNOCENCE, RIGHT TO A FAIR TRIAL, AND HIS RIGHT TO HAVE HIS CASE PRESIDED OVER BY A FAIR AND IMPARTIAL JUDGE     27

    III.     SENTENCING BASED ON IMPROPER CONSIDERATIONS     28

IV.   RESPONSES TO POST-CONVICTION
MOTIONS DEMONSTRATE TRIAL COURT UNABLE
TO RENDER FAIR JUDGMENT         29

CONCLUSION         30

CERTIFICATE OF SERVICE         31

EXHIBITS         32

# TABLE OF AUTHORITIES

## Cases

*In Re Application of The Herald Co.*, 734 F.2d 93 (2nd Cir. 1984)  25

*Estelle v. Williams*, 425 U.S. 501  (1976)  23

*Estes v. Texas*, 381 U.S. 532 (1965)  24

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)  26

*In re Oliver*, 333 U.S. 257 (1948)  24, 26

*Kerr. v. United States District Court*, 426 U.S. 394 (1976)  21

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847  (1988)  21, 22

*Liteky v. United States*, 510 U.S. 540 (1994)  21, 22

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)  26

*Nichols v. Alley, United States of America, Real Party in Interest,*
   71 F.3d 1347 (10th Cir. 1995)  21

*Presley v. Georgia*, 558 U.S. 209 (2010)  25, 26

*Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*,
   464 U.S. 501 (1984)  25, 26

*Starr v. United States*, 153 U.S. 614 (1894)  27

*Thornhill v. Alabama*,310 U.S. 88 (1940)  28

*United States v. Cooley*, 1 F.3d 985 (10th Cir.1993)  21

*United States v. Marzano*,149 F.2d 923 (2d Cr. 1945)  27

iv

*United States v. Norris*, 873 F.2d 1519 (D.C.Cir. 1989)    27

*United States v. Paccione*, 949 F.2d 1183 (2d Cir. 1991)    23

*U.S. v. Thomas*, 757 F.2d 1359 (2nd Cir.1985)    23

*Waller v. Georgia*, 467 U.S. 39 (1984)    26

**Statutes**

28 U.S.C. § 455(a)    21, 29

28 U.S.C.  § 2106

    29

**RELIEF SOUGHT**

Petitioner Ross Ulbricht, by and through his counsel, petitions this Court for a writ of mandamus under 28 U.S.C. §1651(a) and Federal Rule of Appellate Procedure 21, and pursuant to 28 U.S.C. §2106, ordering that Mr. Ulbricht's convictions be vacated and directing the District Court for the Southern District of New York to recuse itself from further proceedings in *United States v. Ulbricht*, 14 Cr 68 (KBF).

**ISSUES PRESENTED**

1.  Whether the trial court appeared to favor the government and interfered with Mr. Ulbricht's rights to due process and a fair trial when the court: empaneled an anonymous jury without request and without a public announcement; when the court intervened at trial in order to help the government present its evidence more clearly to the jury; and when the court displayed concern about, and hostility towards, Mr. Ulbricht's political views during the sentencing hearing.

2.  Whether the district court displayed bias against Mr. Ulbricht when it acted quickly and summarily in simultaneously denying three recent requests for relief: the Motion for Recusal, the unopposed Request for Extension of Time to Submit Rule 33 Motion, and the Request for Partial Unsealing of

1

Three Magistrate's Files.

3.    Whether the district court displayed bias against Mr. Ulbricht and denied

Mr. Ulbricht his right to due process when it used the denial of his request

for an extension of time to submit his Rule 33 Motion, as justification for

denying his request to access three sealed magistrate's files, when those

three files should contain newly discovered evidence wrongly withheld by

the government prior to trial.  The district court stated that the issue of

whether newly discovered evidence in the magistrate's files could help Mr.

Ulbricht is now moot since the court had just denied his request to extend

the deadline for filing his Rule 33 motion.

4.    Whether the district court displayed bias against Mr. Ulbricht when it

accused him of misstating the record in his Motion for Recusal; when the

court then denied Mr. Ulbricht's request to make public some of the

relevant documents on which he had relied in his Motion for Recusal, a

request made to allow the public to determine whether the record supported

Mr. Ulbricht's Motion for Recusal; and when the court denied that the jury

in this case was anonymous, in direct contradiction to what the record

shows - *i.e.*, the transcript of voir dire shows that the jurors were identified

by their juror numbers and seat numbers, but not by their names.

2

5.     Whether the district court displayed bias against Mr. Ulbricht when it responded to his request for an order authorizing the Clerk to provide him with copies of all documents filed under seal in his case (documents which supposedly had been provided to his trial counsel during trial proceedings), by first telling Mr. Ulbricht he should consult with the United States Attorney to identify which documents he wanted, and next by denying Mr. Ulbricht's request to receive copies of records maintained by the Clerk because trial counsel (who is now conflicted because he is aware he is facing a future claim of ineffective assistance of counsel) intervened in the discussion and assured the court that he had provided all the sealed documents to Mr. Ulbricht's new attorney.

## STATEMENT OF FACTS

## I.     MOTION FOR RECUSAL

Mr. Ulbricht filed his Motion for Recusal in the district court, citing three instances where the court had appeared to (1) favor the government, (2) engage in secret proceedings that denied Mr. Ulbricht a fair trial, or (3) display bias against Mr. Ulbricht because of his political philosophy.  Exhibit A, Doc. 301 (2/5/2018) (Memorandum of Law in Support of Motion for Recusal), Doc. 302 (Declaration of Paul Grant in Support of Motion for Recusal), Doc. 303 (Declaration of Ross

3

Ulbricht Re Non-Waiver of Rights).

A.  The Anonymous Jury

The first issue Mr. Ulbricht raised in pointing out actions of the district

court which would cause a reasonable person to doubt the impartiality of the court,

was the court's unannounced decision to empanel an anonymous jury, the secret

implementation of that plan, and out-of-court, hidden jury selection proceedings.

A prospective jury panel of 183 persons was called into the courthouse the

week before trial and the trial court or her surrogates (not the jury administrator)

presented those prospective jurors with a jury questionnaire. Exhibit A, Doc. 301

(Memorandum of Law), at 2 - 4; Doc. 302, Declaration of Paul Grant at 2; Doc.

302-1, -2 (Juror Questionnaire Exhibits).  Out of 183 prospective jurors, only three

wrote their names on the form.  *Id*. The questionnaire required jurors to provide

their full names on Page 1, but 180 out of 183 prospective obviously understood

they had been instructed not to provide their names. *Id*.

The transcript of the jury voir dire proceedings reveals that trial jurors were

only referred to in court by their juror numbers or by the number of their juror

seat.  Exhibit Y, Transcript of Voir Dire (document is not yet available on the

public docket).  At the end of the trial, the jurors were instructed by the trial court

that they need not give anyone their names.  Exhibit A, Doc. 302 (Declaration of

4

Paul Grant) at 2.  Exhibit Z, Trial Excerpts at 2338 - 2339.

Although the transcript shows the jurors were not identified by name in open court, and the juror questionnaires show the prospective jurors must have been told not to write their names on the forms, the trial court has recently stated, in contradiction to the record, that "the jury in this case was not "anonymous." Exhibit C, Doc. 314 (2/13/2018 Order).

Page 1 of the juror questionnaire advised the prospective jurors in bold type that the information they provided on the questionnaire would remain confidential and under seal. Exhibit A, Doc. 301 at 2. After the jurors filled out the forms, the forms were apparently provided to the court and to counsel for each party.  Exhibit I, Doc. 318 (Petition for Rehearing Re Denial of Motion for Recusal) at 8. Counsel for the parties reviewed the answers on the questionnaires out-of-court and out of the presence of Mr. Ulbricht, and counsel for the parties jointly agreed to recommend that 59 of the prospective jurors be struck from the panel. Exhibit I, referring to Exhibit X, Doc. 144. Their proposed 59 strikes were submitted to and accepted by the trial court, who then added 33 more strikes of her own.  *Id.*  None of the 92 strikes were explained.  Thus, 92 out of the 183 jurors on the prospective juror panel were struck in out-of-court proceedings.

Mr. Ulbricht was not present for those proceedings but he did not waive his

5

right to be present.  Exhibit B, Doc. 303, Declaration of Ross Ulbricht Re Non-Waiver of Rights.

The jurors' names were not provided, even on the sealed questionnaires; their names were not mentioned in court.  At the end of the trial the jurors were told that they would not have to reveal their names. That was an anonymous jury.

The court denied the Motion for Recusal as "frivolous," describing the Motion as containing many "misstatements of the record," without identifying any. Exhibit D, Doc. 310 (denied on 2/5/2018, the same day the Motion was filed).  In response, Mr. Ulbricht asked the court to add the jury selection documents to the docket, so the public could decide if he had misstated the record in his Motion. Exhibit E, Doc. 313.

There is no record as to what explanation was provided, if any, to the jurors for the anonymous jury proceeding.  There is no record as to what explanation was provided to the jurors, if any, as to why they should not write their names on questionnaires which were always going to remain confidential and under seal. Mr. Ulbricht requested that any record of the administration of the juror questionnaires be added to the docket.  Exhibit E, Doc. 313 at 4.

In response to Mr. Ulbricht's request that the jury selection documents - the transcript of the voir dire, copies of the juror questionnaires, and any record of the

juror questionnaire proceedings - be added to the public docket, the court agreed to add the transcript of the jury voir dire, refused to add the juror questionnaires to the docket, and declined to answer whether there is a record of the juror questionnaire proceeding.  The court then also refused to add to the docket the record of the juror questionnaire proceeding.  Exhibit C, Doc. 314 (Order).

The district court volunteered, in its response to the request to add these items to the docket: "to dispel a misconception, the jury in this case was not anonymous.  Counsel of record always had access to the names and addresses of the full venire panel."  Exhibit C, Doc. 314.

B. The Trial Court Vouched For The Strength Of The Government's Case

During voir dire proceedings, the trial court advised the jurors that *"all of the evidence that you are going to need to render a verdict will be evidence received into evidence at this trial."* Exhibit Y, Transcript of Voir Dire at 17.  This statement suggested to the jury that the court knew what the evidence would be and believed the evidence would be strong enough to support jury verdicts - of guilty, since not guilty verdicts require no evidentiary support.

A reasonable person could view this statement from the court as a display of bias in favor of the government, as it deprived Mr. Ulbricht of the presumption of innocence and of his argument that the government would fail, and did fail, to

7

prove its case.

On Day 2 of the trial, the court intervened to help the prosecutor keep the court's promise that the jurors would receive the evidence they needed, when it advised the prosecutor that his first witness had described the Tor browser in a way that was just "mumbo jumbo to most people on the jury right now. . . [I]n terms of clarity, I do think clarity of the evidence is important here. The jury I do think needs to understand things. I wanted to give you a sense that there still is room for clarity." Exhibit G, Excerpts of Trial Transcript at 127.

The prosecutor accepted the court's advice and went back over its explanation of the Tor browser so that the jury would have a clearer picture. When a judge offers advice to the government intended to improve the clarity and the effectiveness of the prosecutor's presentation, a reasonable person could view those actions as favoring the prosecution.

In denying the Motion for Recusal, the court did not address this issue.

C.    The Trial Court apparently sentenced Mr. Ulbricht, at least in part, based on its hostility towards Mr. Ulbricht's political philosophy

When addressing Mr. Ulbricht at sentencing, the court displayed strong disapproval of political and philosophical views that were expressed in anonymous Silk Road posts, posts which the court clearly attributed to Mr.

8

Ulbricht. The court said, "there are posts which discuss the laws as the oppressor and that each transaction is a victory over the oppressor. This is deeply troubling and terribly misguided and also very dangerous." Exhibit H (Sentencing Tr. At 70). Before pronouncing Mr. Ulbricht's sentence, the court again mentioned his philosophy: *". . . the reasons that you started Silk Road were philosophical and I don't know that it is a philosophy left behind."* Exhibit H (Sentencing Tr. At 88). The court's statements provided the appearance that the court imposed the harshest penalty the law allowed, *i.e.*, a sentence to life imprisonment, at least in part because it condemned Mr. Ulbricht's philosophy.

The court denied Mr. Ulbricht's Motion for Recusal without addressing any of the issues raised. *See* Exhibit D, Doc. 310 (2/5/2018). The court also quickly denied his 11-page petition (Exhibit I, Doc. 318, 2/20/2018) to reconsider that denial, with no comment. Exhibit V, Doc. 320 (2/21/2018).

In its Order denying the Motion for Recusal, the court did not deny that the jury was anonymous (that denial came later), nor that the jurors were identified by number only during in-court voir dire, nor that the sworn panel was instructed at the conclusion of the trial that they would not have to reveal their names; nor that 180 out of 183 prospective jurors chose not to provide their names despite the fact that the questionnaire called for them to do so; nor that the trial court administered

9

the juror questionnaire proceedings; nor that the court did not announce that an anonymous jury was being empaneled; nor that counsel for the parties and the court struck 92 out of 183 jurors from the prospective jury pool, in out-of-court proceedings, without the presence of Mr. Ulbricht and without providing any on-the-record explanation for any of those 92 strikes. *See* Exhibit V. Doc. 320.

The court's secret empaneling of an anonymous jury, later denial of that fact, use of sealed juror questionnaires, and resorting to out-of-court, off-the-record, jury de-selection procedures, provide the appearance that the court preferred secret, rather than public, jury selection proceedings. Those actions will undermine public confidence in the integrity of the judiciary.

## II. REQUEST TO EXTEND TIME TO SUBMIT RULE 33 MOTION

The court promptly denied Mr. Ulbricht's unopposed Request for Extension of Time to Submit Rule 33 Motion. See Exhibit J (Doc. 307, Request for Extension of Time, 2/5 2018); Exhibit K, (Doc. 309, Order denying Request, 2/5/2018). The Order denying the request stated that a Rule 33 motion is not an opportunity to relitigate what has been litigated. However, that is not true as a Rule 33 motion seeks to use new evidence to establish the need for a new trial to relitigate the questions as to whether the government can prove the defendant guilty of any or all of the offences with which he was charged. Mr. Ulbricht's

10

motion pointed to new evidence from three sources: never-before produced

discovery of FBI-collected pen register and trap and trace ("PRTT") data, which

has just been located (February 2, 2018) by the United States Attorney; never-

before disclosed FBI-collected PRTT data which should be located in three sealed

magistrate's files; and new evidence from the recently (2017) published book

*American Kingpin* that the FBI used previously undisclosed electronic

surveillance to monitor and track Mr. Ulbricht's movements, actions and location

within his residence.  Exhibit J, Doc. 307 at 2; at 3-4; at 4-5. The Order denying

the extension of time prevented Mr. Ulbricht from evaluating or investigating or

using any of this newly discovered evidence or newly located data.

The court said it was irrelevant to the request for extension of time that

post-conviction counsel has not yet been able to obtain the complete client file

from trial counsel (after eight months of trying), because trial counsel knew what

was in the file.  Exhibit K, Doc. 309.  This implied that trial counsel had

determined that Mr. Ulbricht had nothing to present in a Rule 33 Motion. As the

trial court undoubtedly understood, post-conviction counsel was retained for the

purpose of exploring post-conviction relief for Mr. Ulbricht.  Current counsel is

researching whether there are grounds to support the granting of a new trial,

including whether there are grounds to show that Mr. Ulbricht is a good man who

11

was denied a fair trial and effective assistance of counsel; to show that he was wrongly convicted of crimes he did not commit; to show that he was wrongly convicted of acts which are not crimes; and to show that he was sentenced based on inappropriate considerations.

The trial court surely understood that the opinion of prior counsel whether Mr. Ulbricht had new evidence to support a Rule 33 Motion, was of no relevance to current proceedings, yet the court's order indicates the court did consider the inaction of prior counsel as a basis for the court's denial of present counsel's request for an extension of time.

In its Order denying the requested extension, the court ignored evidence that Mr. Ulbricht had terminated prior counsel eight months earlier and that prior counsel had refused to provide the complete client file to present counsel. Exhibit L, Doc. 308 (Declaration of Paul Grant in Support of Request for Extension of Time to Submit Rule 33 Motion).

The court did not address the fact that Mr. Ulbricht pointed out in his request for extension, that the FBI-collected PRTT data being now being obtained from the government, had been requested but not provided during pre-trial proceedings, when the government said it had provided all relevant and material PRTT data. See Exhibit J, Doc. 307 at 3-4. The court overlooked this discovery

12

violation.

The court also overlooked that Mr. Ulbricht showed that the government had relied upon the undisclosed FBI-collected PRTT data in the affidavits used to obtain two important search warrants: the laptop search warrant and the search warrant for the search of Mr. Ulbricht's residence. See Exhibit J, Doc. 307 at 2. The government cited PRTT data it never disclosed to the defense as factual material on which the affidavits were based in applying for the laptop and residence search warrants. Evidence seized pursuant to those warrants was heavily relied upon by the government at trial.

The previously undisclosed PRTT data, which Mr. Ulbricht now seeks from three sealed magistrate's files and from new material just located by the United States Attorney, is newly discovered and material evidence that should have been disclosed prior to trial. Mr. Ulbricht showed in his Request for Extension, that the evidence he has recently identified and located, is important and relevant to issues involving the validity of the search warrants. But for the government's failure to disclose that evidence pre-trial, and for trial counsel's abandonment of Mr. Ulbricht, he may not have needed to request an extension of time. He may not even have been convicted.

The trial court ignored the good cause provided for the extension, ignored

13

that trial counsel had abandoned Mr. Ulbricht at least eight months before the
deadline for the Rule 33 Motion, and ignored the importance and the nature of the
newly discovered evidence. In its order denying the extension, the trial court
referred to Tr. at 319 in support of its statement that it was known at trial (thus not
new evidence) that the FBI was monitoring Mr. Ulbricht's online "movements."
Exhibit K, Doc. 309. The testimony the court referred to does not relate to the
point Ulbricht raised in his request for extension of time. The testimony referred
to described the unsuccessful efforts of the government's undercover agent to
correlate online activities of DPR (a/k/a Dread Pirate Roberts, the digital persona
running the Silk Road), with the real life activities of Mr. Ulbricht, to establish
that Ulbricht was DPR. Exhibit G, Transcript Excerpts at 317-319. That
testimony did not deal with FBI surveillance efforts to monitor and track Mr.
Ulbricht's physical movements, actions and location within his residence, which is
what Mr. Ulbricht raised as new evidence in his Request for Extension of Time.
Exhibit J. Doc. 307 at 4-5.

The trial court hastily and summarily denied without comment (Exhibit M,
Doc. 319, 2/21/2018) Mr. Ulbricht's detailed motion to reconsider the denial, in
which Mr. Ulbricht pointed out the misunderstandings reflected in the court's
order denying the extension of time. Exhibit N, Doc. 316 (Petition for Rehearing

14

Re Denial of Request for Extension of Time, 2/16/2018), Exhibit N-1, Doc. 316-1

(Declaration of Paul Grant In Support of Petition for Rehearing Re Request for

Extension).  The trial court's quick and summary denials of the requested

extension of time and of the petition for rehearing show the court's lack of

concern with Mr. Ulbricht's right to pursue post-conviction relief.

The court's Order denying rehearing did not mention any issue, displaying a

complete lack of interest in the facts raised, the legal arguments presented, and in

Mr. Ulbricht's right to pursue Rule 33 relief.  See Exhibit M, Doc. 319.

The trial court's hasty and unreasoned denial of Mr. Ulbricht's unopposed

request for extension of the Rule 33 deadline, in spite of considerable good cause

shown for that extension, and the court's clearly displayed lack of interest in the

facts and legal argument presented in the request for extension and in the petition

for rehearing, provide a clear indication that the court is not likely to fairly

consider any post-conviction request for relief by Mr. Ulbricht.  Mr. Ulbricht

requests a replacement judge who will treat his submissions with due respect for

his rights to fair proceedings.


## III.    MOTION FOR PARTIAL UNSEALING OF MAGISTRATES'
##         RECORDS

Mr. Ulbricht recently submitted his Request to Partially Unseal and Make Available to Counsel and Defendant Three Magistrate's Files. Exhibit O, Doc. 305, 2/5/2018. The Pen Trap Statute required the FBI to provide in the sealed files *a record which will identify (i) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network; (ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information; (iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and (iv) any information which has been collected by the device.* 18 U.S.C. § 3123. *See* Exhibit O, Doc. 305 at 4.

Mr. Ulbricht explained that the PRTT data allegedly collected had been relied upon to obtain the laptop search warrant. Exhibit O, Doc. 305 at 2-3. The PRTT data collected pursuant to the three sealed magistrate's orders was requested from the government but not produced prior to trial, and would be newly discovered evidence if it is now produced. Despite the showing Mr. Ulbricht made as to how vital this information could be to support a Rule 33 Motion, and despite the showing that this pen register and trap and trace data should have been provided in response to defense discovery requests before trial, the trial court

16

denied the request to view the three magistrate's sealed files, saying that the request is now moot because the court had just denied the request for extension of time to file the Rule 33 Motion: "In Light of the Court's order on the Rule 33 motion . . . this is DENIED as moot." Exhibit P, Doc. 311 (2/5/2018). Both requests were denied on February 5, 2018, the same day they were filed.

The trial court's actions show a lack of interest in the important issues raised in Mr. Ulbricht's requests to be allowed to pursue Rule 33 relief and show the court's disdain for Mr. Ulbricht's rights to pursue post-conviction relief.

## IV.    MOTION TO ADD DOCUMENTS TO PUBLIC DOCKET

Mr. Ulbricht followed the denial of his Motion for Recusal (in which the court accused him of misstating the record) with a Request to Add Jury Selection Documents and Records to the Public Docket. Exhibit E, Doc. 313 (2/12/2018). He asked that certain records be added to the public docket because he has a right to a public trial with a public record, and so that members of the public could determine for themselves what was in the record. *Id.*

The court responded by agreeing to place the transcript of the jury voir dire on the docket, by refusing to place the juror questionnaires on the docket, by not answering whether there was any record of the juror questionnaire proceedings, and by refusing to add the record of the juror questionnaire proceedings to the

17

docket.  Exhibit C. Doc. 314 (2/13/2018).

The court stated in its order that this was not an anonymous jury, even though the transcript of the jury voir dire shows that it was.  *Id*.  The court maintained the secrecy of the juror questionnaires, despite their anonymity (no juror name written on 180 out of 183 questionnaires, and the three others could have been redacted), without any finding of a necessity for secrecy.  *See Id.*  The preference for continued secrecy and the court's denial of what the record clearly shows, would cause a reasonable person to question the impartiality of the court.

## V.     MOTION TO ACCESS COURT RECORDS

In order to ensure that he has all court records in this case, Mr. Ulbricht recently submitted his request for access to certain sealed documents.  Exhibit Q, Doc. 321 (Request for Access to Sealed Filings (2/26/2018) and the Order (2/27/2018) responding to the request).  Mr. Ulbricht requested an order authorizing the Clerk of the Court to provide copies of the sealed documents to his current counsel.  All of the sealed documents requested should have been provided to both parties during the course of trial proceedings but because of his duties to independently investigate this case for Mr. Ulbricht, current counsel for Mr. Ulbricht needs to confirm that he has copies of all of the sealed documents that are in the records of the Clerk of the Court.

The court responded by telling Mr. Ulbricht to work with the government to identify any sealed documents he wanted copies of. *Id*. The court's response made it clear the court had a problem authorizing the Clerk to provide to counsel for Mr. Ulbricht the sealed documents from the official court record of this case. The court has not yet explained what that problem is.

A day after the court's first order, trial counsel intervened in the discussion and, in an unsworn statement, informed the court that he had provided present counsel with all of the sealed documents filed in the case. Exhibit R, Doc. 322 (2/27/2018). In reliance on that gratuitous intervention by long-terminated trial counsel, counsel who abandoned Mr. Ulbricht on or before May 31, 2017, the court then denied Mr. Ulbricht's request to obtain copies from the Clerk of the documents filed under seal in his case. Exhibit S, Doc. 323 (2/28/2018).

The court's denial makes it clear that the court has no intention of providing Mr. Ulbricht with copies of documents in his court file. The court has once again provided no explanation for its ruling. In this instance, the court has not explained why it is okay for the defendant to have sealed documents that may have been provided by prior counsel, but why the defendant should be barred from obtaining official copies from the Clerk of the Court, who can actually verify which sealed documents are in the court files. The court's order barring Mr. Ulbricht from

19

access to his own court files provides the appearance that the court does not want

Mr. Ulbricht to know what is contained in the sealed document records of the

Clerk of the Court.

Mr. Ulbricht has asked the court to reconsider this unexplained denial of

access to court records, advising the court that Mr. Ulbricht would not accept any

representation from the government, or from trial counsel (who has abandoned his

client, refused to provide Mr. Ulbricht with his complete client file, and knows

that he is the target of a potential claim of ineffective assistance of counsel), as to

what records are contained in the official records of the Clerk of the Court.

Exhibit T, Doc. 324 (Request to Reconsider Denial of Request for Access to

Sealed Court Records, 3/5/2018).

The court responded to Mr. Ulbricht's request for reconsideration, by asking

the government if they know any reason why his request for access to his court

records should not be granted.  Exhibit U, Doc. 325 (Order, 3/5/2018).  The court

did not state a reason when it denied Mr. Ulbricht's request to obtain copies of

court files from his own case.  Now the court seeks a reason from the government.


It is apparent from the trial court's hasty, dismissive and obstructive

responses to everything filed by Ulbricht since February 5, 2018, that it will

obstruct any effort by Mr. Ulbricht to pursue or obtain post-conviction relief.

**REASONS WHY THE WRIT SHOULD ISSUE**

An order denying a motion to recuse is interlocutory and is not immediately appealable.  *See Nichols v. Alley*, 71 F.3d 1347, 1350 (10th Cir. 1995).  Mr. Ulbricht's only remedy is a writ of mandamus.

Section 455(a) requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a).  The purpose of this provision is "to promote public confidence in the integrity of the judicial process . . . ." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988).  It is designed to not only eliminate actual bias or prejudice but also to eliminate the appearance of bias or prejudice. *Liteky v. United States*, 510 U.S. 540, 548 (1994).  The test is an objective one and in applying that standard, the inquiry must start with whether there is a factual basis for questioning the judge's impartiality.  *See United States v. Cooley*, 1 F.3d 985, 993 (10th Cir.1993).

When a judge's impartiality can reasonably be questioned, public respect for the judiciary demands recusal.  *See Id*.  "The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr. v. United States District Court*, 426 U.S. 394, 402 (1976).

Whenever a question is raised involving disqualification of a judge, it is

critical to examine all possible bases for the judge's disqualification.  *See Liljeberg, supra*, at 868.  The ultimate inquiry is whether circumstances satisfy section 455(a), *i.e.*, create *an objectively reasonable basis for questioning a judge's impartiality*. *Liteky, supra*, at 555 (emphasis added).

As shown above, the trial court's actions pre-trial, during trial, during sentencing, and continuing through post-sentencing proceedings, clearly display the court's inability to render fair judgment.  Mr. Ulbricht has established an objectively reasonable basis for questioning the judge's impartiality.  Mr. Ulbricht cannot exercise any of his rights if his efforts are opposed by the court.  A writ of mandamus is the only remedy available to Mr. Ulbricht.

The Anonymous Jury and Secret Jury Selection Proceedings

The record shows that the court secretly empaneled an anonymous jury, apparently without taking any measures to minimize the prejudicial effect that might have on Mr. Ulbricht.  Exhibit A, Doc. 301, 302, 302-1, 302-2; Exhibit Y, Transcript of Voir Dire; Exhibit E, Doc. 313.

"A district court may order the empaneling of an anonymous jury upon (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *U.S. v. Thomas*, 757 F.2d

22

1359, 1365 (2nd Cir.1985). "The impanelling of an anonymous jury . . . and its impact on the presumption of innocence must receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense." *Id.*, at 1363, *citing Estelle v. Williams*, 425 U.S. 501, 504 (1976). The trial court made no findings, took no precautions and made no effort to protect Mr. Ulbricht's fundamental rights.

If an anonymous jury is determined to be required, a defendant's fundamental rights must be protected by "t[aking] care to give the jurors a plausible and non-prejudicial reason for not disclosing their identities. . . " *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). No reason was provided to Mr. Ulbricht's jury.

The Court's order denying Mr. Ulbricht's request to make the juror questionnaires public, pointed to the promise on the form that the information provided would be kept confidential and under seal. See Exhibit C, Doc. 314. The Court's order did not address the case law that shows the law favors public court proceedings, not secret ones: "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *In re Oliver*, 333 U.S. 257, 270 (1948).

A public jury selection process, with jurors identified, encourages honest

23

responses, discourages perjury from jurors, and protects the defendant's right to the presumption of innocence. "The public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring). When the court (or the court's surrogate) told prospective jurors not to write their names on their questionnaires and told them that anything they wrote on their questionnaires would be kept confidential and under seal, and when in voir dire the court and the courtroom deputy referred to jurors only by their juror numbers and juror seat numbers, the court conveyed to the jurors that their identities were secret and that they would not be held accountable to the public for what they said. This treatment may also have sent the message that Mr. Ulbricht was a threat to them.

The court stated (Exhibit C, Doc. 314) that the parties did not object to sealing the juror questionnaires but overlooked Mr. Ulbricht's declaration, in which he stated that he never waived his right to a public trial; didn't waive his right to be present at all critical stages of his trial proceedings; and never authorized his lawyer to waive any of his fair trial rights. Exhibit B, Doc. 303 (Declaration of Ross Ulbricht Re Non-Waiver of Rights). Mr. Ulbricht did not

24

waive his rights to object to secret or sealed or unrecorded jury proceedings. *Id.*

The court's order refusing to add the juror questionnaires to the public docket provided no explanation as to why the questionnaires could not be redacted if they contained sensitive personal information.  *See Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*, 464 U.S. 501, 505 (1984).  The court apparently presumed that continued secrecy is a value that should be maintained.

When the court decides to seal a record of proceedings in a criminal case, "the judge must articulate on the public or sealed record a sufficiently detailed basis for his serious concern about public dissemination risks . . . and his preference for [sealing] over alternative remedies."  *In Re Application of The Herald Co.*, 734 F.2d 93 (2nd Cir. 1984) (dealing with the First Amendment right of access to court proceedings).  The court has not justified sealing the juror questionnaires.

A criminal defendant's Sixth Amendment right to an open jury selection process is . . . as extensive as the public's right of access under the First Amendment. *Presley v. Georgia*, 558 U.S. 209, 212 (2010). In any case where closed jury selection proceedings are utilized, the court must make findings adequate to support the closure. *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

The secret jury proceedings described above "can only breed ignorance and

25

distrust of courts and suspicion concerning the competence and impartiality of judges." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring). The guarantee that a trial will be conducted in public view, without secret proceedings, is "a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver, supra*, at 268-270. Conversely, hiding jury proceedings or records of jury proceedings, including juror questionnaires, provides the opportunity to use the courts as instruments of persecution. Guaranteeing public access to records of judicial proceedings is an effective restraint on abuse of judicial power. *See Id.*, at 270.

Secret judicial proceedings are a "menace to liberty . . . justice cannot survive behind walls of silence." *Gannett Co. v. DePasquale*, 443 U.S. 368, 412 (1979) (Blackmun, J., concurring in part and dissenting in part). Jury selection proceedings are presumptively public. *See Press-Enterprise I* at 505. That is a right of the public and of the defendant. *Presley v. Georgia, supra*, 558 U.S. at 212.

The court's recent efforts to maintain the secrecy of the jury questionnaire proceedings, and the court's denial that the jury was anonymous, call into question the impartiality of the court. A fair and impartial judge should be expected to protect the defendant's right to a public trial, and should not be expected to invent

26

ways to circumvent the public jury selection processes which are guaranteed by the First and Sixth Amendments.

<u>Judicial Intervention Which Bolstered The Government's Case.</u>

When addressing the jury, the court must avoid any appearance of partiality, to avoid violating the rule that "prosecution and judgment are two quite separate functions in the administration of justice; they must not merge." *United States v. Norris*, 873 F.2d 1519, 1527 (D.C.Cir. 1989) (*quoting United States v. Marzano*, 149 F.2d 923, 926 (2d Cr. 1945). Each judicial intervention raises the possibility that the jury will perceive the court as favoring one party over the other. *See Starr v. United States*, 153 U.S.614, 626 (1894) ("It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling"). The trial court presented the appearance of partiality when its words effectively vouched for the sufficiency of the government's evidence at the very beginning of the trial, when instructing the jury about their role in the case and in advising them of what was to come. Exhibit A, Doc. 301, Doc. 302. This action compromised Mr. Ulbricht's right to a fair trial.

The trial court did not leave room for doubt that it meant what it had said, that the jury would receive all the evidence needed to convict, when on Day 2 of

the trial, the court intervened in order to help the government present its evidence more clearly. Exhibit G, Excerpts from Trial Transcript at 126 -127.  The court advised the prosecuting attorney that its first witness had described the Tor browser in a way that was just "mumbo jumbo to most people on the jury right now. . . [I]n terms of clarity, I do think clarity of the evidence is important here. The jury I do think needs to understand things. I wanted to give you a sense that there still is room for clarity." *Id*.

Sentencing Based On Improper Considerations

The district court said during sentencing that "there are posts which discuss the laws as the oppressor and that each transaction is a victory over the oppressor. This is deeply troubling and terribly misguided and also very dangerous." See Exhibit H, Sentencing Transcript Excerpts at 71.  The trial court should not have concerned itself with Mr. Ulbricht's philosophy, in determining his sentence. The right to free speech embraces the liberty to discuss matters of public concern without . . . fear of subsequent punishment. *Thornhill v. Alabama*, 310 U.S. 88, 101-102 (1940).

The court's expressed concern about Mr. Ulbricht's political views, combined with the imposition of the harshest penalty the law allowed, gives the appearance that the sentence may well have been imposed to punish Mr. Ulbricht

28

for what the court viewed as his dangerous views and to prevent his views from being expressed or followed. The sentencing transcript would cause a reasonable person to question the court's impartiality.

Trial Court Responses To Post-Conviction Motions

The court's arbitrary denial of Mr. Ulbricht's request to get copies from the Clerk of the Court of the sealed documents filed in his case, provides the appearance that the court does not want Mr. Ulbricht to know what is in the official court records and that the court will deny any reasonable request from Mr. Ulbricht without any serious consideration of his rights.

The district court's responses to each of Mr. Ulbricht's recent post-conviction motions provide the appearance that the court is committed to maintaining Mr. Ulbricht's convictions against any challenge. The court's responses also display that the court has a clear inability to render fair judgment.

Mr. Ulbricht cannot exercise any of his rights if he is opposed by the court. A writ of mandamus is the only remedy available to Mr. Ulbricht. Pursuant to 28 U.S.C. §2106 and 28 U.S.C. §455(a), Mr. Ulbricht requests the remedies that are appropriate and fair and just under the circumstances: an order vacating the convictions below and ordering that the district court recuse herself from further proceedings in this case. The trial court's actions throughout this case show that

29

Mr. Ulbricht's trial was fundamentally unfair in that he has been and continues to be denied his fundamental rights, including the right to have his trial and post-trial proceedings presided over by a fair and impartial judge.

## CONCLUSION

Public respect for the judiciary and for justice and for the appearance of justice, require that the trial court be recused from all further proceedings, and require such further relief as this Court finds consistent with the interests of justice and with protection of Mr. Ulbricht's fundamental rights. Given the pervasive and continued conduct of the court that has provided the strong appearance of partiality throughout all proceedings in this case, the most appropriate remedies consistent with justice under the circumstances, will be for the court to vacate Mr. Ulbricht's convictions and remand the case to a different judge.

Dated: Parker, Colorado

March 7, 2018

/s/ Paul Grant
Paul Grant
Counsel for Petitioner, Ross Ulbricht

## CERTIFICATE OF SERVICE

I hereby certify that I have this seventh day of March, 2018, electronically filed the Petition for Writ of Mandamus of Mr. Ulbricht using the Court's ECF system, and I have also provided electronic or FedEx notice of this filing to the following:

Eun Young Choi
United States Attorney's Office
SDNY
One St. Andrew's Plaza
New York, NY 10007
eun.young.choi@usdoj.gov

Hon. Kathleen B. Forrest
United States District Court Judge
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007
(Via FedEx)

/s/  Paul Grant
Paul Grant
Counsel for Petitioner, Ross Ulbricht
Law Office of Paul Grant

EXHIBITS

|  | PDF Page # |
|---|---|
| Exhibit A | 40 |
| Exhibit B | 59 |
| Exhibit C | 62 |
| Exhibit D | 64 |
| Exhibit E | 65 |
| Exhibit G | 69 |
| Exhibit H | 71 |
| Exhibit I | 74 |
| Exhibit J | 85 |
| Exhibit K | 91 |
| Exhibit L | 97 |
| Exhibit M | 103 |
| Exhibit N | 104 |
| Exhibit O | 115 |
| Exhibit P | 122 |
| Exhibit Q | 123 |
| Exhibit R | 124 |

Exhibit S                                          125

Exhibit T                                          126

Exhibit U                                          129

Exhibit V                                          132

Exhibit X                                          133

Exhibit Y                                          135

Exhibit Z                                          340

EXHIBIT A, Doc. 301, Doc. 302, Doc. 302-1, Doc. 302-2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA,                                        14 Cr. 68 (KBF)

                          Plaintiff,                                        MEMORANDUM OF LAW
                                                                IN SUPPORT OF MOTION
                                                                FOR RECUSAL

                  -v-

ROSS WILLIAM ULBRICHT,

                      Defendant.

---------------------------------------------------X

On February 4, 2015, Defendant Ross Ulbricht was convicted by his jury of various offenses and he was subsequently sentenced by the court to life imprisonment. Mr. Ulbricht has appealed his convictions and sentence to the Second Circuit Court of Appeals, and his appeal has been denied. On December 22, 2017, Mr. Ulbricht submitted his petition for writ of certiorari to the Supreme Court, and his petition is currently pending.

There have been no proceedings in this court since Mr. Ulbricht was sentenced on May 29, 2015. Mr. Ulbricht now intends to pursue his right to file a Rule 33 Motion for New Trial Based on Newly Discovered Evidence, a motion which is due on or before February 5, 2018.

Mr. Ulbricht is entitled to have his Rule 33 Motion and all other proceedings in this case presided over by a fair and impartial judge. A judge "shall disqualify [herself] in a proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A judge must recuse herself in a proceeding in which the judge has a personal bias or prejudice concerning a

party. 28 U.S.C. § 455(b)(1).  The requirement that a judge recuse herself whenever her

impartiality might reasonably be questioned, is commonly linked to circumstances where the

alleged impartiality originates with an extrajudicial source.  *U.S. v. Carlton*, 534 F.3d 97, 100

(2nd Cir. 2008), citing *Liteky v. United States*, 510 U.S. 540, 544 (1994).  Extrajudicial sources,

although a common basis, are not the exclusive basis for establishing bias or prejudice. *Liteky v.*

*United States*, 510 U.S. 540, 551 (1994). "The goal of section 455(a) is to avoid even the

appearance of partiality."  *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860

(1988).

I.      **The trial court undermined the presumption of innocence and prejudiced the jurors**
**against the defendant by empaneling an anonymous jury.**

The trial court began the trial with an *in camera*, unsolicited, unexplained, and

unannounced decision to empanel an anonymous jury.  Declaration of Paul Grant, par. 5, 6, 7.

No one reviewing the transcripts of pre-trial proceedings or the court's docket could glean from

the record that the court had determined to, or had empaneled an anonymous jury.  Yet, the trial

transcript reveals that the jurors' names were never mentioned in trial proceedings and that the

jurors were advised at the conclusion of the trial that they would never need to reveal their names

to anyone.  Declaration of Paul Grant, par. 5.

The juror questionnaires administered to prospective jurors before the trial convened in

open court, reveal that the prospective jurors had been told prior to the trial not to provide their

names in the juror questionnaire.  This is apparent as only three of the 183 prospective jurors

filled in their names in the space provided. Declaration of Paul Grant, par. 4.  Someone obviously

instructed the prospective jurors not to write their names on the form.

2

During the first day of trial, after the anonymous jury had been empaneled, the trial court then concealed from the public and Mr. Ulbricht the fact that an anonymous jury had been empaneled. This was apparent when the trial court stated in open court that the presence of jury rights protesters and pamphleteers outside the courthouse might require the court to empanel an anonymous jury. Addressing defense counsel Joshua Dratel, the court stated: "I know, Mr. Dratel, you have objected and not wanted to have an anonymous jury. But if individuals are continuing, I don't really know if we've got much alternative." Tr. 1-13-2015 at 116.

It's not clear what the court was referring to, in mentioning defense counsel Dratel's "opposition" to an anonymous jury, for two reasons: (1) the court had just completed empaneling an anonymous jury without any objection from defense counsel, and (2) because undersigned counsel searched the public docket and the pre-trial hearing transcripts and found no indication in the record that the parties and trial court had ever addressed the possibility of empaneling an anonymous jury. Declaration of Paul Grant, par. 7. It may be that the trial court was threatening additional "anonymizing measures," measures that would have included having the jurors "brought out to a different place and brought in specially. I prefer for the defendant not to do that." Tr. 1-13-2015 at 102. "[W]e won't let it go any longer than that because it's a classic reason to allow for additional procedures." Tr. 1-13-2015 at 103.

What is clear is that neither the public nor Mr. Ulbricht had any idea that an anonymous jury had been empaneled. Mr. Ulbricht would have voiced his objection, had he been aware of the court's undisclosed action to empanel an anonymous jury, and had he been aware of the fact that he had been prejudiced by an erosion of the presumption of innocence. Declaration of Ross Ulbricht, par. 6, 7, 10, 11, 13, 14, 17.

"A district court may order the empaneling of an anonymous jury upon (a) concluding

that there is strong reason to believe the jury needs protection, and (b) taking reasonable

precautions to minimize any prejudicial effects on the defendant and to ensure that his

fundamental rights are protected."  The empaneling of an anonymous jury and its impact on the

presumption of innocence must receive close judicial scrutiny and be evaluated in

the light of reason, principle and common sense. *U.S. v. Thomas*, 757 F.2d 1359, 1363 (2nd Cir.

1985), *citing Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 1693 (1976). Where a trial

court examines the specific facts of the case, considers the arguments of counsel, determines the

jury needs protection, and gives the jury an intelligent, reasonable and believable explanation for

concealing the jurors' names that does not cast the defendant in an unfavorable light, *the*

*defendant's interest in avoiding erosion of the presumption innocence may be overcome.  Id.*, at

1364-1365.

If an anonymous jury is determined to be warranted, a defendant's fundamental rights

must be protected "by the court's conduct of a voir dire designed to uncover bias as to issues in

the cases and as to the defendant," and by "t[aking] care to give the jurors a plausible and

nonprejudicial reason for not disclosing their identities or for taking other security measures."

*United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991), cert. denied, --- U.S. ----, 112

S.Ct. 3029, 120 L.Ed.2d 900 (1992).

In this case, the court did not consider the arguments of counsel, did not on the record

examine the facts of the case, did not provide a reasoned basis for empaneling an anonymous

jury, and there is no record that the court ever provided to the jurors an intelligent, reasonable,

and believable explanation for concealing the jurors' names.  In fact, there is no record at all of

4

how the court made or implemented this decision. This decision appears to have been made privately, based on the trial court's own personal, undisclosed reasons. The decision implies the trial court considered Mr. Ulbricht to pose a threat to the jurors. The jurors may well have inferred that the trial court thought they needed protection from Mr. Ulbricht or from persons associated with him, thus prejudicing Mr. Ulbricht's right to a fair trial and eroding his right to the presumption of innocence.

Mr. Ulbricht did not waive his right to the presumption of innocence; he did not waive his right to have his case presided over by a fair and impartial judge; he did not waive his right to trial by a fair and impartial jury; he did not knowingly or intelligently waive any of his fair trial or due process rights; and he did not authorize or consent to his trial counsel waiving any of those rights on his behalf. Declaration of Ross Ulbricht, par. 2, 3, 4.

## II.    The trial court engaged in actions which would cause a reasonable person to doubt the impartiality of the court, when the court told the jury they would get all the evidence they needed to reach their verdict. The statement also compromised the presumption of innocence.

During the in-court voir dire process, the trial court intervened on behalf of the government by advising the jurors that *"all of the evidence that you are going to need to render a verdict will be evidence received into evidence at this trial."* Tr. 1-13-2015, Voir Dire at 17. This statement implied that the trial court had already previewed the government's evidence and determined that their evidence would be sufficient to prove the defendant guilty. How else could the court assure the jurors they were going to receive all the evidence they needed to reach their verdicts? The only verdict that requires evidentiary support, is a verdict of guilty.

5

There is only one party with the burden of proof at trial, and that is the government.
When the trial court told the jury they would receive all the evidence they needed, the trial court
vouched for the strength and sufficiency of the government's evidence.  The court certainly
wasn't talking about the evidence that Mr. Ulbricht might produce, because he had no obligation
to produce any evidence or prove his innocence.  A jury doesn't need any evidence to render a
verdict of acquittal.

A common trial strategy for the defense in many cases is to put on no evidence and argue
at the close of evidence that the government's evidence was insufficient to prove beyond a
reasonable doubt that the defendant committed the crime(s) charged.  The court's assurances to
the jury of the strength of the evidence, before any evidence was even introduced, deprived Mr.
Ulbricht of that argument and of the presumption of innocence and of his right to a fair trial.

When addressing the jury, as in all aspects of trial administration, the trial court must
avoid any appearance of partiality, to avoid running afoul of the maxim that "prosecution and
judgment are two quite separate functions in the administration of justice; they must not merge."
*United States v. Norris*, 873 F.2d 1519, 1527 (D.C.Cir. 1989) (*quoting United States v. Marzano*,
149 F.2d 923, 926 (2d Cr. 1945).  Each judicial intervention raises the possibility that the jury
will perceive the court as favoring one party over the other.  *See Starr v. United States*, 153 U.S.
614, 626 (1894) ("It is obvious that under any system of jury trials the influence of the trial judge
on the jury is necessarily and properly of great weight, and that his lightest word or intimation is
received with deference, and may prove controlling.")

The trial court presented the appearance of judicial bias when its words implied that the
court was vouching for the sufficiency of the government's evidence at the very beginning of the

6

trial, when instructing the jury about their role in the case and in advising them of what was to come, thus causing serious prejudice to Mr. Ulbricht's right to a fair trial.

The trial court didn't leave much room for doubt that it meant the jury really would receive all the evidence needed to convict, when on Day 2 of the trial, the court intervened in a manner that showed the intent of the court to help the government strengthen its presentation of evidence.

The court advised the prosecuting attorney that its first witness had described the Tor browser in a way that was just "mumbo jumbo to most people on the jury right now. . . [I]n terms of clarity, I do think clarity of the evidence is important here. The jury I do think needs to understand things. I wanted to give you a sense that there still is room for clarity." Tr. 1-14-2015 at 127. The government responded by telling the court that it was trying to explain the use of the Tor browser to the jury, and by informing the court what it was trying to communicate: "I think the point is, it hides an IP address and, therefore, allows people to anonymize their identities and locations. That's really all we're trying to get across." Tr. 1-14-2015 at 127.

The court then stated that it was not telling the government how to put on its evidence, it was just trying to help the government keep in mind that in trying to make something seem simple, they might make be making it sound more complex. Tr. 1-14-2015 at 127-128.

The government accepted the court's advice, and began the second day of testimony by having their witness re-explain what the Tor network was, how it worked, and what it allowed for, complete with a demonstration. Tr. 1-14-2015 at 135-139. This second-day testimony was much more clear and effective than the testimony presented through the same witness before the trial court intervened and advised the prosecutor about the weakness and lack of clarity of his

presentation.

That kind of judicial intervention presents a strong appearance of partiality. That judicial intervention had a clearly perceptible effect on the quality and clarity of the government's presentation of evidence, from that point forward in the trial. The court's intervention did help the government present its case.

The trial court conducted Mr. Ulbricht's trial in a manner evidencing pre-judgment of Mr. Ulbricht (the jury needed protection from him) and in a manner evidencing pre-judgment of the evidence, telling the jury that the [government's] evidence presented would support their verdict. The trial court successfully persuaded the prosecutor as to the need to present his evidence more clearly, pointing out specific weaknesses in the government's first attempt to explain the Tor browser to the jury. The court's advice and observations resulted in the prosecutor presenting further testimony to more clearly explain the Tor browser. The trial court's actions and statements in the course of the trial presented the appearance of partiality and bias and actually appear to have helped the government in presenting its case.

Defense counsel did not object to these court interventions and statements but Mr. Ulbricht did not waive his right to object. Declaration of Ross Ulbricht, par. 11, 14, 15, 17. Nor did Mr. Ulbricht authorize defense counsel to waive his right to object to the court's intervention and statements which appeared designed to help and support the government. Declaration of Ross Ulbricht, par. 19.

## III.    The Trial Court Displayed Bias Against Mr. Ulbricht At Sentencing

The trial court displayed an animus against and fear of Mr. Ulbricht's philosophical views at sentencing, causing any reasonable observer to wonder whether the sentence imposed was a

sentence designed to punish him for his views and to suppress his political views, views which

the trial court found to be "deeply troubling and terribly misguided and also very dangerous."

Before pronouncing Mr. Ulbricht's sentence, the court again mentioned his philosophy: ". . . the

*reasons that you started Silk Road were philosophical and I don't know that it is a philosophy*

*left behind."*

 The trial court should not have concerned itself about Mr. Ulbricht's philosophy in

determining his sentence.  His freedom of expression (and belief) *"*is . . . protected against

censorship or punishment, unless shown likely to produce a clear and present danger of a serious

substantive evil that rises far above public inconvenience, annoyance, or unrest.*"  Terminiello v.*

*City of Chicago*, 337 U.S. 1, 4-5 (1949). The right to free speech embraces the liberty to discuss

matters of public concern without . . .  fear of subsequent punishment. *Thornhill v. Alabama*,

310 U.S. 88, 101-102 (1940).

 The court's expressed concern about Mr. Ulbricht's "deeply troubling and terribly

misguided and also very dangerous" political views, combined with the imposition of the

harshest penalty the law allowed, gives the appearance that the sentence may well have been

imposed to punish Mr. Ulbricht for his dangerous views and to prevent his views from being

expressed or followed.  The court's focus on Mr. Ulbricht's views provides the appearance, if not

the proof, that the court was biased against Mr. Ulbricht because she found his views so troubling

and dangerous.

 A reasonable person can't read the sentencing transcript without questioning whether the

trial court may have sentenced Mr. Ulbricht based on her disagreement with and fear of his

views. The law forbids sentencing based on consideration of a defendant's political or

philosophical views:  Sentencing based on "race, sex, national origin, creed, and socioeconomic status of offenders" is prohibited.  See 28 U.S.C. § 994(d); U.S.S.G. § 5H1.10.

The trial court's expressed concerns about Mr. Ulbricht's philosophy provide the appearance that the trial court based his sentence on impermissible considerations, and provides the appearance of bias, irrespective of whether there was actual bias, and when under such circumstances the case is remanded for re-sentencing, . . .  "[T]he better course is to remand to a different judge for re-sentencing as a matter of course, irrespective of whether there was actual bias . . ." *See United States v. Kaba,* 480 F.3d 152, 157 (2nd Cir. 2007).

The better course in this proceeding, will be for the trial court to recuse itself.  The appearance of bias at sentencing would cause a reasonable person to question the impartiality of the court, and requires that the trial court recuse itself from further proceedings in this case.

**No Waiver of Right to Seek Recusal**

Mr. Ulbricht has never knowingly and intentionally waived his right to have his case presided over by a fair and impartial judge, nor has he waived his right to ask for recusal of the trial court based on actual or apparent bias.  Declaration of Ross Ulbricht, par. 8, 12.  Nor has he authorized his trial or appellate counsel to waive any of those rights, including the right to seek recusal where the trial court's actions and statements reveal actual bias or provide the appearance of bias. Declaration of Ross Ulbricht, par. 19, 20.

Mr. Ulbricht has never before had the opportunity to ask for the court's recusal in this case.  He wasn't aware of his rights to request recusal at trial or sentencing, or of his rights to object to the court's actions described above.

Waiver is the intentional relinquishment of a known right.  *United States v. Quinones,*

10

511 F.3d 289, 321 n.21 (2d Cir. 2007). Mr. Ulbricht did not knowingly and intentionally waive

any of his fair trial or due process rights, nor did he authorize his trial or appellate counsel to

waive any of his rights.  Declaration of Ross Ulbricht, par. 18, 19, 20. Mr. Ulbricht was not

aware that the trial court secretly empaneled an anonymous jury or how that would prejudice his

jury or what his rights were to object.  He was not aware of the implications of the trial court

vouching for the strength of the government's evidence.  He was not aware he had a right to

object to the trial court helping the prosecutor present his evidence. He was not aware he had the

right to move for recusal of the court at sentencing, for the trial court's prior actions and

statements exhibiting bias or the appearance of bias.

## CONCLUSION

The trial court's actions and words as described above, provide at least the appearance of

partiality and bias, and would cause a reasonable person to question the court's partiality.  Mr.

Ulbricht, in the interest of justice and on the basis of the facts and arguments submitted, hereby

moves the Court for an Order recusing the court in this matter, and for such other relief as is just

and proper.  The motion for recusal is based upon this Memorandum of Law in Support of

Motion for Recusal, and upon the Declaration of Paul Grant and the Declaration of Ross

Ulbricht, each of which is submitted with this motion.

Dated: 2/5/2018                                    Respectfully submitted,

                                                   /s/ Paul Grant_____
                                                   Paul Grant
                                                   Counsel for Ross Ulbricht
                                                   P.O. Box 2720
                                                   Parker CO 80134
                                                   Telephone: 303-909-6133
                                                   Email: paul_pglaw@yahoo.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

UNITED STATES OF AMERICA,                     14 Cr. 68 (KBF)

                          Plaintiff,          DECLARATION OF PAUL
                                              GRANT IN SUPPORT OF
                                              MOTION FOR RECUSAL

                -v-

ROSS WILLIAM ULBRICHT,

                          Defendant.

-------------------------------------------------X

        I, Paul Grant, pursuant to 28 U.S.C. § 1746, hereby affirm under penalty of perjury:

I am an attorney licensed in the State of Colorado and I am admitted *pro hac vice* in this case for

purposes of my representation of Ross Ulbricht in this matter. I state the following to be true:

1.  I have thoroughly reviewed the public docket in the case of *United States v. Ross Ulbricht*,

Case No. 14 Cr. 68 (KBF), and my statements in the Motion for Recusal are made upon the basis

of what I have seen in documents available in the public docket, what I have seen in hearing and

trial transcripts in the public docket, and on information provided to me by Mr. Ulbricht's trial

counsel, Joshua L. Dratel.

2.  My statements in the Motion for Recusal are not based on my review of sealed documents or

sealed transcripts in this case because I have not had access to sealed materials.

3.  Based on my review of the documents and transcripts available to me, including the transcript

of the in-court jury voir dire, I can state that the jurors and prospective jurors questioned in open

court, were not identified by name during in-court proceedings.  One juror did mention his own name, without having been asked to do so.

4.  Based on my review of the juror questionnaires filled out by all prospective jurors called for this case, I can state that of the 183 prospective jurors called in to the jury assembly room to fill out juror questionnaires in this case, I found only three out of 183 jurors who wrote their names in the space on the questionnaire that was provided for them to fill in their names. A few (11) others wrote in their names, but then crossed them out.  Most of the prospective jurors either drew a line though the box that called for them to fill in YOUR FULL NAME _____, or they left the box blank. Exhibit 1, Exhibit 2.  A few wrote their juror number in the space provided for their full name.

5.  Based on my review of the juror questionnaires filled out by all prospective jurors, and on my review of the transcript of the in-court jury voir dire proceedings, the jury that was empaneled was an anonymous jury, in that (with exceptions mentioned above): their names were not written down or otherwise shown in the questionnaires; their names were not mentioned in open court; and the trial court told the jurors at the end of the trial that they would never have to reveal their names.  *However, you need not talk to anyone should you choose not to talk to anybody. Should you choose to be silent, that's entirely up to you. You need give no one your name. Doc. 220, Tr. 2/4/2015 at page 89 of 92.*  It is clear the trial court understood this was an anonymous jury, even though that fact was not communicated to the public or the defendant, either in open court or in court documents I have examined.

6.  Based on my review of all court documents and transcripts publicly available, and on other documents otherwise available to me, I can state that I found no record of a request by either

2

party for an anonymous jury; nor of any discussion of the need to empanel an anonymous jury; nor of any discussion of the possibility of seating an anonymous jury, other than the remarks made in court after the jury had been empaneled.

7. Based on my review of all court documents and transcripts publicly available or otherwise available to me, I found no mention by the court (before the jury was empaneled) of the need for or possibility of, empaneling an anonymous jury; no mention by the court that an anonymous jury was going to be empaneled; no explanation by the court why an anonymous jury should be or had been empaneled; and no mention that the court had decided to empanel and had empaneled an anonymous jury.

8. Based on my research into online media coverage of the trial in this case, I can state that I found no public mention or discussion of the fact that an anonymous jury had been empaneled, other than the story mentioned in par. 10, below.

9. Based on my extensive research into online media coverage of the trial in this case, I can state that I did find significant media coverage of the fact that the trial court had threatened to anonymize the jury (after already having done so) if the jury rights protesters and pamphleteers continued to pass out flyers in front of the courthouse.

Sarah Jeong wrote in Forbes: *Judge Forrest is raising the possibility of making the jury anonymous—a somewhat extreme measure that was first used in a 1977 trial of a drug kingpin. (A judicial order for an anonymous jury keeps juror names secret.) Although some jurisdictions use anonymous juries regularly, Ulbricht's defense team seems to find the possibility of an anonymous jury to be highly objectionable—possibly because of its use in mafia trials. . .*
*But as long as the jury nullification activists continue to approach jurors, Forrest is inclined to*

3

*institute an anonymous jury. She may have been preparing for this all along—during jury selection, she and the courtroom deputy used numbers for the prospective jurors instead of names.*

https://www.forbes.com/sites/sarahjeong/2015/01/14/people-think-theyre-helping-the-defense-but-theyre-not-why-nobody-in-the-silk-road-trial-likes-jury-nullification/#2db8d7cb559b

Sarah Jeong didn't recognize that Judge Forrest had already empaneled an anonymous jury. Many other reporters and wire services covering the trial wrote of Judge Forrest's threat to establish an anonymous jury, without realizing that she already had. For example, see:

http://www.cbc.ca/m/touch/world/story/1.2899905

10. One reporter did realize that Judge Forrest had empaneled an anonymous jury. Nicole Hong wrote in the Wall Street Journal: *After 3½ hours of deliberation,* **an anonymous jury** *of six men and six women found the 30-year-old California man guilty of creating and operating a website that started out selling homegrown psychedelic mushrooms and swelled into a multimillion-dollar criminal enterprise.*

https://www.wsj.com/articles/silk-road-creator-found-guilty-of-cybercrimes-1423083107

11. I found one article online which discussed how the use of an anonymous jury in Ulbricht's case would threaten the presumption of innocence and harm Mr. Ulbricht:

*On the other hand, there are legitimate fears that jurors are more likely to be biased in their decision making if they are not going to be held accountable for their decision in the case. Either way, as anonymous juries become more common, we are setting a dangerous precedent pushing us towards a scenario similar to the 15th Century Star Chamber, a secret court where there were no witnesses, the defendant did not know their accuser, and evidence was only*

4

*provided in written form.*

*The judicial system is based on the idea that the defendant is "innocent until proven guilty." If Judge Forrest decides to anonymize the jury, Ulbricht will be added to a short list alongside the most notorious criminals in history and, as we know, perception is reality.*

https://www.deepdotweb.com/2015/01/15/step-towards-the-star-chamber/

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 5th day of February, 2018.

/s/ Paul Grant
Paul Grant

**Juror ID:** _/ 3 ⹁_

YOUR FULL NAME: _____

<u>(PLEASE PRINT LEGIBLY USING DARK INK)</u>

**<u>United States v. Ross Ulbricht</u>**

**JUROR QUESTIONNAIRE**

**PRELIMINARY INSTRUCTIONS:**

Please print your name and juror number in the space provided at the top of each page. Please answer each question by placing an "X" next to your response or by providing the information requested. Please answer each question fully. Some questions have more than one part.

**YOU ARE SWORN TO GIVE TRUE AND COMPLETE ANSWERS TO ALL QUESTIONS IN THIS QUESTIONNAIRE.** This questionnaire is designed to help simplify and shorten the jury selection process. The purpose of this questionnaire is to determine whether prospective jurors can decide this case impartially based upon the evidence presented at trial and the legal instructions given by the presiding judge. The questions are not intended to inquire unnecessarily into personal matters. Although some of the questions may appear to be of a personal nature, please understand that the Court and the parties must learn enough information about each juror's background and experiences to select a fair and impartial jury.

**ALL INFORMATION CONTAINED IN THIS QUESTIONNAIRE WILL BE KEPT CONFIDENTIAL AND UNDER SEAL.**

Please answer all questions to the best of your ability. If you do not know the answer to a question then write, "I don't know." There are no "right" or "wrong" answers, only <u>truthful</u> answers. Do not discuss the case or your answers with anyone. It is important that the answers be yours alone. Remember, <u>you are sworn to give true and complete answers to all questions</u>.

**DO NOT DISCUSS YOUR QUESTIONS AND ANSWERS OR THE CASE WITH ANYONE, NOW OR UNTIL FURTHER INSTRUCTED BY THE COURT, AND DO NOT DO YOUR OWN RESEARCH ON THE CASE.** The Court instructs you not to discuss the questions and answers with fellow jurors. It is very important that your answers be your own individual answers. Do not discuss the case with anyone, including the lawyers (except in the presence of the Court), your fellow jurors, your family, your friends, or anyone else. You must also avoid reading about the case in newspapers or on the internet, or listening to any radio or television reports about the case.

1

<u>United States v. Ross Ulbricht</u>

EXHIBIT 2

Juror ID: _80_

YOUR FULL NAME: 

(PLEASE PRINT LEGIBLY USING DARK INK)

### United States v. Ross Ulbricht

### JUROR QUESTIONNAIRE

**PRELIMINARY INSTRUCTIONS:**

Please print your name and juror number in the space provided at the top of each page. Please answer each question by placing an "X" next to your response or by providing the information requested. Please answer each question fully. Some questions have more than one part.

**YOU ARE SWORN TO GIVE TRUE AND COMPLETE ANSWERS TO ALL QUESTIONS IN THIS QUESTIONNAIRE.** This questionnaire is designed to help simplify and shorten the jury selection process. The purpose of this questionnaire is to determine whether prospective jurors can decide this case impartially based upon the evidence presented at trial and the legal instructions given by the presiding judge. The questions are not intended to inquire unnecessarily into personal matters. Although some of the questions may appear to be of a personal nature, please understand that the Court and the parties must learn enough information about each juror's background and experiences to select a fair and impartial jury.

**ALL INFORMATION CONTAINED IN THIS QUESTIONNAIRE WILL BE KEPT CONFIDENTIAL AND UNDER SEAL.**

Please answer all questions to the best of your ability. If you do not know the answer to a question then write, "I don't know." There are no "right" or "wrong" answers, only truthful answers. Do not discuss the case or your answers with anyone. It is important that the answers be yours alone. Remember, you are sworn to give true and complete answers to all questions.

**DO NOT DISCUSS YOUR QUESTIONS AND ANSWERS OR THE CASE WITH ANYONE, NOW OR UNTIL FURTHER INSTRUCTED BY THE COURT, AND DO NOT DO YOUR OWN RESEARCH ON THE CASE.** The Court instructs you not to discuss the questions and answers with fellow jurors. It is very important that your answers be your own individual answers. Do not discuss the case with anyone, including the lawyers (except in the presence of the Court), your fellow jurors, your family, your friends, or anyone else. You must also avoid reading about the case in newspapers or on the internet, or listening to any radio or television reports about the case.

1

Case 18-648, Document 1-2, 03/07/2018, 2251690, Page59 of 343

EXHIBIT B, Doc. 303

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,                    14 Cr. 68 (KBF)

                        Plaintiff,        DECLARATION OF ROSS
ULBRICHT REGARDING NON-
WAIVER OF RIGHTS

               -v-

ROSS WILLIAM ULBRICHT,

                Defendant.

--------------------------------------------------X

I, Ross Ulbricht, pursuant to 28 U.S.C. § 1746, hereby affirm under penalty of perjury:

I am the defendant in this case and I state the following to be true:

1. I was represented during pre-trial and trial proceedings, including sentencing, by three lawyers, Joshua Dratel, Lindsay Lewis, and Joshua Horowitz.

2. I did my best to study, understand and exercise my rights throughout all stages of pre-trial and trial proceedings. I asked my counsel to explain to me all legal proceedings in my case and all of my rights in my case.

3. I did my best to assert my rights whenever given the opportunity to exercise my rights.

4. I understand that I have various fair trial and due process rights as a criminal defendant, rights guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

5. I consider my fair trial and due process rights as fundamental and important rights I would not waive or compromise or surrender.

1

6.  I never knowingly or intentionally waived any of my fair trial and due process rights, before or during trial, with the exception that I did exercise the right not to testify at my trial, an action which could be viewed as having waived the right to testify.

7.  I did not knowingly or intentionally waive my right to trial by a fair and impartial jury.

8.  I did not knowingly or intentionally waive my right to have my trial presided over by a fair and impartial judge.

9.  I did not knowingly or intentionally waive my right to a public and speedy trial.

10. I did not knowingly or intentionally waive my right to be present at all critical stages of my case and my trial.

11.  I did not knowingly or intentionally waive my right to object to being denied any of my fair trial and due process rights.

12.  I did not knowingly or intentionally waive my right to request the trial court recuse itself based on actual or apparent bias.

13.  I did not knowingly or intentionally waive my right to participate in any of the trial proceedings.

14.  I did not knowingly or intentionally waive my right to the presumption of innocence, nor did I consent to, or waive my right to object to, the compromise or erosion of that right.

15.  I did not knowingly or intentionally waive my right to object to improper or prejudicial remarks from the trial court.

16.  I did not knowingly or intentionally waive my right to object to being excluded from critical stages of the trial proceedings.

17.  I did not knowingly or intentionally waive my right to object to improper and prejudicial

2

interventions by the trial court in trial proceedings.

18.  I did not knowingly or intentionally waive my right to any of the fair trial or due process protections afforded by the Constitution, statutes, or rules governing trial procedures.

19.  I did not authorize my counsel to waive any of my fair trial or due process rights, including, but not limited to, the specific rights mentioned above.  Since my counsel had a duty of loyalty to me, I had every reason to expect that my counsel would at all times protect, and not ignore, compromise, or impair my rights.

20.   My counsel did not ask me to waive any of my fair trial or due process rights.

21.  If my counsel knowingly or intentionally ignored, failed to protect, compromised or impaired my rights, then counsel betrayed his duty of loyalty.

22.  I did not knowingly or intentionally waive my right to object to my counsel betraying or breaching his duty of loyalty.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of February, 2018.

Ross Ulbricht

EXHIBIT C, Doc 314

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
                                                                          :
UNITED STATES OF AMERICA                                                  :
                                                                          :
                                                                          :        14 Cr. 68 (KBF)
              -v-                                                          :
                                                                          :            ORDER
                                                                          :
ROSS WILLIAM ULBRICHT,                                                    :
                                        Defendant.                        :
                                                                          :
------------------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 13, 2018

KATHERINE B. FORREST, District Judge:

The Court has received a letter motion dated February 12, 2018, requesting that various documents and records be added to the public docket. (ECF No. 313.)

The Court notes that the record in this matter has long been closed, and that the appeal to the Second Circuit is complete. The appeal to the Supreme Court relies on the record as it was. In any event, this Court is particularly careful to ensure that all matters generally publicly filed have been.

While voir dire transcripts are not routinely publicly filed, the Court GRANTS defendant's first (unopposed) request to file the transcript of the in-court jury voir dire. The transcript will be posted separately.

As to defendant's second and third requests, the Court notes that there were numerous conferences (again, as fully reflected in transcripts on the public docket) whereby every aspect of jury selection was placed fully before the parties, discussed, and agreed to. The Juror Questionnaire was sent numerous times to both the Government and the defendant for review and comment. The first page of the

questionnaire stated in all caps and bold that "All information contained in this
questionnaire will be kept confidential and under seal." Neither party noted any
objection. However, to dispel a misconception, the jury in this case was not
"anonymous." Counsel of record always had access to the names and addresses of the
full venire panel.

Accordingly, defendants' second and third requests are DENIED.

SO ORDERED.

Dated:      New York, New York
            February 13, 2018

_____
            KATHERINE B. FORREST
            United States District Judge

Case 18-648, Document 1-2, 03/07/2018, 2251620, Page64 of 343
Case 1:14-cr-00068-KBF   Document 310   Filed 02/05/18   Page 1 of 1
Case 1:14-cr-00068-KBF   Document 301   Filed 02/05/18   Page 1 of 12

EXHIBIT D, Doc. 310

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,                14 Cr. 68 (KBF)

            Plaintiff,            MEMORANDUM OF LAW
                                                  IN SUPPORT OF MOTION
                                                  FOR RECUSAL

             -v-

ROSS WILLIAM ULBRICHT,

            Defendant.

------------------------------------------------------X

*[Handwritten annotation: Ordered. This is frivolous and full of many misstatements of the record. It is DENIED without need for any further briefing. (COS. 708 USDJ 2/5/18)]*

On February 4, 2015, Defendant Ross Ulbricht was convicted by his jury of various

offenses and he was subsequently sentenced by the court to life imprisonment. Mr. Ulbricht has

appealed his convictions and sentence to the Second Circuit Court of Appeals, and his appeal has

been denied. On December 22, 2017, Mr. Ulbricht submitted his petition for writ of certiorari to

the Supreme Court, and his petition is currently pending.

There have been no proceedings in this court since Mr. Ulbricht was sentenced on May

29, 2015. Mr. Ulbricht now intends to pursue his right to file a Rule 33 Motion for New Trial

Based on Newly Discovered Evidence, a motion which is due on or before February 5, 2018.

Mr. Ulbricht is entitled to have his Rule 33 Motion and all other proceedings in this case

presided over by a fair and impartial judge. A judge "shall disqualify [herself] in a proceeding in

which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A judge must

recuse herself in a proceeding in which the judge has a personal bias or prejudice concerning a

EXHIBIT E, Doc. 313

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
paul_pglaw@yahoo.com
303-909-6133

February 12, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:   *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
       Request to Add Jury Selection Documents and Records to the Public Docket

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request that three items be added to the public docket in this case, where they can be viewed in person at the Clerk's Office, or where they can ve viewed on-line through the Public Access to Court Electronic Records (PACER) electronic public access service. The three items Mr. Ulbricht requests be added to the public docket are (1) the transcript of the in-court jury *voir dire*; (2) the juror questionnaires filled out by all prospective jurors who reported for jury service in this case; and (3) any record of the administering of the jury questionnaire proceedings, whether that record be recorded by audio, video, by a court reporter, or by other means.

AUSA Eun Young Choi advises the government will not oppose this request as to Item 1, if the transcript is not sealed and if it contains no personal identifying information, but the government will oppose the requests as to Items 2 and 3.

**ARGUMENT**

Mr. Ulbricht has recently submitted his Motion for Recusal in this case, which was summarily denied (Doc. 310) by the court. The court's denial stated that Mr. Ulbricht, through undersigned counsel, misstated the record. Mr. Ulbricht now asks that certain records be added to the public docket, because he has the right to a public trial, and so that members of the public can determine for themselves what is in the record.

It appears to undersigned counsel that there are and may be records not currently included in the public docket that relate to Mr. Ulbricht's statement that the trial court

empaneled an anonymous jury, without disclosure and to his detriment.  Mr. Ulbricht
respectfully requests that three items be added to the public docket which relate to the record as
to how his jury was empaneled.

Court proceedings are presumed to be open to the public.  "The requirement of a public
trial is for the benefit of the accused; that the public may see he is fairly dealt with and not
unjustly condemned, and that the presence of interested spectators may keep his triers keenly
alive to a sense of their responsibility and to the importance of their functions."  *Gannett Co. v.
DePasquale*, 443 U.S. 368, 380 (1979), *quoting In re Oliver*, 333 U.S. 257, 270 (1948), in turn
*quoting* 1 T. Cooley, Constitutional Limitations 647 (8th Ed. 1927).  "In addition to ensuring that
judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to
come forward and discourages perjury."  *In re Oliver, supra*, at 270, n. 24.

Mr. Ulbricht requests that records relating to his jury selection be made part of the public
record because he has a right to public trial proceedings. Sixth Amendment, United States
Constitution.  Openness of judicial proceedings serves vital functions and secrecy threatens those
functions.  "Secrecy of judicial action can only breed ignorance and distrust of courts and
suspicion concerning the competence and impartiality of judges; free and robust reporting,
criticism, and debate can contribute to public understanding of the rule of law and to
comprehension of the functioning of the entire criminal justice system, as well as improve the
quality of that system by subjecting it to the cleansing effects of exposure and public
accountability." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J.,
concurring).  Secrecy in judicial proceedings is "a menace to liberty . . . justice cannot survive
behind walls of silence."  *Gannett Co. V. DePasquale, supra*, at 412 (Blackmun, J., concurring
in part and dissenting in part).

''The traditional Anglo-American distrust for secret trials has been variously ascribed to
the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court
of Star Chamber, and to the French monarchy's abuse of the letter de cachet. All of these
institutions obviously symbolized a menace to liberty. . . . Whatever other benefits the guarantee
to an accused that his trial be conducted in public may confer upon our society, the guarantee has
always been recognized as a safeguard against any attempt to employ our courts as instruments
of persecution.'' *In re Oliver, supra*, at 266-270. The fundamental concept of a fair trial includes
the right to have the proceedings open to the public. *In re Oliver*, 333 U.S. at 257. "The
knowledge that every criminal trial is subject to contemporaneous review in the forum of public
opinion is an effective restraint on possible abuse of judicial power." *Id*., at 270. "The
public-trial guarantee embodies a view of human nature, true as a general rule, that judges,
lawyers, witnesses, and jurors will perform their respective functions more responsibly in an
open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J.,
concurring).

Mr. Ulbricht asserts his right to a fair and public trial, rights guaranteed by the Sixth
Amendment to the United States Constitution. He has never waived those rights nor authorized

counsel to waive those rights for him.  See Doc. 303, Declaration of Ross Ulbricht Regarding Non-Waiver of Rights (Declaration in Support of Motion for Recusal).

**I.    Mr. Ulbricht requests that the transcript of the in-court *jury voir* dire be added to the public docket.**

Jury *voir dire* proceedings are presumptively open to the public.  *Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*, 464, U.S. 501, 505 (1984) (*voir dire* of prospective jurors must be open to the public under the First Amendment).  There is no reason to prohibit publication of the transcript of in-court jury *voir dire* proceedings in this case.  The jurors' names are not mentioned in the transcript and there is no personally sensitive information included in the transcript. If there was some information in the transcript deserving of privacy protection, the court could order that material redacted or the name of a particular juror protected from disclosure.  *See Press-Enterprise I* at 513.

A criminal defendant's Sixth Amendment right to an open jury selection process is at least as extensive as the public's right of access under the First Amendment. *Presley v. Georgia* 558 U.S. 209, 212 (2010).  In any case where closed jury selection proceedings are utilized, the trial court must make findings adequate to support the closure. *Waller v. Georgia*, 467 U.S. 39, 45 (1984).

"[T]here appears to be no sufficient reason why [the public] should not also be allowed to see in print the reports of trials, if they can thus have them presented as fully as they are exhibited in court, or at least all the material portion of the proceedings impartially stated, so that one shall not, by means of them, derive erroneous impressions, which he would not have been likely to receive from hearing the trial itself." 2 Cooley's Constitutional Limitations 931-932 (Carrington ed. 1927), quoted in *Estes v. Texas*, 381 U.S. 532, 542 (1965).

**II.    Mr. Ulbricht requests that the juror questionnaires filled out by prospective jurors in his case, be added to the public docket.**

It does not appear to undersigned counsel, that there is any sensitive personal information contained in the juror questionnaires.  Only a handful of jurors even wrote their names on the forms.  Since juror names are not shown on approximately 98% of the forms, and since juror numbers, not juror names, were used during in-court *voir dire* and after the jury was empaneled, there appears to be no reason not to include the juror questionnaires in the public docket. It will be difficult, if not impossible, to link answers on the jury questionnaires to the identity of any juror, but even if those links could be established, there would still be no reason to withhold either the questionnaires, the transcript of the jury *voir dire*, or the names of any jurors from the public.

It will be useful to the public to have access to the juror questionnaires, to see what information was sought and obtained, and to see whether the jurors' names were filled in on

those forms. The public has a right to see the juror questionnaires used, and the information the jurors provided therein, in the trial of Mr. Ulbricht. Mr. Ulbricht's right to a public trial includes the right to have the record of his trial proceedings made available to the public.

### III. Mr. Ulbricht requests that any record that was made concerning the administration of the juror questionnaire proceedings, be added to the public docket.

It is not clear from the record available to Mr. Ulbricht and his counsel, under what circumstances the prospective jurors were provided with the juror questionnaires used in this case, who administered the proceeding, and what instructions were given to the prospective jurors when the juror questionnaires were filled out. Undersigned counsel has attempted to determine in conversations with the jury administrator, the deputy jury administrator, and the staff of the jury administrator, whether any record was made of the juror questionnaire proceedings in this case. The responses from these sources were, " the jury administrator does not make a record; you will have to ask the trial judge to find out if a record was made. Some judges make a record, while others do not." It appears that the standard practice in this district is, that after prospective jurors report to the jury assembly room to fill out a jury questionnaire, the panel of prospective jurors is turned over to the trial court to which that jury is assigned, and the trial court then conducts the juror questionnaire proceedings and all further jury proceedings.

Mr. Ulbricht requests that the court advise if there is a record of the administering of the juror questionnaire in his case. Mr. Ulbricht asserts his right to have any record of the juror questionnaire proceedings added to the public docket.

### CONCLUSION

WHEREFORE, for all the reasons provided above, in the interests of his rights to a fair and public trial, in the interest of the openness of judicial proceedings, and in the interest of fundamental justice, Mr. Ulbricht requests that the court: (1) add the transcript of the in-court jury *voir dire* to the public docket in his case; (2) add the juror questionnaires to the public docket; and (3) advise whether there is any record of the juror questionnaire proceedings, and, if there is, add that record to the public docket.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

4

Case 1:14-cr-00068-KBF Document 198 Filed 02/25/15 Page 1 of 226    121
Case 14-4515, Document 41-E, 03/27/2018, 2263 662, Page69 of 342

EXHIBIT G, Doc 198
Trial Excerpts Day 2

F1EGULB1                    Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        14 Cr. 68 (KBF)

 5   ROSS WILLIAM ULBRICHT,

 6                 Defendant.

 7   ------------------------------x

 8                                       New York, N.Y.
                                         January 14, 2015
 9                                       9:20 a.m.

10
     Before:
11
                     HON. KATHERINE B. FORREST,
12
                                          District Judge
13

14                        APPEARANCES

15
     PREET BHARARA,
16         United States Attorney for the
           Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18             Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
           Attorneys for Defendant
21
               – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24   Sharon Kim, Government Legal Intern

25
```

F1EGULB1                    Trial

1    something.

2              I do want to note that to the extent the government

3    has a view about the clarity of yesterday, I think what came

4    out is that there's something called a tor browser.  What that

5    is I think is mumbo jumbo to most people on the jury right now.

6    I think they understand there's a tor browser and another

7    browser and they're different, and that tor is associated with

8    Silk Road, but I think that that's about all that came out.

9              So in terms of -- that will be up for the jury to

10   decide.  They may have heard it differently, but in terms of

11   clarity, I do think clarity of the evidence is important here.

12   The jury I do think needs to understand things.  I wanted to

13   give you a sense that there still is room for clarity.

14             MR. TURNER:  Okay.  What we hoped to convey is that it

15   also hides the IP address of the user; in our view, that's

16   really the essence of what they need to understand.  We're not

17   seeking to try to provide a seminar on how tor works.  We don't

18   think it's really necessary, but I think the point is, it hides

19   an IP address and, therefore, allows people to anonymize their

20   identities and their locations.  That's really all we're trying

21   to get across.

22             THE COURT:  How ever you choose to put on the evidence

23   and whatever points you think are most important is entirely up

24   to you.  I wanted to let you know that sometimes when you're

25   living and breathing a case for so very long and you try to

EXHIBIT H, SENTENCING TRANSCRIPT EXCERPTS

1

F5T5ulbS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          14 Cr. 68 (KBF)

5   ROSS WILLIAM ULBRICHT,

6               Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        May 29, 2015
9                                       1:10 p.m.

10

    Before:
11
                    HON. KATHERINE B. FORREST,
12
                                        District Judge
13

14                      APPEARANCES

15

    PREET BHARARA,
16      United States Attorney for the
        Southern District of New York
17  BY:  SERRIN A. TURNER
        TIMOTHY HOWARD
18          Assistant United States Attorneys

19  JOSHUA DRATEL
    LINDSAY LEWIS
20  WHITNEY SCHLIMBACH
    JOSHUA HOROWITZ
21      Attorneys for Defendant

22  ALSO PRESENT:   VINCENT D'AGOSTINO, Special Agent, FBI
                    GARY ALFORD, Special Agent, IRS
23                  JARED DER-YEGHIAYAN, Homeland Security
    Investgations
24                  Molly Rosen, Government Paralegal
                    Nicholas Evert, Government Paralegal
25


                SOUTHERN DISTRICT REPORTERS, P.C.

F5T5ulbS

1    the fact that the laws are what distinguished us from what is

2    uncivilized that they are the embodiment -- laws are the

3    embodiment -- and they are the manifestation of our democratic

4    process.  When that gets lost, it becomes meaningless.

5           Silk Road's birth and its presence asserted that its

6    creator -- you -- and its operator -- were better than the laws

7    of this country and there are posts which discuss the laws as

8    the oppressor and that each transaction is a victory over the

9    oppressor.  This is deeply troubling and terribly misguided and

10   also very dangerous.

11          Your own words I have looked at very carefully and I

12   have reread certainly more than once in this whole process.

13   They reveal a kind of an arrogance and they display an intent

14   that is very important to the Court's determination, and the

15   Court will go through some of the chronology of putting some of

16   your words into chronological order here now and I will give

17   you the Government's Exhibits but they're exhibits that were

18   all introduced at trial and which were all very, very familiar.

19          In GX 240A you wrote in 2010 that you began -- or

20   about 2010 that you began working on a project that had been in

21   your mind for over a year indicating, of course, the lack of a

22   last minute lightbulb going off, this was a well-planned

23   project, and you say:  "The idea was to create a website where

24   people could buy and sell anything anonymously with no trail

25   whatsoever that could lead back to them."  And that is not so

F5T5ulbS

1             It is notable that you were prepared to flee; that

2     having acquired new identification because you acquired your

3     own array of fake identification -- nine of them -- that you

4     were in the process of obtaining alternative citizenship.  You

5     had flown down to Dominica, had an interview and filled out the

6     form and were doing that.  You just didn't pull the trigger

7     fast enough.

8             It is also notable that the reasons that you started

9     Silk Road were philosophical and I don't know that it is a

10    philosophy left behind.  And except for your family and friends

11    and the statement you made today, I don't know that you feel a

12    lot of remorse for the people who were hurt.  I don't know that

13    you believe you hurt a lot of people.  I don't think you know

14    that you hurt many.

15            Let me comment now on the many letters of support you

16    received discussing your character.  I read each and every one

17    of them with care.  I have read them more than once.  They are

18    beautiful letters.  These are letters written by a vast, broad

19    array of people which are a statement that is extraordinary for

20    you because they are, as I said earlier, from every phase of

21    your life and they tell different stories and they tell

22    different anecdotes about you.  They reveal a man who was

23    loved, who has built enduring and significant relationships

24    over a lifetime and maintained them.  The letters reveal you as

25    intelligent, that you displayed great kindness to many people,

EXHIBIT I, Doc. 318

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
paul_pglaw@yahoo.com
303-909-6133

February 20, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:     *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
          Petition for Rehearing Re Denial of Motion for Recusal

Dear Judge Forrest:

        I write on behalf of Defendant Ross Ulbricht to submit this petition for rehearing and motion for reconsideration, asking that the court vacate its February 5, 2018 order (Doc. # 310) denying Mr. Ulbricht's Motion for Recusal, and that the court now grant the motion.  I have contacted the government about this request and AUSA Eun Young Choi advises that the government objects to the requested relief.

        Mr. Ulbricht believes that the court has misapprehended, overlooked, not addressed, or misapplied the facts and pertinent law provided by Mr. Ulbricht.

*1.      The court's order denying the Motion for Recusal describes Mr. Ulbricht's Motion as "frivolous and full of many misstatements of the record."*  Doc. 310.  The court's order did not explain why the Motion was frivolous nor what the alleged "many misstatements of the record" may consist of.

        The court's order did not address any of the factual allegations nor any of the legal arguments advanced by Mr. Ulbricht.

*2.       The order denying the Motion for Recusal did not address Mr. Ulbricht's three bases for calling into question the impartiality of the court.*  Each of these will now be addressed:

A. The empaneling of an anonymous jury

        What the court overlooked or misapprehended about Mr. Ulbricht's claim that the court's empaneling of an anonymous jury undermined the presumption of innocence and prejudiced his jurors against him, is the following:

1

(1)      As Mr. Ulbricht established in his Motion, the record shows that the 183 prospective jurors called for this case were provided with a juror questionnaire prior to trial, and asked to fill out that questionnaire.  Doc. 301, Memorandum of Law in Support of Motion for Recusal,  at page 2.

As Mr. Ulbricht established in his Motion, the record shows that out of 183 prospective jurors who filled out the juror questionnaire, only a handful (14) of jurors wrote their name where they were required to provide:    YOUR FULL NAME _____.    Doc. 302, Declaration of Paul Grant in Support of Motion for Recusal.

As Mr. Ulbricht established in his Motion, the record shows that out of the handful of prospective jurors who did write their names in the space provided on Page 1 of the Juror Questionnaire, 11 of those jurors then crossed through their names.  Doc. 302, Declaration of Paul Grant in Support of Motion for Recusal.

As Mr. Ulbricht established in his Motion, the record shows that a few of the prospective jurors wrote their juror number, not their full names, in the space provided for them to write their full names.  Doc. 302, Declaration of Paul Grant in Support of Motion for Recusal.

It is not clear from the record who presented the juror questionnaires to the 183 prospective jurors.  As Mr. Ulbricht stated previously, he has learned from discussions with the jury administrator and her staff, that when prospective juror panels are brought into the courthouse to fill out juror questionnaires, the panels are turned over to the trial court for administering of juror questionnaires.  See Doc. 313, Request to Add Jury Selection Documents and Records to the Public Docket, at page 4.

It is not clear from the publicly docketed record, whether there is a record of the administering of the juror questionnaire in this case, but the jury administrator and staff said that decision was up to the judge and one would have to ask the judge to find out if such a record was made.  Doc. 313 at page 4.  Mr. Ulbricht did ask the court if a record of those proceedings was made.  *Id.* The court declined to answer the question.  Doc. 314.

Without any record of what instructions were given to the 183 prospective jurors when they were asked to fill out the juror questionnaires, one can still make educated guesses about what they were told.  Based on the written responses of the jurors, *i.e.,* based on the information that jurors did and did not provide on their questionnaires, it is reasonable to surmise that the jurors were given instructions similar to the following:

(a) *"Do not write your names on Page 1 of the questionnaire where the form asks you to provide Your Full Name."*  This is a reasonable inference since the overwhelming majority (180 out of 183) of jurors either did not provide their names, or wrote their names and then crossed them out.  The jurors would have written in their names where their names were required, if they had not been instructed not to.

2

(b) ***"If you already did write your name on Page 1 of the form, cross it out."*** This is a reasonable inference since out of the 14 jurors who did write in their names, 11 crossed their names out.

(c) ***"If you have not written anything in the space provided for your name, either leave the space blank or draw a line through that space."*** This is a reasonable inference because the overwhelming majority of prospective jurors either left the space blank or drew a line through it.

(d) ***"Your names will not be used in this trial proceeding.  You will only be referred to by your juror numbers."*** This is a reasonable inference because several prospective jurors wrote their assigned Juror Number in the space provided on the questionnaire for them to write their full names.  Why else would a juror write their Juror Number in a space provided for them to write their name?

This last inference is also supported by the fact that during in-court *voir dire*, the record shows that each of the jurors spoken to was referred to by the court or the courtroom deputy, by their juror number, and none were referred to by their name.  See generally the Transcript of Jury *Voir Dire* (which will be, but has not yet been placed on the public docket); Doc. 314, court order to place that transcript on the public docket).

Without a record of what was said to the 183 jurors, there is no way to guess what else they may have been told.  There is no way to know what the prospective jurors were told as to why a decision had been made, after the questionnaire was printed, that they should not write their names on the form in the space set aside for their names, or why their names would not be mentioned in this case.

(2)     The trial court's assertion that Mr. Ulbricht's Motion for Recusal contained many misstatements of the record, prompted Mr. Ulbricht to request that the relevant record be made available to the public, so that the public could determine what was in the record. Doc. 313, Request to Add Jury Selection Documents and Records to the Public Docket.

In that request, presented in the interests of his rights to a fair and public trial, in the interest of the openness of judicial proceedings, and in the interest of fundamental justice, Mr. Ulbricht requested three items be added to the public docket: (1) the transcript of the in-court jury voir dire; (2) the filled-out juror questionnaires; and (3) any record of the administering of the jury questionnaire proceedings.  Doc. 313.

The court responded to Mr. Ulbricht by granting the first request, but denied requests (2) and (3).  The court offered as the reason for refusing the request to make the juror questionnaires public, that the form itself stated that "All information contained in this questionnaire will be kept confidential and under seal."  That promise is not an adequate finding to justify sealing a court record.  See below.

3

The court declined to answer the question whether there is a record of the proceeding in which the jury questionnaire was presented to the 183 prospective jurors (regarding request (3)), but the court also denied Mr. Ulbricht's request to make that record public.  The court did not offer any reason why that record (if it exists) should be kept secret.

(3)      The trial court has recently (February 13, 2018) stated, in responding to Mr. Ulbricht's request to make the jury selection records public, "***to dispel a misconception, the jury in this case was not 'anonymous.' Counsel of record always had access to the names and addresses of the full venire panel.***" Doc. 314.

This statement from the court appears to be a direct response by the court to Mr. Ulbricht's claim in the Motion for Recusal, that the court did empanel an anonymous jury, without request, without making findings, and without notice to the public or to the defendant. Since the court's statements in Document 314 appear to be made in response to Mr. Ulbricht's Motion for Recusal, Mr. Ulbricht is responding in this Petition to statements in Documents 313 and 314, as collectively containing the court's response to his Motion for Recusal.

(a)      The jurors' names, but not their addresses, were  disclosed to the lawyers, but not to the public.  Based on the (sealed) record available to undersigned counsel, it appears that counsel of record for both the government and Mr. Ulbricht were provided the names of the 183 prospective jurors.  It does not appear, however, that counsel of record were provided with the addresses of any of the prospective jurors.  Counsel of record appear to have been provided with the name of the city in which each prospective juror lived, but not with any of their addresses.  Declaration of Paul Grant in Support of Petition for Rehearing and Motion for Reconsideration of Denial of Motion for Recusal.

Based on the sealed and unsealed record available to undersigned counsel, it does appear the court is factually mistaken - *i.e.*, the jury empaneled was, in fact, an anonymous jury. Their names were not disclosed to the public.

(b)      The court did empanel an anonymous jury.  That action had consequences.

The entire prospective jury venire of 183 persons was informed that the jurors should not provide their names on their juror questionnaires, despite the fact that the questionnaire called for them to provide their full names, and despite the fact that they were promised - on the questionnaire - that their responses would remain confidential and under seal.  If their responses would never to be revealed, why did the jurors need to avoid writing their names on the questionnaires?  What extraordinary circumstances required instructing the jurors not to write their names on the forms?  What danger were the jurors in?  And from whom?

It appears from the sealed record that some or all of the 183 prospective jurors were told that their names would not be mentioned in this case and that they would only be identified by their juror numbers.  See above. The not-yet docketed transcript of the jury voir dire shows that neither the court, the courtroom deputy, or counsel referred to any of the jurors by their name

during in-court proceedings.  Transcript Jury Voir Dire, generally.

The trial transcript shows that those members of the jury panel that brought back the verdict in this case were told upon their discharge that they would not have to tell their names to anyone:  *"You need give no one your name. You need give no one any information at all."*  Doc. 220, Tr. (2/4/2015), at 2339 (page 89 of 92).

Anonymous means: "not identified by name; of unknown name.  Origin: Late 16th century: via late Latin from Greek anōnumos 'nameless' (from an- 'without' + onoma 'name') + -ous."  English Oxford *Living* Dictionaries.
https://en.oxforddictionaries.com/definition/anonymous

Mr. Ulbricht's jurors appeared in court and were not identified by name.  Thus, they were anonymous.

The question is not whether counsel knew the jurors' names, but whether the public did.
When a judge decides to prevent the names of the jurors from being disclosed to the public, and implements that plan, the jury empaneled is an anonymous jury.  *See U.S. v. Barnes*, 604 F.2d 121, 137 (2nd Cir. 1979).  An anonymous jury is a jury where the members' names were not disclosed to the public. Mr. Ulbricht's jury was an anonymous jury.

"A judge may properly determine to empanel an anonymous jury if the judge finds strong reason to think that the jury deserves protection, and if the court takes appropriate measures to minimize the prejudicial impact a decision to empanel an anonymous jury may have on the jurors' opinion of the defendant."  *U.S. v. Thomas*, 757 F.2d 1359, 1365 (2nd Cir. 1985).  Empaneling an anonymous jury does impose a burden on the presumption of innocence, and must receive close scrutiny. *See Id.*, at 1363.

The reason empaneling an anonymous jury will prejudice the defendant is that the jurors will likely attribute the need for hiding their names from the public (and from the defendant), to some possible threat that the defendant or his supporters may pose to them.

Here, the court's action was unannounced and thus not publicly visible.  The sealed and unsealed record shows that neither party requested an anonymous jury; no argument from counsel was entertained; no findings were made; and no effort was made to minimize the harmful impact that empaneling an anonymous jury would have on Mr. Ulbricht's right to be presumed innocent.  The court did make sure the jurors' names remained confidential, even to the point of telling the prospective jurors not to write their names on their already-confidential questionnaires.

The sealed and unsealed record, including the transcript of the jury voir dire, shows, contrary to what the court now states (Doc. 314), that Mr. Ulbricht's jury was, in fact, an anonymous jury.

The trial court's hidden implementation of a plan to empanel an anonymous jury provides

5

the appearance that the trial court judged Mr. Ulbricht to present a threat to the jurors, decided to empanel an anonymous jury, and did so, without revealing to Mr. Ulbricht or to the public what the court had done. The act of empaneling an anonymous jury imposed a severe burden on Mr. Ulbricht's right to be presumed innocent.

Because the record in this case shows that the trial court took hidden actions which ignored and compromised Mr. Ulbricht's right to be presumed innocent, a reasonable person might well question the impartiality of the court, thus requiring that the judge recuse herself.  *See U.S. v. Carlton*, 534 F.3d 97, 100 (2nd Cir. 2008).  "The goal of section 455(a) is to avoid even the appearance of partiality."  *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860 (1988).

Mr. Ulbricht described what the record shows and does not show about the court's actions in his Memorandum in Support of the Motion for Recusal (Doc. 301), with specific references to the record, where the record exists.  The Court's order (Doc. 313) does not rebut any of the facts presented by Mr. Ulbricht.

(c)     The court has kept the juror questionnaire and other jury selection proceedings secret.

The Court's order (Doc. 314) denying Mr. Ulbricht's request to make the juror questionnaires public, pointed to the promise on the form that the information provided would be kept confidential and under seal.  The Court's order did not address the case law provided by Mr. Ulbricht that shows the law favors public court proceedings, not secret ones.  "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." *In re Oliver*, 333 U.S. 257, 270 (1948).  A public jury selection process, with jurors identified, encourages honest responses, discourages perjury from jurors, and protects the defendant's right to the presumption of innocence.

When the court (or the court's surrogate) told prospective jurors not to write their names on their questionnaires; and told them that anything they wrote on their questionnaires would be kept confidential and under seal; and when the court made sure that jurors were only referred to by their juror numbers in court, the court sent a message to the jurors: their identities were secret and that they would not be held accountable to the public for what they said on their questionnaires or for what they said in court.

The court's refusal to add the juror questionnaires to the public docket did not explain why secrecy is necessary, nor why Justice Harlan was wrong when he wrote:  "The public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J.,concurring).

The court mentioned (Doc. 314) that the parties did not object to sealing the juror questionnaires but overlooked Mr. Ulbricht's declaration, in which he stated: he never waived his right to a public trial; he didn't waive his right to be present at all critical stages of his trial

proceedings; and he never authorized his lawyer to waive any of his fair trial rights. Doc. 303. Mr. Ulbricht did not waive his rights to object to secret jury proceedings. See generally, Declaration of Ross Ulbricht Regarding Non-Waiver of Rights (Doc. 303).

The court's order refusing to add the juror questionnaires to the public docket does not provide any explanation why the juror questionnaires could not be redacted if they contained any sensitive personal information. *See Press-Enterprise Co. v. Superior Court (Press-Enterprise I)*, 464, U.S. 501, 505 (1984). The court's order does not state that there is any sensitive personal information that needs to be protected. The court's order presumes that continued secrecy is a value that should be maintained, without explaining why.

When the court decides to seal a record of proceedings in a criminal case, "the judge must articulate on the public or sealed record a sufficiently detailed basis for his serious concern about public dissemination risks . . and his preference for [sealing] over alternative remedies." *In Re Application of The Herald Co.*, 734 F.2d 93 (2nd Cir. 1984) (dealing with the First Amendment right of access to court proceedings). The trial court has not indicated that there is any record of the court having made findings justifying sealing of the juror questionnaires.

A criminal defendant's Sixth Amendment right to an open jury selection process is . . . as extensive as the public's right of access under the First Amendment. *Presley v. Georgia*, 558 U.S. 209, 212 (2010). In any case where closed jury selection proceedings are utilized, the trial court must make findings adequate to support the closure. *Waller v. Georgia*, 467 U.S. 39, 45 (1984). The court's order (Doc. 314) refusing to add the juror questionnaires to the public docket, defies the teachings of *Waller*.

The secret jury proceedings described above "can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring). Where a judge's impartiality can reasonable be questioned, the judge has a duty to recuse herself. 28 U.S.C. § 455(a).

"[F]ree and robust reporting, criticism, and debate can . . . improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability." *Nebraska Press Ass'n v. Stuart*, 427 U.S. at 587, *supra*, (Brennan, J.,concurring).

The court's pronouncement (Doc. 314) that the jury was not anonymous, does not address the record-based facts discussed above.

The guarantee that a trial will be conducted in public view, without secret proceedings, is "a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver, supra*, at 268-270. Conversely, hiding jury proceedings or records of jury proceedings, including juror questionnaires, provides the opportunity to use the courts as instruments of persecution. Guaranteeing public access to records of judicial proceedings is an effective restraint on abuse of judicial power. *See Id.*, at 270.

Secret judicial [and jury] proceedings are a "menace to liberty . . . justice cannot survive behind walls of silence." *Gannett Co. V. DePasquale, supra,* at 412 (Blackmun, J., concurring in part and dissenting in part).

Secret Juror Elimination Proceedings

The trial court not only conducted the jury questionnaire proceeding outside of court and off the record, the court then joined with counsel for the government and defense counsel to eliminate half (92 out of 183) of the prospective jurors through further out-of-court, out of public view, and unrecorded *juror elimination* proceedings.

Counsel for the government and defense counsel consulted in private and agreed to eliminate 59 out of the 183 prospective jurors who filled out juror questionnaires, and the court accepted their recommendations. See Doc. 144, Order. No discussion of the reasons for striking any of those jurors was provided on the record. The trial court then eliminated an additional 33 jurors, on her own motion, out-of-court, and with no explanation offered why the judge eliminated any of those jurors. Doc. 144.

There is no record as to why any of these 92 jurors were eliminated from the prospective jury panel. These were not public proceedings. Mr. Ulbricht was not present to witness these proceedings.

The results of the hidden or secret jury selection proceedings in this case can be summarized as follows: juror questionnaires were presented to 183 prospective jurors in a proceeding the trial court chose not to record; the jurors were promised that their responses on the questionnaires would remain confidential and sealed; the prospective jurors were told not to write their names on the questionnaires which were always going to remain secret and sealed, anyway; and the judge and the attorneys eliminated 92 out of 183 jurors. All of this was done off the record, out of court, out of public view, and out of the defendant's view and presence.

The jurors were put on notice through these highly unusual proceedings, that the trial court was going to great lengths to protect their anonymity. That action severely compromised the defendant's right to the presumption of innocence. That action also gave jurors the idea that whatever they said would likely remain unattributed to them, thus increasing the chances that some of the jurors may have chosen to be less than truthful. An anonymous juror can deny a bias, or make one up, for the purpose of getting selected to, or excluded from a jury, with little chance of getting caught.

Jury selection proceedings are presumptively open to the public. *See Press-Enterprise I* at 505. That is a right of the public and of the defendant. *Presley v. Georgia,* 558 U.S. at 212.

The court's recent efforts to maintain the secrecy of the jury questionnaire proceedings give the impression that the court was at the time of trial, and still is, committed to secret jury selection proceedings, and call into question the impartiality of the court. A fair and impartial judge should be expected to protect the defendant's right to a public trial, and should not be

expected to invent ways to circumvent the public jury selection processes which are guaranteed by the First and Sixth Amendments.

<u>The Threat To Empanel An Anonymous Jury</u>

As Mr. Ulbricht pointed out in his Memorandum In Support of Motion for Recusal, the trial court made statements during the first day of trial that had the effect of concealing from the public and from Mr. Ulbricht that an anonymous jury had been empaneled.  Memorandum at 3.  During that first day, and after the jurors had been sworn, the court threatened to empanel an anonymous jury.  Tr. 1-13-2015 at 116.  That statement does not make sense.  If the jury was not already anonymous, their names would have been known to the public and there would have been no way to make that jury anonymous.  A new trial and a new jury would have been required.

But that is not what the trial court had in mind.  The court knew the jury was already anonymous and admitted as much when the court stated  "we won't let it go any longer than that because it's a classic reason to allow for *additional procedures*." Tr. 1-13-2015 at 103 [emphasis added].  A judge cannot anonymize a jury where the jurors have already been identified by name in open court.  The judge can, however, add "*additional procedures*" for protecting an already anonymous jury from unwanted contact, procedures such as what the court described as having the jurors "brought out to a different place and brought in specially. . ."  Tr. 1-13-2015 at 102.

B.   The court's order (Doc. 313) denying the Motion for Recusal, did not address Mr. Ulbricht's contention that by instructing the jury that they would be receiving all the evidence they needed to reach their verdicts, and by assisting the prosecutor by offering advice on how to strengthen the presentation of his case to the jury, the trial court appeared to be helping the prosecutor convince the jury to convict.

The arguments and facts presented stand unrebutted.

C.  The court's order (Doc. 313) denying the Motion for Recusal did not address Mr. Ulbricht's arguments that the remarks made by the trial court at sentencing display judicial bias in that the court's remarks would cause a reasonable person to believe that sentence was imposed, at least in part, because of the trial court's hostility toward and fear of Mr. Ulbricht's political or philosophical views.

The arguments and facts presented stand unrebutted.


*3.  Recent Action By The Court Bolsters The Arguments For Recusal.*

In addition to the facts established in the Motion for Recusal, recent action by the court provides further support for the Motion for Recusal.  Mr. Ulbricht calls the court's attention to the following:

9

On 2/5/2018, Mr. Ulbricht made a timely request (Doc. 307) for an extension of time to file his Rule 33 Motion for a New Trial Based on Newly Discovered Evidence. The court denied the motion on the same day. Doc. 309. In the court's order denying the motion, the court stated, in part: *"Whatever is in the file was necessarily known to prior counsel."*

In the motion requesting an extension of time, Mr. Ulbricht made known to the court that prior counsel had refused since he was terminated in the first week of June 2017, to provide his complete client file to undersigned counsel. Prior counsel who has been terminated yet refuses to turn over the client file to new counsel, has abandoned his client and no longer represents his client.

It is remarkable that the court did not see good cause for an extension of time, in Mr. Ulbricht's need for his client file. It is remarkable that a judge would suggest that Mr. Dratel, who abandoned Mr. Ulbricht, can be trusted to have protected Mr. Ulbricht's right to research and submit a Rule 33 Motion, during a period of more than eight months after his representation was terminated.

The court had no reason to suggest that Mr. Dratel has been representing Mr. Ulbricht's best interests since he was terminated. The court had no reason to believe that Mr. Dratel was adequately representing Mr. Ulbricht's interests at many points before or during the trial, either.

At one point in these proceedings, in an order precluding defense experts for inadequate and belated disclosure by the defense, the court expressed concern and wrote at great length about numerous unfathomable decisions made by Mr. Dratel during trial and pre-trial proceedings. See Doc. 173.

The court described as a tactical decision Mr. Dratel's decision to wait until [too] late in the trial to disclose his experts, but questioned those decisions since Mr. Dratel knew the rules. Doc. 173 at 3. The court wrote that the "defense's decision to put in such belated and substantially inadequate notices of expert witnesses was a tactical choice." Doc. 173 at 6. The court stated that a consistent body of case law "leaves no doubt that such disclosures are inadequate." *Id.*

The court speculated as to what Mr. Dratel's motives might have been in making his belated and obviously inadequate expert disclosures - accumulating appeal points, perhaps; perhaps something else. Doc. 173 at 8. The court made the point that choices have consequences, and then excluded both proffered defense experts. Doc. 173 at 2; 18.

Mr. Dratel is an experienced criminal defense attorney and he had to know that his expert witness disclosures were inadequate, so why did he bother? Mr. Dratel's many strange decisions in this case were motivated by something, but not, apparently, by his concern for the best interests of his client. Whatever his agenda may have been, Mr. Dratel appears to have abandoned his client during the trial, and post-trial proceedings.

Considering the court's lengthy written comments on various incidents of peculiar and inexplicable defense counsel behavior that resulted in harm to Mr. Ulbricht, or that at least resulted in wasted effort and resources, it is entirely unreasonable for the court to now say that trial counsel knew what was in Mr. Ulbricht's file, implying that trial counsel was looking out for Mr. Ulbricht's interests. The court knew when denying the requested extension of time, that prior counsel had been terminated and had refused to turn over the complete client file, and that Mr. Ulbricht had retained undersigned counsel to help him research and submit his Rule 33 Motion. Prior counsel's refusal to turn over the complete client file has obstructed that effort.

The court's suggestion that prior [but terminated and non-cooperative] counsel was looking out for Mr. Ulbricht's interests and right to pursue a Rule 33 Motion was absurd. That statement would cause a reasonable person to question the impartiality of the court.

## CONCLUSION

For all the reasons stated above, the court should grant this petition for rehearing and motion for reconsideration, vacate the order denying the Motion for Recusal, and the trial court should recuse herself from further proceedings in this case.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

EXHIBIT J, Doc. 307

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133

February 5, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:   *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
      Request for Extension of Time to Submit Rule 33 Motion

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request an extension of time through and including May 7, 2018, in which to submit his Rule 33 Motion for a New Trial Based on Newly Discovered Evidence. I have contacted the government about this request and AUSA Eun Young Choi advised that the government will not oppose this request.

Mr. Ulbricht was tried in this court and on February 4, 2015, his jury brought back guilty verdicts on all charges in the indictment. The deadline for filing his Rule 33 motion is 3 years from the date of those verdicts, which means his motion is due to be filed on or before February 5, 2018. Rule 33(b), Fed.R.Crim.P.; Rule 45(a)(1)(C), Fed.R.Crim.P.

Mr. Ulbricht submitted his petition for writ of certiorari to the Supreme Court on December 22, 2017, and his case was docketed on January 4, 2018. That action does not extend the deadline for filing his Rule 33 motion.

Mr. Ulbricht is requesting an extension of his filing deadline until and including May 7, 2018. This extension is made necessary for the following reasons:

1. Undersigned counsel has yet to receive the complete client file from prior trial and appellate counsel, Joshua Dratel and Lindsay Lewis. Counsel has made every effort to persuade Mr. Dratel and Ms. Lewis to collect Mr. Ulbricht's complete client file, and send it to undersigned counsel. See generally the Declaration of Paul Grant in Support of Request for Extension of time to Submit Rule 33 Motion for New Trial, which declaration is filed herewith.

After nearly 8 months of continuous efforts by undersigned counsel to obtain the client file from Mr. Dratel, Ms. Lewis advised me [for the first time], on January 22, 2018, that Mr.

1

Dratel still retains a file cabinet full of Mr. Ulbricht's case materials, which they will release to me only if Mr. Ulbricht, undersigned counsel, or someone will pay them for their time to gather together the file materials, search their email records to find relevant emails, produce a copy of client file materials for them to retain, and ship the remaining client file materials to Paul Grant. Declaration of Paul Grant In Support of Request for Extension of Time, par. 3-15.

Undersigned counsel cannot distinguish what may be newly discovered evidence from evidence that was available to trial counsel, without the complete client file. Counsel can't distinguish among what might be discovery violations by the government, strategic decisions by defense counsel, or neglect of issues by trial counsel, without the complete client file.

Counsel can't adequately represent Mr. Ulbricht in Rule 33 or in other post-conviction matters, such as an investigation into possible 28 U.S.C. § 2255 claims, without the complete client file. Counsel's efforts to find newly discovered evidence and to provide competent representation to Mr. Ulbricht are being hindered by the refusal and failure of trial and appellate counsel Dratel to collect and transmit the entire client file to undersigned counsel.

2. Counsel has requested data from the USAO relating to the pen-trap orders and data collection used in this case. The USAO advised (in November 2017) that they were searching for these records in FBI files. The USAO advised that they found it difficult to locate the files, given that the lead agents involved in the investigation no longer work for the FBI.

The USAO advised undersigned counsel on Friday, February 2, 2018, that they had located some pertinent files, files containing pen register and trap and trace data collection ("PRTT files"), and that they will be sending that data to undersigned counsel on a disk. Undersigned counsel has also requested those files and FBI surveillance files through a FOIA request sent to the FBI, but the FBI has recently said that some of the records being sought are in the control of the Executive Office for United States Attorneys. It isn't clear at this time whether the FOIA request will produce any records.

The requested PRTT files are material to determining whether Mr. Ulbricht has grounds for filing a Rule 33 motion. The affidavits in support of the laptop search warrant and the residence search warrant that were obtained during the course of the Silk Road investigation, both relied upon evidence allegedly collected pursuant to the pen-trap orders. Only the results from one pen-trap data collection were provided to the defense prior to trial. Undersigned counsel has requested from the USAO in the SDNY the files containing the data collected pursuant to four other pen-trap orders, the orders identified by magistrate case numbers as 13 MAG 2228, a Sealed Order for the Secret Service directed to Comcast, 13 MAG 2258 (the 9.19.13 wireless router pen for FBI), 13 MAG 2274 (9.20.13.Router Pen for FBI), and 13 MAG 2275 (9.20.13.MAC Address Pen for FBI).

It is not yet clear if those PRTT files are the files now being produced to the defense by the AUSA. Mr. Ulbricht will need expert assistance and an unknown length of time to examine

what are expected to be gigabytes of data.

Defendant Ulbricht did make a written discovery request to the government before trial for *any and all data obtained from pen registers judicially authorized in this case*. Doc 70-3, Par. 13, p. 3, 9/17/2014 letter from Joshua Dratel to AUSAs Serrin Turner and Timothy T. Howard. That request was for data material to preparation of the defense.

In response to Ulbricht's request for discovery of *any and all data obtained from pen registers judicially authorized in this case*, the government responded [somewhat ambiguously]:

> *The Government has provided all available pen register data used to detect Ulbricht's email and Internet activity in September 2013, as well as pen register data received from Icelandic law enforcement authorities concerning the SR Server and the server described in the Tarbell Declaration as Server-1. To the extent any other pen register information was obtained in the course of the investigation, the Government objects to this request on the ground that such information is not material to the defense or otherwise required to be produced under Rule 16.* See Doc 70-4 at p. 5, 9/23/2014 letter from AUSA Serrin Turner to Joshua Dratel.

The government's response is artfully or inadvertently worded to avoid revealing whether the data used to detect Ulbricht's internet activity was available and whether it was or was not provided, and, at the same time, the government said that if any other data was not available, then it wasn't material and they were not required to produce it. It isn't clear from the response whether the government was saying that the data used to detect Ulbricht's internet activity in September 2013 was provided, or whether it was no longer available.

The government only produced to the defense the data resulting from one pen register, data in a file called 9.17.13 ISP Pen (Comcast). That pen register was authorized by the magistrate in Case No. 13 MAG 2236, and that order required data collection assistance from Comcast. That order did not authorize the collection of MAC addresses and did not authorize collection of routing data involving any data transmitted from or to any device identified by a MAC address.

Four other pen-trap orders were obtained. No data was ever produced in discovery for any of those four orders, yet the laptop search warrant cites the results from two of those orders, orders which did authorize the collection of MAC addresses, and which did authorize collection of data transmitted to or from devices associated with certain MAC addresses. Those two orders were obtained by AUSA Serrin Turner on 9/20/2013, in cases numbered 13 MAG 2274 and 13 MAG 2275.

If the data collected as a result of those two pen-trap orders was important enough to include in the laptop and residence search warrant affidavits, and important enough to include in Tarbell's declaration as to what data was and was not collected, then the data was material to preparation of the defense and it should have been provided to the defense. By law, that data,

3

along with descriptions of methods and equipment that law enforcement employed in the data collection, were required to be filed under seal with the court which authorized the orders. That data and those descriptions should be there still, available for review by Mr. Ulbricht. Mr. Ulbricht is today requesting access to those files, by separate motion.

Because three of the pen-trap orders authorized law enforcement (the FBI) to use their own data collection hardware and software, without third party involvement, the FBI was required to file in each of the three case files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275) authorizing pen-trap data collection, a record *which will identify (i) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network; (ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information; (iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and (iv) any information which has been collected by the device.* 18 U.S.C. § 3123. The record to be maintained must be provided *ex parte* and under seal to the court which authorized the installation and use of the device within 30 days after termination of the order. *Id*.

The government has never produced the data collected pursuant to four of the five pen-trap orders, yet argued before trial against suppression of evidence obtained from the pen registers on the basis of the government's representation as to what each of the pen registers did and did not collect. If the government lacked the data, the arguments based on the knowledge of a government attorney were made in bad faith. If the government had the data, but did not produce it upon request, and misrepresented what it contained in argument to the court, that would be a serious problem. If the government had the data but did not produce it, that alone would constitute a serious discovery violation.

The government stated that the pen registers were used to establish when Ulbricht logged onto and off of the internet, in support of their argument that the search warrant applications to search for information to allow comparison with online activity were reasonable requests seeking relevant information, referencing Tarbell Dec. Ex. M., par. 33-41. See Doc. 56 at 29.

There is new information which has recently become available that reveals the FBI used electronic surveillance to track the movement and determine the precise location of Mr. Ulbricht in his residence as part of its pen register data collection, and to determine when he logged in and out on his laptop, while Ulbricht was in his residence. This information is revealed in the book *American Kingpin*, a book published in May 2017, long after the trial was concluded.

According to the author, Nick Bilton, his accounts are based, in part, on more than 250 hours spent with federal agents involved in the investigation, including FBI special agents [Tarbell and Kiernan], and including Homeland Security special agent Jared Der-Yeghiayan. Bilton's account of FBI surveillance correctly places Tarbell, Der-Yeghiayan, and Kiernan on site outside Ulbricht's residence, a short time before Ulbricht's arrest. He describes the actions and observations of these agents.

4

Bilton describes the FBI surveillance of Ulbricht in his residence:

"Jared [Der-Yeghiayan], Thom [Thomas Kiernan], and Brophy stood in front of the café near Ross' house, listening to Tarbell . . . They knew that Ross was at home because the FBI had an undercover SUV circling his block and monitoring the Wi-Fi traffic (this is pen register and trap and trace activity). The system they were using (which should be described in the magistrates' files) would check the signal strength of the Wi-Fi on his computer and then, by triangulating that data from three different points they had captured as they drove around the block, they were able to figure out Ross's exact location, which at this very moment was his bedroom, on the third floor of his Monterey Boulevard apartment." Bilton at 331.

## CONCLUSION

The description of methods, hardware and configuration used by the FBI to gather pen-trap data, as well as the data itself, were all essential and material to preparation of the defense and should have been provided before the trial.

Undersigned counsel will need to obtain and then review (1) all of the remaining client file materials from Joshua Dratel, (2) the new PRTT data promised by the prosecutor, and (3) material from the now sealed magistrate files, to see if these materials will provide the basis for a Rule 33 motion, *i.e.*, whether newly discovered evidence will show that a new trial is required.

It is clear from the facts presented that Mr. Ulbricht has diligently pursued the collection of evidence and of his file materials in his investigation into the basis for a Rule 33 motion. He has a good faith basis for believing that investigation into the surveillance of him while within his residence, and investigation into the missing pen register data, will provide him with information that can provide the bases for a successful Rule 33 motion.

Mr. Ulbricht is serving a life sentence and justice requires that he be afforded the opportunity to research and present his motion for a new trial. ***Mr. Ulbricht therefore respectfully requests, pursuant to Rule 45(b)(1)(A), Fed.R.Crim.P., and for good cause shown, that he be allowed an extension of time until and including May 7, 2018, in which to submit his Rule 33 motion***.

Mr. Ulbricht is incarcerated and has no ability to pay Mr. Dratel for the costs to search for, gather together, and reproduce his client file, or to pay the costs for shipping the file to current counsel. Mr. Dratel is harming Mr. Ulbricht by holding onto portions of the client file until Mr. Ulbricht or undersigned counsel or someone pays him for collecting and transferring the complete client file.

For the reasons stated above, **Mr. Ulbricht further requests that the court order Joshua L. Dratel, of the law firm Joshua L. Dratel, P.C., to collect and transfer to Paul Grant, of the Law Office of Paul Grant, on or before February 23, 2018, all of Mr. Ulbricht's client file,** which file includes both trial court and appellate work performed for Mr.

5

Ulbricht, including all electronic documents in Ulbricht's file, all email communications in his possession or control which involve work on Ulbricht's cases, all paper documents in his file, and all sealed documents filed in Ulbricht's cases, with Joshua L. Dratel bearing all the costs associated with gathering the client file and transferring it to Mr. Grant.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

Case 18-648, Document 1-2, 03/07/2018, 2251620, Page91 of 342
Case 1:14-cr-00068-KBF   Document 309   Filed 02/05/18   Page 1 of 6
Case 1:14-cr-00068-KBF   Document 304   Filed 02/05/18   Page 1 of 6

EXHIBIT K, Doc. 309

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133

February 5, 2018

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: FEB 0 5 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:   *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
      Request for Extension of Time to Submit Rule 33 Motion

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request an extension of time through and
including May 7, 2018, in which to submit his Rule 33 Motion for a New Trial Based on Newly
Discovered Evidence. I have contacted the government about this request and AUSA Eun Young
Choi advised that the government will not oppose this request.

Mr. Ulbricht was tried in this court and on February 4, 2015, his jury brought back guilty
verdicts on all charges in the indictment. The deadline for filing his Rule 33 motion is 3 years
from the date of those verdicts, which means his motion is due to be filed on or before February
5, 2018. Rule 33(b), Fed.R.Crim.P.; Rule 45(a)(1)(C), Fed.R.Crim.P.

Mr. Ulbricht submitted his petition for writ of certiorari to the Supreme Court on
December 22, 2017, and his case was docketed on January 4, 2018. That action does not extend
the deadline for filing his Rule 33 motion.

Mr. Ulbricht is requesting an extension of his filing deadline until and including May 7,
2018. This extension is made necessary for the following reasons:

1. Undersigned counsel has yet to receive the complete client file from prior trial and
appellate counsel, Joshua Dratel and Lindsay Lewis. Counsel has made every effort to persuade
Mr. Dratel and Ms. Lewis to collect Mr. Ulbricht's complete client file, and send it to
undersigned counsel. See generally the Declaration of Paul Grant in Support of Request for
Extension of time to Submit Rule 33 Motion for New Trial, which declaration is filed herewith.

After nearly 8 months of continuous efforts by undersigned counsel to obtain the client
file from Mr. Dratel, Ms. Lewis advised me [for the first time], on January 22, 2018, that Mr.

1

Dratel still retains a file cabinet full of Mr. Ulbricht's case materials, which they will release to me only if Mr. Ulbricht, undersigned counsel, or someone will pay them for their time to gather together the file materials, search their email records to find relevant emails, produce a copy of client file materials for them to retain, and ship the remaining client file materials to Paul Grant. Declaration of Paul Grant In Support of Request for Extension of Time, par. 3-15.

Undersigned counsel cannot distinguish what may be newly discovered evidence from evidence that was available to trial counsel, without the complete client file. Counsel can't distinguish among what might be discovery violations by the government, strategic decisions by defense counsel, or neglect of issues by trial counsel, without the complete client file.

Counsel can't adequately represent Mr. Ulbricht in Rule 33 or in other post-conviction matters, such as an investigation into possible 28 U.S.C. § 2255 claims, without the complete client file. Counsel's efforts to find newly discovered evidence and to provide competent representation to Mr. Ulbricht are being hindered by the refusal and failure of trial and appellate counsel Dratel to collect and transmit the entire client file to undersigned counsel.

2. Counsel has requested data from the USAO relating to the pen-trap orders and data collection used in this case. The USAO advised (in November 2017) that they were searching for these records in FBI files. The USAO advised that they found it difficult to locate the files, given that the lead agents involved in the investigation no longer work for the FBI.

The USAO advised undersigned counsel on Friday, February 2, 2018, that they had located some pertinent files, files containing pen register and trap and trace data collection ("PRTT files"), and that they will be sending that data to undersigned counsel on a disk. Undersigned counsel has also requested those files and FBI surveillance files through a FOIA request sent to the FBI, but the FBI has recently said that some of the records being sought are in the control of the Executive Office for United States Attorneys. It isn't clear at this time whether the FOIA request will produce any records.

The requested PRTT files are material to determining whether Mr. Ulbricht has grounds for filing a Rule 33 motion. The affidavits in support of the laptop search warrant and the residence search warrant that were obtained during the course of the Silk Road investigation, both relied upon evidence allegedly collected pursuant to the pen-trap orders. Only the results from one pen-trap data collection were provided to the defense prior to trial. Undersigned counsel has requested from the USAO in the SDNY the files containing the data collected pursuant to four other pen-trap orders, the orders identified by magistrate case numbers as 13 MAG 2228, a Sealed Order for the Secret Service directed to Comcast, 13 MAG 2258 (the 9.19.13 wireless router pen for FBI), 13 MAG 2274 (9.20.13.Router Pen for FBI), and 13 MAG 2275 (9.20.13.MAC Address Pen for FBI).

It is not yet clear if those PRTT files are the files now being produced to the defense by the AUSA. Mr. Ulbricht will need expert assistance and an unknown length of time to examine

2

what are expected to be gigabytes of data.

Defendant Ulbricht did make a written discovery request to the government before trial for *any and all data obtained from pen registers judicially authorized in this case*. Doc 70-3, Par. 13, p. 3, 9/17/2014 letter from Joshua Dratel to AUSAs Serrin Turner and Timothy T. Howard. That request was for data material to preparation of the defense.

In response to Ulbricht's request for discovery of *any and all data obtained from pen registers judicially authorized in this case*, the government responded [somewhat ambiguously]:

*The Government has provided all available pen register data used to detect Ulbricht's email and Internet activity in September 2013, as well as pen register data received from Icelandic law enforcement authorities concerning the SR Server and the server described in the Tarbell Declaration as Server-1. To the extent any other pen register information was obtained in the course of the investigation, the Government objects to this request on the ground that such information is not material to the defense or otherwise required to be produced under Rule 16.* See Doc 70-4 at p. 5, 9/23/2014 letter from AUSA Serrin Turner to Joshua Dratel.

The government's response is artfully or inadvertently worded to avoid revealing whether the data used to detect Ulbricht's internet activity was available and whether it was or was not provided, and, at the same time, the government said that if any other data was not available, then it wasn't material and they were not required to produce it. It isn't clear from the response whether the government was saying that the data used to detect Ulbricht's internet activity in September 2013 was provided, or whether it was no longer available.

The government only produced to the defense the data resulting from one pen register, data in a file called 9.17.13 ISP Pen (Comcast). That pen register was authorized by the magistrate in Case No. 13 MAG 2236, and that order required data collection assistance from Comcast. That order did not authorize the collection of MAC addresses and did not authorize collection of routing data involving any data transmitted from or to any device identified by a MAC address.

Four other pen-trap orders were obtained. No data was ever produced in discovery for any of those four orders, yet the laptop search warrant cites the results from two of those orders, orders which did authorize the collection of MAC addresses, and which did authorize collection of data transmitted to or from devices associated with certain MAC addresses. Those two orders were obtained by AUSA Serrin Turner on 9/20/2013, in cases numbered 13 MAG 2274 and 13 MAG 2275.

If the data collected as a result of those two pen-trap orders was important enough to include in the laptop and residence search warrant affidavits, and important enough to include in Tarbell's declaration as to what data was and was not collected, then the data was material to preparation of the defense and it should have been provided to the defense. By law, that data,

Case 18-648, Document 1-2, 03/07/2018, 2251620, Page94 of 343
Case 1:14-cr-00068-KBF   Document 309   Filed 02/05/18   Page 4 of 6
Case 1:14-cr-00068-KBF   Document 304   Filed 02/05/18   Page 4 of 6

along with descriptions of methods and equipment that law enforcement employed in the data collection, were required to be filed under seal with the court which authorized the orders. That data and those descriptions should be there still, available for review by Mr. Ulbricht. Mr. Ulbricht is today requesting access to those files, by separate motion.

Because three of the pen-trap orders authorized law enforcement (the FBI) to use their own data collection hardware and software, without third party involvement, the FBI was required to file in each of the three case files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275) authorizing pen-trap data collection, a record *which will identify (i) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network; (ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information; (iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and (iv) any information which has been collected by the device.* 18 U.S.C. § 3123. The record to be maintained must be provided *ex parte* and under seal to the court which authorized the installation and use of the device within 30 days after termination of the order. *Id.*

The government has never produced the data collected pursuant to four of the five pen-trap orders, yet argued before trial against suppression of evidence obtained from the pen registers on the basis of the government's representation as to what each of the pen registers did and did not collect. If the government lacked the data, the arguments based on the knowledge of a government attorney were made in bad faith. If the government had the data, but did not produce it upon request, and misrepresented what it contained in argument to the court, that would be a serious problem. If the government had the data but did not produce it, that alone would constitute a serious discovery violation.

The government stated that the pen registers were used to establish when Ulbricht logged onto and off of the internet, in support of their argument that the search warrant applications to search for information to allow comparison with online activity were reasonable requests seeking relevant information, referencing Tarbell Dec. Ex. M., par. 33-41. See Doc. 56 at 29.

There is new information which has recently become available that reveals the FBI used electronic surveillance to track the movement and determine the precise location of Mr. Ulbricht in his residence as part of its pen register data collection, and to determine when he logged in and out on his laptop, while Ulbricht was in his residence. This information is revealed in the book *American Kingpin*, a book published in May 2017, long after the trial was concluded.

According to the author, Nick Bilton, his accounts are based, in part, on more than 250 hours spent with federal agents involved in the investigation, including FBI special agents [Tarbell and Kiernan], and including Homeland Security special agent Jared Der-Yeghiayan. Bilton's account of FBI surveillance correctly places Tarbell, Der-Yeghiayan, and Kiernan on site outside Ulbricht's residence, a short time before Ulbricht's arrest. He describes the actions and observations of these agents.

Bilton describes the FBI surveillance of Ulbricht in his residence:

"Jared [Der-Yeghiayan], Thom [Thomas Kiernan], and Brophy stood in front of the café near Ross' house, listening to Tarbell . . . They knew that Ross was at home because the FBI had an undercover SUV circling his block and monitoring the Wi-Fi traffic (this is pen register and trap and trace activity). The system they were using (which should be described in the magistrates' files) would check the signal strength of the Wi-Fi on his computer and then, by triangulating that data from three different points they had captured as they drove around the block, they were able to figure out Ross's exact location, which at this very moment was his bedroom, on the third floor of his Monterey Boulevard apartment." Bilton at 331.

## CONCLUSION

The description of methods, hardware and configuration used by the FBI to gather pen-trap data, as well as the data itself, were all essential and material to preparation of the defense and should have been provided before the trial.

Undersigned counsel will need to obtain and then review (1) all of the remaining client file materials from Joshua Dratel, (2) the new PRTT data promised by the prosecutor, and (3) material from the now sealed magistrate files, to see if these materials will provide the basis for a Rule 33 motion, *i.e.*, whether newly discovered evidence will show that a new trial is required.

It is clear from the facts presented that Mr. Ulbricht has diligently pursued the collection of evidence and of his file materials in his investigation into the basis for a Rule 33 motion. He has a good faith basis for believing that investigation into the surveillance of him while within his residence, and investigation into the missing pen register data, will provide him with information that can provide the bases for a successful Rule 33 motion.

Mr. Ulbricht is serving a life sentence and justice requires that he be afforded the opportunity to research and present his motion for a new trial. *Mr. Ulbricht therefore respectfully requests, pursuant to Rule 45(b)(1)(A), Fed.R.Crim.P., and for good cause shown, that he be allowed an extension of time until and including May 7, 2018, in which to submit his Rule 33 motion*.

Mr. Ulbricht is incarcerated and has no ability to pay Mr. Dratel for the costs to search for, gather together, and reproduce his client file, or to pay the costs for shipping the file to current counsel. Mr. Dratel is harming Mr. Ulbricht by holding onto portions of the client file until Mr. Ulbricht or undersigned counsel or someone pays him for collecting and transferring the complete client file.

For the reasons stated above, **Mr. Ulbricht further requests that the court order Joshua L. Dratel, of the law firm Joshua L. Dratel, P.C., to collect and transfer to Paul Grant, of the Law Office of Paul Grant, on or before February 23, 2018, all of Mr. Ulbricht's client file,** which file includes both trial court and appellate work performed for Mr.

5

Case 18-640, Document 1-2, 03/07/2018, 2251620, Page96 of 342
Case 1:14-cr-00068-KBF   Document 309   Filed 02/05/18   Page 6 of 6
Case 1:14-cr-00068-KBF   Document 304   Filed 02/05/18   Page 6 of 6

Ulbricht, including all electronic documents in Ulbricht's file, all email communications in his possession or control which involve work on Ulbricht's cases, all paper documents in his file, and all sealed documents filed in Ulbricht's cases, with Joshua L. Dratel bearing all the costs associated with gathering the client file and transferring it to Mr. Grant.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

## Ordered

The motion to extend time for a Rule 33 motion is DENIED. A Rule 33 motion is not an opportunity to relitigate that which has been litigated, or to engage in a fishing expedition for new evidence. The Court appreciates that Mr. Grant was not involved in the trial, but the transcript reveals that the very evidence to which he now points (that the FBI was monitoring the defendant's online movements) was explicitly known at the trial. (See e.g., Tr. 319, et. seq.) This is not new news. As to an inability to obtain the file, that does not suggest any basis for a new trial -- indeed, whatever is is the file was necessarily known to prior counsel. No good cause to delay the deadline has been shown.

KBS. Forrest
USDJ    2/5/18

EXHIBIT L, Doc. 308

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA,                    14 Cr. 68 (KBF)

                     Plaintiff,               DECLARATION OF PAUL
                                                   GRANT IN SUPPORT OF
                                                   REQUEST FOR EXTENSION OF
                                                   TIME TO SUBMIT RULE 33
                                                   MOTION FOR NEW TRIAL

                           -v-

ROSS WILLIAM ULBRICHT,

                        Defendant.

---------------------------------------------------X

     I, Paul Grant, pursuant to 28 U.S.C. § 1746, hereby affirm under penalty of perjury:

I am an attorney licensed in the State of Colorado and admitted *pro hac vice* in this case for

purposes of my representation of Ross Ulbricht in this matter. I state the following to be true:

1.  The Second Circuit affirmed Mr. Ulbricht's conviction and sentence on May 31, 2017.  I was

then asked to represent Mr. Ulbricht in further proceedings in the Second Circuit and in matters

in this court, and I agreed.

2.  After learning of the Second Circuit's decision, Mr. Ulbricht advised trial and appellate

counsel Joshua Dratel in writing that his representation in all matters was terminated, and Mr.

Ulbricht asked Mr. Dratel to deliver his client file to me.

3.  On June 5, 2017, via email, I confirmed to Mr. Dratel that I was taking over Mr. Ulbricht's

representation and I requested that he furnish me with Mr. Ulbricht's case file, including the

discovery provided in the criminal case.

4.  On June 6, 2017, via email, I asked Mr. Dratel how long it would take him to send me the discovery and the rest of Mr. Ulbricht's file, letting him know I needed that information to prepare the petition for rehearing and to represent Mr. Ulbricht in further proceedings, and I needed to know how long it would take him to send me the client file because that would determine what extension of time I would need to request in the Second Circuit to allow me to research and prepare the petition for rehearing.

5.  Mr. Dratel responded on 6/7/2017 that they had located some of the discovery but he did not know how long it would take to locate the rest. Mr. Dratel advised he was not going to drop everything else he was working on to collect Mr. Ulbricht's file because Mr. Ulbricht's parents owed him a lot of money and he was "not going to devote time to this (collecting and sending me Mr. Ulbricht's file) at the expense of other pressing matters for clients who are paying."  He "guessed" that the other client file materials would be provided to me "over the next couple of weeks."

Mr. Dratel did soon provide to undersigned counsel most of the discovery and some client file materials.

6.  On 6/8/2017, via email, I reminded Mr. Dratel that I needed the entire client file to represent Mr. Ulbricht, and I asked him if that could be completed within 30 days and to inform me when it could be completed, if 30 days was not possible.  Mr. Dratel did not respond as to when he would deliver the rest of the client file.

7.  On 7/14/2017, via email, I acknowledged to Mr. Dratel that I had received from him three discovery hard drives and a flash drive, and asked if there was any other discovery in the case.  I also reminded him of my 6/8/2017 request for information and the timing for him sending me

the rest of the client file.

8.  On 9/11/2017, via email, I informed Mr. Dratel that I had just received a CD prepared by his office, which disk contained some additional client file materials, but advised him that based on information from Mr. Ulbricht, there may be additional discovery CDs provided by the government.  I asked Mr. Dratel if he had transferred that data onto the discovery hard drives he sent to me, but he did not respond.  In my email, I listed several specific file items that I had not received, but which I had reason to believe did exist.  I provided Mr. Dratel with a letter listing items I was asking him to locate and provide.  I informed Mr. Dratel that when I said I was requesting the client file, I meant "everything in your files or the files of other attorneys who worked with you on the cases (trial and appeal and civil forfeiture. . .), related to his representation" of Mr. Ulbricht, from his first day of contact on the case, to the last day he sent or received communications on the case.  No response was received.

9.  On 9/29/2017, via email, I requested of Mr. Dratel and his co-counsel in this case, Lindsay Lewis and Joshua Horowitz, that they each move to withdraw as counsel for Mr. Ulbricht in all cases where they had entered appearances on his behalf.  They have not done so.  Mr. Horowitz has, however, been very cooperative in providing to me all client file materials in his possession.

10.  On 10/1/2017, via email to Lindsay Lewis, I requested that Ms. Lewis review her records for additional information in Mr. Ulbricht's client file.  I asked her if there was more discovery that had not been sent to me, and I mentioned several specific items and categories of information that I was requesting, information I had reason to believe did exist. I also asked her to help me get Mr. Dratel to give a defense expert witness written permission to talk to me about his work on the case.  That defense expert witness was bound by a confidentiality agreement not to

3

discuss his work on the case with anyone without express written permission from Joshua L.

Dratel. **Ms. Lewis finally sent this written permission to two defense experts on 1/18/2018.**

I asked Ms. Lewis not to pick and choose what to send me from the client file, but to

send me everything.

11.  On 10/2/2017, via email to Mr. Dratel, I repeated my request for the entire client file, and

asked him to identify anything he was retaining and not providing.  He did not respond.

I also reminded him of my 9/22/2017 phone request to his office that he provide written

permission to a defense expert that would allow them to speak to me about their work on the

case. **This written permission was sent by Ms. Lewis to two defense experts, on 1/18/2018.**

12.  On 10/20/2017, via email, I reminded Ms. Lindsay of my voicemail message left for her that

same day, in which I had requested her to let me know if she would be sending me all the

material she had from Ross Ulbricht's client file. There has been no response.

13.  On 10/21/2017, via email, I advised Ms. Lindsay of my fast-approaching Rule 33 motions

filing deadline, told her I couldn't complete my research for the Rule 33 motion without the

complete client file, and asked her to do whatever she could to provide me with the complete

client file, reminding her that the question as to whether Mr. Ulbricht would spend the rest of his

life in prison, may well depend on her response and my efforts.  There was no response.

14.  On 10/22/2017, via email to Mr. Dratel, I reminded him of my email request of 10/2/2017,

and advised him of my impending Rule 33 deadline.  I provided Mr. Dratel with a table showing

certain discovery I had received from his office, and certain discovery I had not received,

concerning certain categories of discovery, and told him I did not know whether the government

had failed to provide the missing discovery, or whether he had failed to provide the missing

discovery to me.  I have not yet received his answer.  I told him it would be awkward for me to complain to the court about important discovery the government had failed to produce, only to find out later that the discovery had been produced to the defense, but Mr. Dratel had not provided it to me.  No response.

15.  On 1/22/2018, in a phone conversation, Ms. Lewis advised me, for the very first time, that Mr. Dratel had in his office a complete file cabinet full of paper documents related to Mr. Ulbricht's case.  Ms. Lewis said they would send me those documents if I would pay to make a copy for Mr. Dratel and if I would pay for shipping.

In that same 1/22/2018 conversation, Ms. Lewis advised that it would be too difficult, and take too much of her time, for her to go through their digital records to search for and collect emails related to their work on Mr. Ulbricht's case.  She, too, reminded me that her firm was owed a lot of money for their work on the case.  Ms. Lewis did not explain how that "problem" related to their obligation to turn over the client file to me, replacement counsel.

Mr. Dratel took on Mr. Ulbricht's case knowing that Mr. Ulbricht could not pay him and that he would have to look to other sources for his payment, which he did.  Now he refuses to collect and transfer the rest of Mr. Ulbricht's client file to undersigned counsel, unless Mr. Ulbricht, I, or *someone* pays him for the cost to copy (for his records) and ship to me the file materials.

16.  Undersigned counsel has reviewed the billing records of Joshua L. Dratel, P.C., bills Mr. Dratel  submitted for work on the Ulbricht case, and, based on a cursory review, I would estimate that Joshua L. Dratel, P.C. billed for reading or sending more than 1000 emails during the course of representation in Mr. Ulbricht's trial and appellate cases, at a cost of at least tens of

thousands of dollars.  This work must have been important client work or Mr. Dratel would

surely not have billed for it, so the emails involved with these communications are clearly part of

the client file.  I estimate that Mr. Dratel has probably not turned over to undersigned counsel

more than a dozen of the emails he billed for, except for a few that were included in court filings.

17.  On 1/29/2018, via email, I asked Mr. Dratel to send me the entire file cabinet full of Ulbricht

file materials.  I also repeated that I wanted all electronic communications, sent or received,

involving his firm's work on the case, and I gave him recommendations as to how he could more

efficiently search his electronic records for relevant emails.  I asked Mr. Dratel to inform me if

he would be sending me more materials and, if so, when I would be receiving them.  I told him I

would need that information in order to determine the length of extension I would need to

request for submitting the Rule 33 motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed this 5th day of February, 2018.

/s/ Paul Grant
Paul Grant

EXHIBIT M, Doc. 319

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
paul_pglaw@yahoo.com
303-909-6133

February 20, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

*Ordered*
*Denied.*
*KBF. Fore*
*USDJ*
*2/21/18*

Re:     *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
        Petition for Rehearing Re Denial of Request for Extension of Time
        to Submit Rule 33 Motion

Dear Judge Forrest:

        I write on behalf of Defendant Ross Ulbricht to submit this petition for rehearing, asking
that the court vacate its February 5, 2018 order (Doc. 309) denying the request for extension of
time. I have contacted the government about this request and AUSA Eun Young Choi advises
that the government will take no position regarding this petition insofar as Mr. Ulbricht is
requesting the court reconsider its denial of the request for extension of time. The government
did not oppose the original request for an extension of time. The government is not endorsing
Mr. Ulbricht's arguments.

        Mr. Ulbricht believes that the court has misapprehended, overlooked, or misapplied the
following facts and pertinent law:

1.      The court is mistaken in not noting that the evidence Mr. Ulbricht brought to the court's
attention is, in fact, new evidence that was neither disclosed nor known to exist at the time of
trial. The court stated that the evidence to which Mr. Ulbricht now points (that the FBI was
monitoring the defendant's online movements) was known at trial.

        What was known at the time of trial was that the FBI (claimed to have) monitored Mr.
Ulbricht's online activities through the use of pen registers and trap and trace devices to collect
pen register and trap and trace data ("PRTT data"), and that the FBI (claimed to have) conducted
its activities pursuant to three pen/trap orders authorized by magistrates in the Southern District
of New York. Doc. 307 at 2. What was known at the time of trial was that the government had
stated that there was no undisclosed PRTT data that would be material to the preparation of the
defense. Doc. 307 at 3.

1

EXHIBIT N, Doc. 316

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
paul_pglaw@yahoo.com
303-909-6133

February 20, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:     *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
        Petition for Rehearing Re Denial of Request for Extension of Time
        to Submit Rule 33 Motion

Dear Judge Forrest:

        I write on behalf of Defendant Ross Ulbricht to submit this petition for rehearing, asking that the court vacate its February 5, 2018 order (Doc. 309) denying the request for extension of time.  I have contacted the government about this request and AUSA Eun Young Choi advises that the government will take no position regarding this petition insofar as Mr. Ulbricht is requesting the court reconsider its denial of the request for extension of time.  The government did not oppose the original request for an extension of time.  The government is not endorsing Mr. Ulbricht's arguments.

        Mr. Ulbricht believes that the court has misapprehended, overlooked, or misapplied the following facts and pertinent law:

1.      The court is mistaken in not noting that the evidence Mr. Ulbricht brought to the court's attention is, in fact, new evidence that was neither disclosed nor known to exist at the time of trial. The court stated that the evidence to which Mr. Ulbricht now points (that the FBI was monitoring the defendant's online movements) was known at trial.

        What was known at the time of trial was that the FBI (claimed to have) monitored Mr. Ulbricht's online activities through the use of pen registers and trap and trace devices to collect pen register and trap and trace data ("PRTT data"), and that the FBI (claimed to have) conducted its activities pursuant to three pen/trap orders authorized by magistrates in the Southern District of New York. Doc. 307 at 2.  What was known at the time of trial was that the government had stated that there was no undisclosed PRTT data that would be material to the preparation of the defense.  Doc. 307 at 3.

1

What was not known prior to trial, and what the government then vehemently denied, was that the government was using unauthorized surveillance tools to track Mr. Ulbricht's physical movements and location within his residence.  Unauthorized and unwarranted surveillance by the FBI has now been revealed in the book *American Kingpin*, where the author describes how the FBI used surveillance equipment located outside the house to physically track Mr. Ulbricht's movement and computer activity and to determine his precise location in his residence.  Doc. 307 at 4-5.  This is new evidence.

What was not known (and was denied by the government) before trial (but is known now), is that the government did have additional and material FBI-collected PRTT data, evidence that was material to the preparation of the defense because it is data the government relied on in its applications for the laptop and residence search warrants.  The government apparently recently "found" some of this data and promised (on February 2, 2018) to deliver it to Mr. Ulbricht, for his review.  Doc. 307 at 3.  This is new evidence.

The government was required to produce the FBI-collected PRTT data prior to trial because the defense requested it.  "Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense." Rule 16(a)(1)(E)(i), Fed.R.Crim.P.  Prior to trial, the government denied such evidence existed.  Doc. 307 at 3.

Mr. Ulbricht was entitled to rely on the government's statement that it had provided all available pen-trap data related to monitoring Ulbricht's internet activity, and that any other data it may have was not material and not subject to production. *See United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009).

Rule 16(a)(1)(E) permits discovery related to the constitutionality of a search or seizure. *U.S. v. Hector Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016).  Materiality is a "low threshold; it is satisfied so long as the information . . . would have helped" to prepare a defense. *Id., quoting United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013).

The only obstacles that will prevent Mr. Ulbricht from inspecting, copying and using material information from the newly located PRTT data (and data in the magistrate's files) to challenge the warrants, should such information be contained in the data, are the court's February 5, 2018-dated orders denying Mr. Ulbricht the opportunity and the time to examine and use the data.

2. Mr. Ulbricht advised the court in his request for extension of time that he would need time to obtain and examine pen register and trap and trace ("PRTT") data from two sources:  (1) the newly located PRTT data promised by the prosecutor, and (2) material from the now-sealed magistrate files, to see if those materials would provide the basis for his Rule 33 motion, *i.e.*,

whether newly discovered evidence will show that a new trial is required.  Doc. 307 at 5.

What the court did not note and apparently overlooked in its order denying the extension, is that the government advised undersigned counsel, on February 2, 2018, three days before the deadline expired for filing his Rule 33 Motion, that they had located additional PRTT data collected in this case, and would provide it to the defense.  Doc. 307 at 2.

The government promised it was sending this new evidence to undersigned counsel, but three days later, and before the package arrived, the court denied the request for extension of time.

As a result, Mr. Ulbricht cannot use this new evidence (and data from the three sealed magistrate's files) even if the data constitutes evidence that would establish that the laptop and residence search warrants were unconstitutionally obtained.

The court's denial of the request for extension will thwart the pursuit of justice, *i.e.*, it will prevent Mr. Ulbricht from examining the data that may show the government engaged in illegal and warrantless surveillance of his activities within the privacy of his home.

3.     Mr. Ulbricht advised the court in his Request that he was seeking to examine three now-sealed magistrate's files which, by law, should contain the pen register and trap and trace data collected by the FBI, as well as *a written description of the methods and equipment used in their surveillance*.  Doc. 307 at 4.

After denying Mr. Ulbricht's request for extension of time to submit his Rule 33 Motion, on February 5, 2018, the court also denied (on the same day) "as moot" (Doc. # 311) Mr. Ulbricht's request to view the new evidence contained in the three magistrate's files.

The PRTT evidence in the three magistrate's files is new evidence because the government denied its existence in 2014, or denied that it would be material to the preparation of the defense.

The FBI-collected PRTT evidence in the magistrate's files was material because ***the laptop and residence search warrants applications depended on that data***.  Doc. 307 at 2.  It also appears material to preparation of the defense because those records should reveal details of the FBI surveillance described in *American Kingpin*.

Tracking Mr. Ulbricht's movements and determining his location within his residence, without a search warrant, would constitute an unreasonable search of his residence.  *See Kyllo v. United States*, 533 U.S. 27 (2001).  The FBI surveillance described in *American Kingpin* "involved officers on a public street engaged in more than naked-eye surveillance of a home." *See Kyllo* at 33.  "Where . . . the government uses a device to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a

"search" and is presumptively unreasonable without a warrant." *Id.*, at 40.

Mr. Ulbricht should be allowed the time and opportunity to examine the data and written record now concealed in the three sealed magistrate's files, and to use that information to vindicate his Fourth Amendment rights, if that improperly withheld data and record show Fourth Amendment violations.

4.     In the court's denial of the Request for Extension, the court stated: *The transcript reveals that the very evidence to which he points (that the FBI was monitoring the defendant's online movements [sic]) was explicitly known at trial.*  Doc. 309.

The court's statement is incorrect.  What Mr. Ulbricht pointed to in his Request for Extension of Time, was the passage in *American Kingpin* which reveals, for the first time, that the FBI was tracking Mr. Ulbricht's physical movement and location in his house:

*They knew that Ross was at home because the FBI had an undercover SUV circling his block and monitoring the Wi-Fi traffic (this is pen register and trap and trace activity). The system they were using (which should be described in the magistrates' files) would check the signal strength of the Wi-Fi on his computer and then, by triangulating that data from three different points they had captured as they drove around the block, they were able to figure out Ross's exact location, which at this very moment was his bedroom, on the third floor of his Monterey Boulevard apartment.* Doc. 307 at 5.

The court's statement refers to testimony from Der-Yeghiayan (Tr. 319, *et seq*) which described him monitoring DPR's (not Mr. Ulbricht's) online activity.  Der-Yeghiayan initiated online chats with DPR because and he was able to sign on and access staff chat with DPR. When he was chatting with DPR, he could tell that DPR was online.  Tr. 314.  What Der-Yeghiayan described in his testimony was FBI efforts to correlate DPR's chat activity with Mr. Ulbricht's online activity, in an effort to establish that DPR was Ulbricht. They were hoping to initiate a chat with DPR at the same time they were watching Mr. Ulbricht *in real life - i.e.*, in a public place and active on his laptop, to establish that DPR and Ulbricht were one and the same person.

The trial testimony that the court refers to does not refer to the FBI monitoring Mr. Ulbricht's online movements [*sic*], and does not reveal that the FBI was using surveillance technology that allowed them to track Mr. Ulbricht's physical movements in his home. What Mr. Ulbricht pointed to in his request for extension of time, is what Bilton described in *American Kingpin*, which is the [warrantless and unlawful] tracking of Ulbricht's physical movements and determination of his location within his home.  That is the newly discovered evidence which needs to be developed and if the FBI conducted such surveillance, and if they complied with the requirements for filing records as specified in 18 U.S.C. § 3123, then evidence describing such surveillance will be found in the sealed magistrate's files.

5.     Mr. Ulbricht asked for his extension of time in the interest of justice and for good cause shown.  Doc. 307 at 5.  There is no indication in the court's denial that the court considered the

interest of justice.  Rule 33 is premised on the interest of justice: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Rule 33, Fed.R.Crim.P.

According to the government, at least some of the PRTT data that was requested but not produced prior to trial, has recently been located and will now be provided to Mr. Ulbricht.  That data may provide Mr. Ulbricht with the basis for challenging the constitutionality of the laptop and residence search warrants.  But for this court's denial of the Request for Extension of Time and the nearly simultaneous denial of his Request to examine the three magistrate's files, Mr. Ulbricht would now have access to improperly withheld, FBI-collected data and descriptions of methods that might allow him to show that the laptop and residence search warrants were obtained in violation of his Fourth Amendment rights.

If Mr. Ulbricht's rights against unreasonable search and seizure were violated, then evidence seized as a result of invalid search warrants should have been suppressed.  Had the evidence resulting from the search of the defendant's laptop and residence not been used against him, he may well not have been convicted at trial, on some or all of the counts of the indictment. Justice requires that Mr. Ulbricht be allowed to determine whether the data just located by the prosecutor and the data and record hidden in the magistrate's files would have changed the outcome of his case.

5.    Mr. Ulbricht has been hindered and interfered with since the first week of June, 2017, in researching and preparing his Rule 33 Motion, by his trial counsel's refusal to turn over the complete client file.  Request at 1.  Mr. Ulbricht still does not have his complete file, and is not sure he has all discovery provided to the defense.  He asked this court for assistance, requesting an order addressed to trial counsel, Joshua L. Dratel, to turn over the complete client file to current counsel.  Doc. 307 at 5-6.  The court did not respond to that request.

The court's order denying the extension of time says prior counsel's refusal to turn over the client file doesn't matter, because prior counsel knew what was in the file. Doc. 309.  That statement from the court assumes that trial counsel had examined and comprehended everything in the file, that he had kept track of what was in the file, that trial counsel was actively pursuing the best interests of his client, and that it was okay that Mr. Ulbricht has not been able to persuade Mr. Dratel to transfer Mr. Ulbricht's complete file to current counsel, though he has been trying to get the complete file since the first week of June, 2017.  Those assumptions are either unreasonable or they are contradicted by known facts, for the following reasons, which Mr. Ulbricht asks the court to consider:

a.   Discovery provided by the government in this case amounted to some 6 terabytes of information.  It would take one technically proficient and extremely dedicated human being years to go through all of that data, depending on the format of the data and the hours available each day, each week, etc.  Human memory being what it is, after years of review anyone would have forgotten most of what they had reviewed.  The discovery contains data in several different

formats, many of which are unfamiliar or impenetrable to most lawyers.  Some of the unfamiliar-to-most lawyer file formats are *.pcap* (packet capture files that can be read in Wireshark), some require ftk imager, some require MySQL.  Even if one could examine the data, it would not be easy for most lawyers to comprehend and relate the data to issues in the case.  There is no reason to believe that Mr. Dratel (trial counsel) is an expert in these areas or that he hired an expert to spend thousands of hours to review the data, some of which Mr. Dratel apparently lost. Declaration of Paul Grant in Support of Petition for Rehearing Re Request for Extension of Time to Submit Rule 33 Motion for New Trial ("Declaration"), at par. 3 - 4.

b.  Trial counsel apparently lost track of some of the discovery provided to him by the government.  For example, trial counsel claimed to have provided to undersigned counsel all of the discovery he received in this case, but trial counsel did not provide to undersigned counsel any of the *.pcap* files that resulted from packet capture data acquisition.  Undersigned counsel did eventually, and purely by happenstance, obtain the *.pcap* files that had been produced in discovery, not from trial counsel, but from the United States Attorney in September 2017, when they shipped a hard drive to undersigned counsel. The 4,499 *.pcap* files contained in a folder on that drive did contain PRTT data, but not the PRTT data that the government allegedly had relied upon in the laptop and residence search warrant affidavits. Declaration at par. 4 - 6.

    After obtaining expert assistance and discovering what was missing from those files, on October 10, 2017, undersigned counsel requested the United States Attorneys Office provide the missing PRTT data.  On February 2, 2018, the AUSA confirmed that they had located additional PRTT data and would be sending it to undersigned counsel.  Declaration at par. 6.

    There is no indication that trial counsel ever looked at the content of any packet capture files, or that he even kept a copy of the discovery folder containing these files.  Declaration at par. 7.

c.  Discovery data was provided in numerous formats so it is impossible to describe "how much" data was included in that 6 terabytes. It is estimated that 1 terabyte of text is equivalent to about 38,000 copies of Webster's Unabridged Dictionary.  Needless to say, it is not reasonable to assume that anyone could know what was contained in 6 terabytes of data.

d.  Trial counsel abandoned his duties to Mr. Ulbricht at least eight months ago, and perhaps much earlier. On May 31, 2017, trial counsel Joshua L. Dratel wrote to Mr. Ulbricht's parents notifying them that the Second Circuit had that day affirmed Mr. Ulbricht's conviction and sentence. In that email message, Mr. Dratel, still counsel of record for Mr. Ulbricht in the Second Circuit, informed Mr. Ulbricht's parents that he would not prepare Mr. Ulbricht's petition for rehearing, which was due in 14 days.  Declaration at par. 8.  Mr. Dratel reminded Mr. Ulbricht's parents that he had previously warned them that *he would no longer represent their son because they had stopped paying Mr. Dratel's bills*.  Declaration at par. 8.

    As of May 31, 2017, Mr. Dratel had neither sought nor received permission from this

court or from the Second Circuit Court of Appeals to withdraw from Mr. Ulbricht's case. Declaration at par. 9.

On June 6, 2016, Mr. Dratel notified Mr. Ulbricht's parents in writing that *he would not gather together Mr. Ulbricht's file and ship it to undersigned counsel, unless they first paid Mr. Dratel a suitable retainer* to cover Mr. Dratel's time and expenses. Declaration at par. 10.

Prior counsel was officially terminated in writing by Mr. Ulbricht the first week of June 2017 and counsel's failure to turn over the complete client file to undersigned counsel since that time (more than eight months) has prevented Mr. Ulbricht from effectively pursuing his Rule 33 motion (and from fully investigating claims under 28 U.S.C. § 2255), as mentioned in his Request. Doc. 307 at 2.

Prior counsel abandoned Mr. Ulbricht, on May 31, 2017, or before. Any thought about what prior counsel may have known cannot justify denying Mr. Ulbricht's timely Request for Extension of Time.

## CONCLUSION

Justice requires that prior counsel, Joshua L. Dratel, be ordered to gather together and deliver the complete client file to undersigned counsel, that Mr. Ulbricht be allowed the time to receive and examine the newly located PRTT data promised by the government, that the contents of the three magistrate's files be made available to Mr. Ulbricht for his examination and use, and that the requested extension of time be granted for Mr. Ulbricht to file his Rule 33 Motion.

The government should not be allowed to profit from its discovery violations and possible unlawful surveillance, and Mr. Ulbricht should not be forced to serve a sentence to life imprisonment, because the court denies Mr. Ulbricht the time needed to examine the relevant and important newly located and newly discovered evidence which he and the government both believe is now available.

The good cause shown by Mr. Ulbricht in his request for extension of time consists of his diligent efforts to pursue new and important evidence (in the face of discovery violations by the government and obstruction and abandonment by his trial counsel); his discovery of important new evidence in *American Kingpin* and in the hands of the United States Attorney (who searched for and recently found FBI-collected PRTT evidence at the defendant's request); and in his discovery of new evidence in the magistrate's files (despite the government's pre-trial denial that there was any undisclosed, material PRTT data). These magistrate's files should contain FBI-collected PRTT data (relied on to get the laptop and residence search warrants) and a description of the configuration of equipment and the surveillance methods used, including the invasive methods (described in *American Kingpin*) used to monitor and track Mr. Ulbricht's movement and computer activity and his location within his home.

The extension of time requested would not result in prejudice to any legitimate interest. There is no legitimate interest in the finality of a judgment that may result from discovery violations by the government and from hidden Fourth Amendment violations.  The interests of justice cannot be served by preserving an unjust conviction obtained through discovery violations and through what may prove to be illegal searches and seizures.

Granting the requested extension now will serve the interests of justice and the public appearance of justice by showing the public and Mr. Ulbricht that the court agrees that he should be allowed the opportunity to examine material evidence that should have been disclosed by the prosecutor prior to his trial. Denying the extension of time disserves the interests of justice.

For all the reasons stated above, the request for extension of time should be granted.  Mr. Ulbricht therefore respectfully requests the court consider the arguments and facts provided herein and in his Request for Extension, grant this petition, vacate the order denying the request for extension, and provide him with a 90 day extension of time, from the date of the court's new order, in which to submit his Rule 33 Motion.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

8

EXHIBIT N-1, Doc. 316-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,                    14 Cr. 68 (KBF)

                Plaintiff,        DECLARATION OF PAUL
                                             GRANT IN SUPPORT OF
                                             PETITION FOR REHEARING RE
                                             REQUEST FOR EXTENSION OF
                                             TIME TO SUBMIT RULE 33
                                             MOTION FOR NEW TRIAL

            -v-

ROSS WILLIAM ULBRICHT,

              Defendant.
--------------------------------------------------X

      I, Paul Grant, pursuant to 28 U.S.C. § 1746, hereby affirm under penalty of perjury:

I am an attorney licensed in the State of Colorado and admitted *pro hac vice* in this case for

purposes of my representation of Ross Ulbricht in this matter. I state the following to be true:

1.     I represent Mr. Ulbricht on post-conviction matters in this case, and on related matters

before the Second Circuit.

2.     I have received some discovery in this case from prior counsel, Joshua L. Dratel, and

some additional discovery from the United States Attorney.

3.     The discovery provided to me by Mr. Dratel amounted to some 6 terabytes of digitally

stored material.

4.     I have spent hundreds of hours reviewing the discovery but have barely scratched the

surface of the material contained therein.  I am not an expert in many of the formats in which the

discovery is stored, including *.pcap* (packet capture files that can be read in Wireshark), ftk

imager, and MySQL.  I require expert assistance to review and understand the data.

1

5.      I found no *.pcap* - formatted files in any of the discovery provided to me by prior

counsel.

6.      I have found 4,499 *.pcap* - formatted files in some discovery inadvertently provided to

me by the United States Attorney.  Those files apparently do include PRTT data, but not the FBI-

collected PRTT data described in the laptop and residence search warrant applications.  Upon

learning that, on October 10, 2017, I requested the United States Attorney provide me with the

missing data.  On February 2, 2018, the AUSA confirmed to me in writing that they had found

and would be sending me some recently located PRTT data files.

7.      I have reviewed all of the client file materials provided to me by prior counsel to the best

of my ability, and have seen no evidence that prior counsel ever looked at or even retained any of

the *.pcap* data files provided in discovery.

8.      Mr. Dratel sent Mr. Ulbricht's parents an email dated May 31, 2017, advising them that

the Second Circuit had on that day denied Mr. Ulbricht's appeal, affirming his conviction and

sentence.  Mr. Dratel informed the parents that he would not be preparing Mr. Ulbricht's petition

for rehearing, which was due in 14 days.  Mr. Dratel stated as his reason the fact that the parents

had stopped paying his bills and he reminded them that he had previously warned them that he

would not represent Mr. Ulbricht after the Second Circuit ruled on the appeal.

9.      As of  May 31, 2017, Mr. Dratel was still counsel of record for Mr. Ulbricht in the

Second Circuit and he had not filed a motion to withdraw in either the Second Circuit or in the

Southern District of New York.

10.     On June 6, 2017, Mr. Dratel sent an email to Mr. Ulbricht's parents, advising them that

he had received my request for the client file.  Mr. Dratel said his firm "cannot" undertake the

task of locating and assembling and preparing and sending the file materials to me, without being

paid up front for their time. Mr. Dratel required a "suitable retainer" <u>from Mr. Ulbricht's parents</u> before he would undertake this task. Mr. Dratel has provided some file materials to undersigned counsel since that date.

11.     As of today's date, February 19, 2018, Mr. Dratel continues to refuse to provide additional file materials to undersigned counsel, or even to search for relevant email messages, without some payment.

   I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 19th day of February, 2018.

<u>/s/ Paul Grant</u><br>
Paul Grant

3

EXHIBIT O, Doc. 305

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133

February 5, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:    *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
       Request to Partially Unseal and Make Available to Counsel and Defendant Three
       Magistrate's Files

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request that three SDNY magistrate's files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275) be partially unsealed and that the entire contents of those files be made available to counsel for the parties and to Mr. Ulbricht, for examination and review and use in this case. I have contacted the government about this request, and AUSA Eun Young Choi advises the government will oppose this request.

As the court may recall from pre-trial suppression proceedings, the government obtained five pen-trap orders authorizing the pen register and trap and trace collection of data sent to and from Ulbricht's router or to and from a device (assumed to be Ulbricht's computer) associated with a particular MAC address, including: 13 MAG 22, a Sealed Order for the Secret Service, directed to Comcast to provide assistance; 13 MAG 2228, a Sealed Order for the Secret Service, directed to Comcast to provide assistance; 13 MAG 2258 (the 9.19.13 wireless router pen for FBI); 13 MAG 2274 ((9.20.13.Router Pen for FBI); and 13 MAG 2275 (9.20.13.MAC Address Pen for FBI). Doc. 48, Memorandum of Law in Support of Defendant Ross Ulbricht's Pre-Trial Motions to Suppress Evidence . . ., at pages 37 -39 (page numbers in original document).

The latter three orders, each of which is directed to the FBI (the "three FBI pen-trap orders"), were issued in the three sealed magistrate's files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275) which Mr. Ulbricht now wishes to examine.

Mr. Ulbricht argued in his motion to dismiss that the data collection resulting from the five pen-trap orders must be suppressed because this data collection required search warrants based on probable cause, and because the orders failed to adhere to statutory limitations. See

1

Doc. 48, Memorandum of Law in Support of Defendant Ross Ulbricht's Pre-Trial Motions to Suppress . . ., at page 37. Mr. Ulbricht's pre-trial Motion to Suppress was hampered by the fact that the government had not disclosed the pen-trap data it had (allegedly) collected. Because the government failed to disclose all of the pen-trap data, Mr. Ulbricht could only attack the scope of the pen-trap orders, *i.e.*, what they authorized. Mr. Ulbricht was not able to separately attack, for example, whether the government's collection actually complied with the statute and with the terms of the pen-trap orders.

In a pre-trial discovery request, Mr. Ulbricht had requested from the government *any and all data obtained from pen registers judicially authorized in this case*. Doc 70-3, par. 13, p. 3, letter from J. Dratel to AUSA S. Turner, et al.

The government responded to that defense discovery request:

*The Government has provided all available pen register data used to detect Ulbricht's email and Internet activity in September 2013, as well as pen register data received from Icelandic law enforcement authorities concerning the SR Server and the server described in the Tarbell Declaration as Server-1. To the extent any other pen register information was obtained in the course of the investigation, the Government objects to this request on the ground that such information is not material to the defense or otherwise required to be produced under Rule 16.* See Doc 70-4 at p. 5, 9/23/2014 letter from AUSA Serrin Turner to Joshua Dratel.

In this response to the defense discovery request, the government stated that it had provided *all available pen register data* used to detect Ulbricht's email and internet activity in September 2013, but *the government did not state that it had actually produced anything, or if it did, what other data was not available*. That appears to have been a false or at best ambiguous statement unless some of the relevant collected data was then unavailable, *because the government did not, in fact, provide the pen-trap data referred to in the laptop search warrant affidavit*. See below.

The only pen-trap data provided to the defense before trial was data that appears to have resulted from collection authorized in the 9/17/2013 Pen Trap Order in Case No. 13 MAG 2236. Declaration of Paul Grant In Support of Partial Unsealing, at par. 5-7. That order authorized a trap and trace device to identify the IP address of internet communications directed to, and a pen register to determine the destination IP addresses of, any Internet communications originating from the "Target Account," referring to a Comcast account.

Mr. Ulbricht has still not received the data resulting from the three FBI pen-trap orders identified above. The government relied on the data supposedly obtained from those pen-trap orders, to monitor Ulbricht's online activity, to correlate his activity to that of DPR, and to establish, in the minds of investigators, that Ulbricht was DPR. Those are the facts testified to in the laptop search warrant affidavit, facts used to establish probable cause for the laptop search warrant to issue.

In the laptop search warrant affidavit, the affiant, Christopher W. Tarbell, FBI Special Agent, testified, in relevant part:

5. . . . The computer contains a network adapter assigned the MAC address 88-53-2E-9C-81-96.

**PROBABLE CAUSE**
**OVERVIEW**
**IDENTIFICATION OF "DREAD PIRATE ROBERTS"**
**AS ROSS WILLIAM ULBRICHT**
**ULBRICHT'S USE OF THE SUBJECT COMPUTER**

. . .

35. On September 20, 2013, the Government obtained a judicial order authorizing the FBI to use a pen register/trap and trace device . . . Data obtained from the Wireless Router Pen-Trap the same day showed a computer with the MAC address 88-53-2E-9C-81-96 - that is, the SUBJECT COMPUTER - regularly accessing the router.

36. Based on my training and experience . . . I determined that the manufacturer associated with the MAC address of the subject computer produces network cards for computers running the Windows operating system. The Subject Computer is the only Windows-based computer that has been detected from the Wireless Routing Pen . . .

39. On September 20, 2013, the FBI collected data from the Wireless Router Pen-Trap over the course of several hours, which showed the SUBJECT COMPUTER logging on and off the wireless router at the Subject Residence at the same time that DPR logged on and off of Pidgin.

40. On September 20, 2013, the Government obtained a judicial order authorizing the FBI to use a pen register/trap and trace device . . . to collect routing data . . .

41. This surveillance yielded the following results:
     a. At approximately 11:15 a.m., PDT, pen register data from the Subject Computer Pen-Trap showed the Subject Computer logging onto the internet at the Subject Residence . . .

42. Based on the foregoing, I respectfully submit there is probable cause to believe that Ulbricht uses the SUBJECT COMPUTER and that he specifically uses it in connection with his operation of Silk Road.

3

Excerpts from Laptop Search Warrant.

Paragraphs 35, 39, and 41 refer to the <u>FBI pen-trap orders</u>, from which no data has ever been produced to the defense.  Paragraph 42 in the affidavit shows the government relied on the pen-trap data described above, data resulting from the three FBI pen-trap orders, to establish probable cause to obtain the laptop search warrant.

The data collected pursuant to the three FBI pen-trap orders should be contained in the 3 magistrate's files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275).  See 18 U.S.C. § 3123.  Mr. Ulbricht is requesting the magistrates' files be partially unsealed and the contents made available to counsel for both parties and to the defendant, because these files should contain the following material and discoverable information:

*a record which will identify (I) any officer or officers who installed the device and any officer or officers who accessed the device to obtain information from the network; (ii) the date and time the device was installed, the date and time the device was uninstalled, and the date, time, and duration of each time the device is accessed to obtain information; (iii) the configuration of the device at the time of its installation and any subsequent modification thereof; and (iv) any information which has been collected by the device.* 18 U.S.C. § 3123.  "The record to be maintained must be provided *ex parte* and under seal to the court which authorized the installation and use of the device within 30 days after termination of the order."  *Id.*

Mr. Ulbricht is entitled to examine the contents of the three magistrate files, to see if what the government claimed to have collected was collected, and to see how the data was collected. To withhold that data now would be unconscionable.  That information was material to preparation by the defense, was in the possession of the FBI, both before and after the deadline by which the law required it to have been filed with the magistrates, and it should have been disclosed to the defense prior to trial.  Rule 16(a)(1)(E)(I), Fed.R.Crim.P.  The government told the court that these pen registers were not used to geo-locate Mr. Ulbricht - apparently without having access to the data collected pursuant to the three FBI pen-trap orders.  Doc. 57, Tarbell Declaration at Page 9 of 10, par. 21. These files should help address that issue.

The government has never produced the data collected pursuant to four out of the five pen-trap orders, yet argued before trial against suppression of evidence obtained from the pen registers on the basis of the government's representation as to what each of the pen registers did and did not collect. If the government did not have the data, then providing the court with statements from the affidavit of an FBI special agent who should have provided them with the data itself, was incautious.  If the government had the data, but did not produce it upon request, and  misrepresented what the data contained in argument to the court, that would be a serious problem; if the government had the data but simply did not produce it, that would constitute a serious discovery violation.

The government stated that the pen registers were used to establish when Ulbricht logged

4

onto and off of the internet, in defending the search warrant, in support of their argument that the search warrant applications to search for information to allow comparison with online activity were reasonable requests seeking relevant information, referencing Tarbell Decl. Ex. M., par. 33-41.  See Doc. 56 at 29.

Mr. Ulbricht has discovered new information, information which has just recently become available, that reveals that the government did use electronic surveillance to track his location, at the very same time, and as part of, its pen register data collection.  The government apparently used its WiFi sniffing and tracking surveillance (as part of the pen-trap data collection) to track and determine Ulbricht's precise location, and to determine when he logged in and out on his laptop, while Ulbricht was in his residence.  This information is provided in the the book titled *American Kingpin*, a book published in May 2017, long after the trial was concluded.

According to the author, Nick Bilton, his accounts are based, in part, on more than 250 hours spent with federal agents involved in the investigation, including FBI special agents [Tarbell and Kiernan], and including Homeland Security special agent Jared Der-Yeghiayan. Bilton's account of FBI surveillance correctly places Tarbell, Der-Yeghiayan, and Kiernan on site outside Ulbricht's residence, a short time before Ulbricht's arrest.  He describes the actions and observations of these agents, in considerable detail and in credible terms, in a manner consistent with material previously disclosed by the government.

Bilton describes the FBI surveillance of Ulbricht in his residence:

 "Jared [Der-Yeghiayan], Thom [Thomas Kiernan], and Brophy stood in front of the café near Ross' house, listening to Tarbell . . . They knew that Ross was at home because the FBI had an undercover SUV circling his block and monitoring the Wi-Fi traffic (this is pen register and trap and trace activity).  The system they were using (which should be described in the magistrates' files) would check the signal strength of the Wi-Fi on his computer and then, by triangulating that data from three different points they had captured as they drove around the block, they were able to figure out Ross's exact location, which at this very moment was his bedroom, on the third floor of his Monterey Boulevard apartment."  Bilton at 331.

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the government is required to produce documents or data "if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense."  Rule 16(a)(1)(E) permits discovery related to the constitutionality of a search or seizure. *U.S. v. Hector Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016).  Materiality is a " low threshold; it is satisfied so long as the information . . . would have helped" to prepare a defense. *Id., quoting United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013).

The defendant was entitled to rely on the government's statement that it had provided all available pen-trap data related to monitoring Ulbricht's internet activity, and on the statement

5

that any other pen-trap data it may have was not material and not subject to production. *See United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009).

It appears the government may now have the PRTT data that the FBI collected in September 2013 pursuant to the three FBI pen-trap orders. Declaration of Paul Grant In Support of Partial Unsealing, par. 10. Any relevant PRTT data the FBI had collected in 2013 was required by statute to have been placed in the three magistrate's files. That PRTT data in the magistrate's files may well be more extensive than the new PRTT data (or may not even include the same data) that the government is now prepared to disclose, and is data that would have been in possession of the FBI pre-trial in 2014, when the defense requested it. Any and all such data should have been provided to the defense prior to trial. That data was material and relevant to preparing the defense, particularly because the pen-traps were directly at issue.

The prosecutor is obligated to disclose to the defendant evidence which is favorable to the defense and suppression of the evidence which is material to either guilt or punishment, violates due process, regardless of the good faith or the bad faith of the prosecutor. *Brady v. Maryland*, 373 U.S. 83, 86-88. (1963). *Brady* itself is a case involving a post-conviction claim of newly discovered evidence. *See Id.*, at 85. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Id.*, at 88.

It is clear that the government did not produce in discovery prior to trial the data that is, or should be, in the three magistrate's files; it appears that the government violated its disclosure obligations under Rule 16 and under *Brady*, and the defense has reason to believe that the evidence it failed to disclose will prove to be exculpatory.

Mr. Ulbricht was unable to review the data before trial, the pen-trap data upon which the government relied to establish probable cause for issuance of both the laptop and residence search warrants. Mr. Ulbricht was, therefore, denied his due process right to effectively challenge the constitutionality of the laptop and residence search warrants. The best way to begin to remedy that violation now, is to allow Mr. Ulbricht to access the data that the government improperly withheld prior to trial, PRTT data which by law should be located in the three magistrate's files.

PRTT evidence withheld in violation of Rule 16 discovery obligations or in violation of *Brady* obligations before trial, will be newly discovered evidence now. Mr. Ulbricht requires access to the material in the three magistrate's files, to determine whether that data is newly discovered evidence which will support his Rule 33 Motion for a New Trial.

The prosecutor should join in this motion, not oppose it. "The United States Attorney is the representative . . . of a sovereign whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88

6

(1935). Prosecutors have an ethical duty to reveal exculpatory evidence obtained after conviction.  See ABA Model Rules of Professional Conduct, Rule 3.8(g) (2012).  If the prosecutor opposes this motion, as they have stated they will, they will be supporting their own improper withholding of evidence prior to trial, and they will be supporting the misleading or misinformed statements they made to the defendant and the court.

Post-conviction judicial decisions should be made with the sole purpose of insuring justice. *See Imbler v. Poachtman*, 424 U.S. 409, 428 (1976).  Mr. Ulbricht is serving a sentence to life without parole and under such dire circumstances, justice requires that this court order that the contents of the sealed magistrate's files be made available to counsel for both parties and to the defendant.

WHEREFORE, for all the reasons provided above, and in the interests of justice, Mr. Ulbricht requests that the court order the partial unsealing of three magistrate's files, namely files identified as 13 MAG 2258, 13 MAG 2274, 13 MAG 2275, and that the contents of those three files be made available for examination and review, to counsel for both parties and to the defendant.  Mr. Ulbricht also requests such additional relief as the court finds to be just and equitable.

Respectfully submitted,

/s/ Paul Grant_____
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

7

EXHIBIT P, Doc. 311

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133

*[handwritten: Ordered
In light of the
Court's order on
the Rule 33 motion
denying the extension,
this is DENIED as
moot. KBF from
LSDJ
2/5/18]*

February 5, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:    *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
       Request to Partially Unseal and Make Available to Counsel and Defendant Three
       Magistrate's Files

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request that three SDNY magistrate's files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275) be partially unsealed and that the entire contents of those files be made available to counsel for the parties and to Mr. Ulbricht, for examination and review and use in this case. I have contacted the government about this request, and AUSA Eun Young Choi advises the government will oppose this request.

As the court may recall from pre-trial suppression proceedings, the government obtained five pen-trap orders authorizing the pen register and trap and trace collection of data sent to and from Ulbricht's router or to and from a device (assumed to be Ulbricht's computer) associated with a particular MAC address, including: 13 MAG 22, a Sealed Order for the Secret Service, directed to Comcast to provide assistance; 13 MAG 2228, a Sealed Order for the Secret Service, directed to Comcast to provide assistance; 13 MAG 2258 (the 9.19.13 wireless router pen for FBI); 13 MAG 2274 ((9.20.13.Router Pen for FBI); and 13 MAG 2275 (9.20.13.MAC Address Pen for FBI). Doc. 48, Memorandum of Law in Support of Defendant Ross Ulbricht's Pre-Trial Motions to Suppress Evidence . . ., at pages 37 -39 (page numbers in original document).

The latter three orders, each of which is directed to the FBI (the "three FBI pen-trap orders"), were issued in the three sealed magistrate's files (13 MAG 2258, 13 MAG 2274, 13 MAG 2275) which Mr. Ulbricht now wishes to examine.

Mr. Ulbricht argued in his motion to dismiss that the data collection resulting from the five pen-trap orders must be suppressed because this data collection required search warrants based on probable cause, and because the orders failed to adhere to statutory limitations. See

EXHIBIT Q, Doc. 321

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: FEB 2 6 2018

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133
paul_pglaw@yahoo.com

February 26, 2018

<u>By Electronic mail to:</u>    ForrestNYSDChambers@nysd.uscourts.gov
Joseph Pecorino, Courtroom Deputy
United States District Court
500 Pearl Street
New York NY 10007

Re:    *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
       Request for Order Authorizing Access to Sealed Documents

Dear Mr. Pecorino:

I am requesting an order from the court to allow me to obtain copies of the sealed documents filed in the above-referenced case. I have received only limited cooperation from prior counsel in this case and I know that I have not been provided with copies of all of the sealed documents. As you can imagine, I cannot adequately represent Mr. Ulbricht in post-trial matters without the sealed documents. I have examined the docket but since sealed documents are not identified on the public docket, I cannot tell which unsealed documents to request, so I am requesting copies of all of them.

The Records Management office has advised me they cannot provide me with copies of the sealed documents until they receive a court order authorizing them to do so. I would greatly appreciate it if you could assist me in getting these records. Please let me know if you have any questions.

Thank you.

Regards,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney
    Via email to: Eun.Young.Choi@usdoj.gov

*Ordered*

*Work with the Government as appropriate to identify specific documents.*

*KBF. Forrest*
*US DJ*
*2/26/18*

1

LAW OFFICES OF
**JOSHUA L. DRATEL, P.C.**
A PROFESSIONAL CORPORATION

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK  10006
---
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: jdratel@joshuadratel.com

EXHIBIT R, Doc. 322

JOSHUA L. DRATEL                                            STEVEN WRIGHT
—                                                          *Office Manager*
LINDSAY A. LEWIS
WHITNEY G. SCHLIMBACH

February 27, 2018

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:     *United States v. Ross Ulbricht*,
              14 Cr. 68 (KBF)

Dear Judge Forrest:

        This letter is submitted in connection with the Court's endorsement yesterday (Docket #321) of the February 26, 2018, letter from Paul Grant, Esq., and to inform the Court and the government – in an effort to avoid unnecessary commitment of resources – that my office provided Mr. Grant all of the sealed (or *ex parte* or otherwise publicly unavailable) filings – 32 documents total – in the above-entitled case August 15 2017 (which we also confirmed recently in a February 1, 2018, letter).  Thus, Mr. Grant's claim, offered without the slightest factual foundation (which his letter oddly acknowledges), is inaccurate.[1]

                                          Respectfully submitted,

                                          Joshua L. Dratel

JLD/

_____

        [1]  This response with respect to this discrete issue is not in any way an adoption of the accuracy of  anything else Mr. Grant has submitted.

EXHIBIT S

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____              │
│ DATE FILED: February 28, 2018        │
└─────────────────────────────────────┘
```

-----------------------------------------------------------------------X
                                      :
UNITED STATES OF AMERICA              :
                                      :
                                      :            14 Cr. 68 (KBF)
            -v-                       :
                                      :               ORDER
                                      :
ROSS WILLIAM ULBRICHT,                :
                          Defendant.  :
-----------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:


       By letter dated February 26, 2018 (ECF No. 321), Paul Grant, counsel for

defendant requested copies of the sealed documents filed in this action.

       On February 27, 2018, former counsel for Mr. Ulbricht, Joshua Dratel, wrote

to the Court (ECF No. 322) indicating that he has already provided Mr. Grant with

copies of all the sealed (or *ex parte* or otherwise publicly unavailable) filings.

       Accordingly, based upon Mr. Dratel's representation to the Court, Mr. Grant's

request at ECF No. 321 is DENIED.


       SO ORDERED:

Dated:      New York, New York
            February 28, 2018




            _____
               KATHERINE B. FORREST
               United States District Judge

EXHIBIT T

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133
paul_pglaw@yahoo.com

March 1, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:     *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
        Request for Reconsideration of Denial of Request for Access to Sealed Court Files

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request the court reconsider his request for access to sealed court filings and to request that the court vacate its order of 2/28/2018 (Doc. 323), in which the court denied Mr. Ulbricht's request for an order authorizing the clerk of the district court to provide to counsel for Mr. Ulbricht copies of all sealed documents filed in this case. The government has not responded to undersigned counsel to advise whether they will take a position regarding this request.

Undersigned counsel represents Mr. Ulbricht in post-trial proceedings in this matter, including researching and possibly filing a Rule 33 Motion for a New Trial Based on Newly Discovered Evidence, and in researching and possibly presenting a motion pursuant to 28 U.S.C. § 2255. The most likely claim that Mr. Ulbricht would present under 28 U.S.C. § 2255 would be a claim of ineffective assistance of trial and appellate counsel.

Counsel cannot adequately represent Mr. Ulbricht in post-trial proceedings without access to the complete court file in this case, including both public and sealed court documents. For that reason, undersigned counsel contacted the Clerk of the District Court, and he was advised by the Records Management Unit that the Clerk would provide undersigned counsel with copies of all of the sealed documents in this case, were they provided with a court order authorizing the Clerk to provide these files to undersigned counsel.

Based on that information, Mr. Ulbricht has requested the court authorize the Clerk to provide undersigned counsel with copies of all sealed filings in this case. On 2/27/2017, the Court ordered (Doc. 320 - 318) the Defense to work with the government (the United States

1

Attorney's Office) as appropriate to identify which sealed documents the Defense wanted.  The Defense wants them all, but cannot make a list.

Undersigned counsel contacted AUSA Timothy Howard on 2/27/2018, in an effort to explore how to work with the government to respond to the court's order.  Mr. Howard advised the government would do what they could, but he also advised the government could not state that they had copies of all sealed filings.

On 2/28/2018, the Court denied (Doc. 323) Mr. Ulbricht's request for an order to the Clerk authorizing the Clerk to provide copies of all sealed documents filed in this case, relying on an unsworn and completely irrelevant statement from prior counsel that he had provided to undersigned counsel all sealed documents filed in this case.  Prior counsel is not the Clerk of the Court.

Respectfully, neither the government nor prior counsel are responsible for maintaining the official court record in this case, and neither can attest to what the official court record contains.  Undersigned counsel will not be relying on any statements from prior counsel or from the government as to what the court record consists of.

Prior defense counsel is also conflicted in any representation he makes as to what is in the record in this case, as his conduct in this case is likely to be the subject of a claim in a 28 U.S.C. § 2255 proceeding, where Mr. Ulbricht will most likely present a claim of ineffective assistance of counsel.  Undersigned counsel has a job to do and is conducting an independent investigation into prior counsel's actions and inactions in this case, and will not be relying upon any representations from prior counsel.

It is undersigned counsel's understanding that in the Southern District of New York, sealed records are managed by the Records Management Unit. Mr. Ulbricht cannot access sealed records maintained by the Records Management Unit without an order from this court.

The court has not suggested any reason for denying Mr. Ulbricht access to the complete court record, including access to each of the documents filed under seal.  Undersigned counsel can find no law, no rule, no case law, and no logic supporting the court's arbitrary denial of Mr. Ulbricht's right to access the complete court file - including sealed documents - in his case.

Denying Mr. Ulbricht access to the complete court file is a complete denial of due process.  Secret court records hidden from the defendant are anathema to the right to public trial and fair trial proceedings, and to the right to due process.  Secret judicial proceedings are a "menace to liberty . . . justice cannot survive behind walls of silence." *Gannett Co. V. DePasquale, supra,* at 412 (Blackmun, J., concurring in part and dissenting in part).

The guarantee that a trial will be conducted in public view, without secret proceedings, is "a safeguard against any attempt to employ our courts as instruments of persecution." *In re*

2

*Oliver*, 333 U.S. 257, 270 (1948).  Conversely, hiding judicial proceedings or records of judicial proceedings from the defendant, provides the opportunity to use the courts as instruments of persecution. Mr. Ulbricht requires access to all court records in his case, including sealed records, in order to exercise his rights in post-trial proceedings. Guaranteeing the defendant's access to records of judicial proceedings can provide an effective restraint on possible abuse of judicial power.  *See Id*., at 270 (concerning the right of public access).

There are numerous indications in the Docket that sealed documents were filed, but Mr. Ulbricht does not have copies of the documents identified by the docket numbers shown. Therefore, Mr. Ulbricht requests the court order the Records Management Unit to provide to Mr. Ulbricht, through undersigned counsel, copies of all sealed documents filed in this case, including, but not limited to, the sealed documents identified by the following docket entries:

Docket Numbers: 5, 15, 65, 66, 91, 95, 99, 104, 135, 136, 137, 138, 141, 143, 151, 152, 153, 158, 159, 160, 161, 194, 195, 225, 275, 276, 279, 284

Finally, Mr. Ulbricht requests copies of any documents that may have been used in court proceedings in this case but not filed with the Clerk of the Court.

## CONCLUSION

In the interests of justice, due process, and fair and open judicial proceedings, Mr. Ulbricht respectfully requests the court vacate its orders of 2/27/2018 (Doc. 322) and 2/28/2018 (Doc. 323), and that the court issue an order authorizing the Records Management Unit of the Clerk of the District Court, to provide copies to undersigned counsel of all documents and other media filed under seal in this case, regardless of whether some sealed items have been assigned Docket numbers.  Mr. Ulbricht also requests copies of any documents that may have been used in court proceedings in this case but not filed with the Clerk of the Court.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

EXHIBIT U

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
303-909-6133
paul_pglaw@yahoo.com

*Ordered*

*Does the Government know of any reason why this request re sealed materials should not be granted?*

March 1, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

*KBF. Hon USDJ 3/1/18*

> USDC SDNY
> **DOCUMENT**
> **ELECTRONICALLY FILED**
> DOC #: _____
> DATE FILED: **MAR 0 1 2018**

Re:  *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
      Request for Reconsideration of Denial of Request for Access to Sealed Court Files

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to request the court reconsider his request for access to sealed court filings and to request that the court vacate its order of 2/28/2018 (Doc. 323), in which the court denied Mr. Ulbricht's request for an order authorizing the clerk of the district court to provide to counsel for Mr. Ulbricht copies of all sealed documents filed in this case. The government has not responded to undersigned counsel to advise whether they will take a position regarding this request.

Undersigned counsel represents Mr. Ulbricht in post-trial proceedings in this matter, including researching and possibly filing a Rule 33 Motion for a New Trial Based on Newly Discovered Evidence, and in researching and possibly presenting a motion pursuant to 28 U.S.C. § 2255. The most likely claim that Mr. Ulbricht would present under 28 U.S.C. § 2255 would be a claim of ineffective assistance of trial and appellate counsel.

Counsel cannot adequately represent Mr. Ulbricht in post-trial proceedings without access to the complete court file in this case, including both public and sealed court documents. For that reason, undersigned counsel contacted the Clerk of the District Court, and he was advised by the Records Management Unit that the Clerk would provide undersigned counsel with copies of all of the sealed documents in this case, were they provided with a court order authorizing the Clerk to provide these files to undersigned counsel.

Based on that information, Mr. Ulbricht has requested the court authorize the Clerk to provide undersigned counsel with copies of all sealed filings in this case. On 2/27/2017, the Court ordered (Doc. 320 - 318) the Defense to work with the government (the United States

1

Attorney's Office) as appropriate to identify which sealed documents the Defense wanted. The Defense wants them all, but cannot make a list.

Undersigned counsel contacted AUSA Timothy Howard on 2/27/2018, in an effort to explore how to work with the government to respond to the court's order. Mr. Howard advised the government would do what they could, but he also advised the government could not state that they had copies of all sealed filings.

On 2/28/2018, the Court denied (Doc. 323) Mr. Ulbricht's request for an order to the Clerk authorizing the Clerk to provide copies of all sealed documents filed in this case, relying on an unsworn and completely irrelevant statement from prior counsel that he had provided to undersigned counsel all sealed documents filed in this case. Prior counsel is not the Clerk of the Court.

Respectfully, neither the government nor prior counsel are responsible for maintaining the official court record in this case, and neither can attest to what the official court record contains. Undersigned counsel will not be relying on any statements from prior counsel or from the government as to what the court record consists of.

Prior defense counsel is also conflicted in any representation he makes as to what is in the record in this case, as his conduct in this case is likely to be the subject of a claim in a 28 U.S.C. § 2255 proceeding, where Mr. Ulbricht will most likely present a claim of ineffective assistance of counsel. Undersigned counsel has a job to do and is conducting an independent investigation into prior counsel's actions and inactions in this case, and will not be relying upon any representations from prior counsel.

It is undersigned counsel's understanding that in the Southern District of New York, sealed records are managed by the Records Management Unit. Mr. Ulbricht cannot access sealed records maintained by the Records Management Unit without an order from this court.

The court has not suggested any reason for denying Mr. Ulbricht access to the complete court record, including access to each of the documents filed under seal. Undersigned counsel can find no law, no rule, no case law, and no logic supporting the court's arbitrary denial of Mr. Ulbricht's right to access the complete court file - including sealed documents - in his case.

Denying Mr. Ulbricht access to the complete court file is a complete denial of due process. Secret court records hidden from the defendant are anathema to the right to public trial and fair trial proceedings, and to the right to due process. Secret judicial proceedings are a "menace to liberty . . . justice cannot survive behind walls of silence." *Gannett Co. V. DePasquale, supra*, at 412 (Blackmun, J., concurring in part and dissenting in part).

The guarantee that a trial will be conducted in public view, without secret proceedings, is "a safeguard against any attempt to employ our courts as instruments of persecution." *In re*

*Oliver*, 333 U.S. 257, 270 (1948). Conversely, hiding judicial proceedings or records of judicial proceedings from the defendant, provides the opportunity to use the courts as instruments of persecution. Mr. Ulbricht requires access to all court records in his case, including sealed records, in order to exercise his rights in post-trial proceedings. Guaranteeing the defendant's access to records of judicial proceedings can provide an effective restraint on possible abuse of judicial power. *See Id.*, at 270 (concerning the right of public access).

There are numerous indications in the Docket that sealed documents were filed, but Mr. Ulbricht does not have copies of the documents identified by the docket numbers shown. Therefore, Mr. Ulbricht requests the court order the Records Management Unit to provide to Mr. Ulbricht, through undersigned counsel, copies of all sealed documents filed in this case, including, but not limited to, the sealed documents identified by the following docket entries:

Docket Numbers: 5, 15, 65, 66, 91, 95, 99, 104, 135, 136, 137, 138, 141, 143, 151, 152, 153, 158, 159, 160, 161, 194, 195, 225, 275, 276, 279, 284

Finally, Mr. Ulbricht requests copies of any documents that may have been used in court proceedings in this case but not filed with the Clerk of the Court.

## CONCLUSION

In the interests of justice, due process, and fair and open judicial proceedings, Mr. Ulbricht respectfully requests the court vacate its orders of 2/27/2018 (Doc. 322) and 2/28/2018 (Doc. 323), and that the court issue an order authorizing the Records Management Unit of the Clerk of the District Court, to provide copies to undersigned counsel of all documents and other media filed under seal in this case, regardless of whether some sealed items have been assigned Docket numbers. Mr. Ulbricht also requests copies of any documents that may have been used in court proceedings in this case but not filed with the Clerk of the Court.

Respectfully submitted,

/s/ Paul Grant
Paul Grant
Counsel for Ross William Ulbricht

cc: Eun Young Choi (by ECF)
    Assistant United States Attorney

3

EXHIBIT V, Doc. 320

**PAUL GRANT**
*LAW OFFICE OF PAUL GRANT*
P.O. Box 2720
Parker CO 80134
paul_pglaw@yahoo.com
303-909-6133

February 20, 2018

**BY ECF**
Hon. Katherine B. Forrest
United States District Judge
United States District Court
500 Pearl Street
New York NY 10007

Re:   *United States v. Ross William Ulbricht, et al*, 14 Cr. 68 (KBF)
       Petition for Rehearing Re Denial of Motion for Recusal

Dear Judge Forrest:

I write on behalf of Defendant Ross Ulbricht to submit this petition for rehearing and motion for reconsideration, asking that the court vacate its February 5, 2018 order (Doc. # 310) denying Mr. Ulbricht's Motion for Recusal, and that the court now grant the motion. I have contacted the government about this request and AUSA Eun Young Choi advises that the government objects to the requested relief.

Mr. Ulbricht believes that the court has misapprehended, overlooked, not addressed, or misapplied the facts and pertinent law provided by Mr. Ulbricht.

*1.        The court's order denying the Motion for Recusal describes Mr. Ulbricht's Motion as "frivolous and full of many misstatements of the record."* Doc. 310. The court's order did not explain why the Motion was frivolous nor what the alleged "many misstatements of the record" may consist of.

The court's order did not address any of the factual allegations nor any of the legal arguments advanced by Mr. Ulbricht.

*2.        The order denying the Motion for Recusal did not address Mr. Ulbricht's three bases for calling into question the impartiality of the court.* Each of these will now be addressed:

A. The empaneling of an anonymous jury

What the court overlooked or misapprehended about Mr. Ulbricht's claim that the court's empaneling of an anonymous jury undermined the presumption of innocence and prejudiced his jurors against him, is the following:

1

EXHIBIT X, Doc. 144

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA                  :
                                          :
               -v-                        :          14-cr-68 (KBF)
                                          :
ROSS WILLIAM ULBRICHT,                    :          <u>ORDER</u>
                                          :
                    Defendant.            :
                                          :
---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 9, 2015

KATHERINE B. FORREST, District Judge:

The Court has reviewed the list of strikes to which both parties have

consented.  The Court agrees, and hereby strikes the following prospective jurors: 3,

9, 13, 18, 22, 24, 25, 34, 35, 36, 40, 42, 44, 47, 48, 54, 57, 67, 68, 69, 71, 72, 74, 76,

78, 79, 80, 82, 83, 84, 88, 94, 95, 96, 99, 100, 103, 105, 108, 109, 125, 126, 128, 129,

131, 132, 133, 142, 145, 147, 149, 150, 151, 161, 172, 174, 177, 179, 182.  Based on

its review of the questionnaires, the Court also strikes the following prospective

jurors: 6, 7, 8, 14, 16, 20, 31, 37, 39, 45, 46, 56, 58, 60, 62, 64, 86, 91, 117, 118, 120,

122, 123, 130, 139, 144, 148, 152, 157, 158, 160, 167, 183.  The parties shall provide

the Court with printed copies of all filled-out juror questionnaires, marked with

each juror's number, as soon as is practicable, but not later than Saturday, January

10, 2015.

      SO ORDERED.

Dated:      New York, New York
              January 9, 2015

                                              KATHERINE B. FORREST
                                          United States District Judge

EXHIBIT Y, TRANSCRIPT OF JURY VOIR DIRE

                                                             1
      F1dgulbvd1                 Voir Dire


 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -----------------------------x

 3    UNITED STATES OF AMERICA

 4              v.                        14 CR 68(KBF)

 5    ROSS WILLIAM ULBRICHT,
          a/k/a "Dread Pirate Roberts,"
 6        a/k/a "DPR,"
          a/k/a "Silk Road,"
 7
                     Defendant.
 8
      -----------------------------x
 9
                                         New York, N.Y.
10                                       January 13, 2015
                                         10:30 a.m.
11

12    Before:

13                    HON. KATHERINE B. FORREST,

14                                       District Judge

15                          APPEARANCES
16

17    PREET BHARARA
          United States Attorney for the
18        Southern District of New York
      SERRIN TURNER
19    TIMOTHY HOWARD
          Assistant United States Attorneys
20
      JOSHUA DRATEL
21    LINDSAY LEWIS
      JOSHUA HOROWITZ
22        Attorneys for Defendant

23    ALSO PRESENT:  NICHOLAS EVERT, AUSA Paralegal
                     MOLLY ROSEN, AUSA Paralegal
24                   VINCENT D'AGOSTINO, Special Agent, FBI
                     LINDA MORENO, Trial Consultant
25


                   SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
                                                          2
     F1dgu1bvd1              Voir Dire
```

```
 1              (In open court)

 2              (Prospective jury panel sworn)

 3              THE COURT:  Good morning, everyone.  Please be seated.

 4              Ladies and gentlemen, I know it's crowded in here.

 5     And the way this process works is, we'll start moving people

 6     pretty quickly.  We're going to put 16 people pretty quickly

 7     into the box and people can start filling in with some of the

 8     seats.  And then there will be a lot of fluid movement and some

 9     people will be excused and there will be some more seats

10     opening up, so this standing won't last very long.

11              My name is Judge Katherine Forrest and I am the judge

12     in this matter, which is a criminal matter.  And we're going to

13     be picking a jury today for this criminal matter.  It's

14     expected that this trial is going to last somewhere between

15     four and six weeks.

16              Now, I know that you folks have already filled out the

17     written questionnaires and that was step one last week in

18     selection of the jury for this case.  Today is the second and

19     final step of that jury selection process.  So let me describe

20     for you folks how we're going to proceed and then get the

21     people the first 16 into the box.

22              What we're going to do is have the 16 in the box and

23     then I'm going to ask some questions, but I'm going to need

24     everybody to listen because you may well be, if you're not

25     initially put in the box, you may be put in the box at some
```

(212) 805-0300

                                                    3
    Fldgulbvd1              Voir Dire

1   point.  It is always the case that whoever the first 16 that's

2   in the box, not all of them end up in the box by the time we're

3   done.  There's always some movement.  So we always have a

4   situation where people from the audience then are called upon

5   to fill in.

6          Now, you've all been given a list of just biographical

7   questions and the pen.  The pen is not for you to fill out that

8   biographical information.  The pen is really for you to use the

9   back of that piece of paper, the blank side, to write down

10  anything you want to remember as we're going along.

11         For instance, I'll be asking questions of the folks in

12  the box, you out there if you're not picked will be listening,

13  and if you believe that you would have had a yes answer to one

14  of my questions, you might want to just note that down so that

15  when I put you in the box and I say were there any questions

16  that I asked that you would have answered yes to, you'll say

17  oh, sure, there were, and on the back of your piece of paper

18  you'll have noted down what they were, all right.

19         I'm going to have Joe, just because there are so many

20  people here right now, put the first 16 in the box.  It will be

21  random.  The first 12 will be the first jury panel and then the

22  other four are the alternate jurors, but again, there will be

23  some fluid movement between folks out there and in here.

24         Joe, why don't you put the first 16 in the box.  We do

25  it in a random -- sort of like an old Bingo wheel to pick your

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

4

Fldgulbvdl                Voir Dire

1    names out.  Literally, your cards are in there and he puts his

2    hand in and picks it out.

3            THE DEPUTY CLERK:  The first prospective juror, Juror

4    No. 50, 50.  Juror no. 50, please take the first seat in the

5    first row closest to me, right here.  You might want to walk

6    around to make it easy for you.

7            Juror no. 49, 49.  Juror no. 49, please take the

8    second seat in the first row closest to me.  The third

9    prospective juror, juror no. 181.  Juror 181, please take the

10   third seat in the first row closest to me.  The fourth

11   prospective juror, juror no. 65.  Juror no. 65, please take the

12   fourth seat in the first row closest to me.  The fifth

13   prospective juror, juror no. 101, 101.  Juror no. 101, please

14   take the fifth seat in the first row closest to me.  The sixth

15   prospective juror, juror no. 102, 102.  Please take the sixth

16   seat in the first row furthest from me.  The seventh

17   prospective juror, juror no. 154.  Juror no. 154, please take

18   the first seat in the second row closest to me.

19           THE COURT:  You can walk all the way around this way

20   if it's easier.

21           THE DEPUTY CLERK:  The eighth prospective juror, juror

22   no. 143.  143, please take the second seat in the second row

23   closest to me, second seat, second row.  The ninth prospective

24   juror, juror no. 63.  Juror no. 63, please take the third seat

25   in the second row closest to me.  The tenth prospective juror,

(212) 805-0300

Fldgulbvd1                    Voir Dire

1      juror no. 140, 140.  Juror no. 140, please take the fourth seat

2      in the second row.

3            The eleventh prospective juror, juror no. 153, 153.

4      Juror no. 153, please take the fifth seat in the second row.

5      The 12th prospective juror, juror no. 38.  Number 38, please

6      take the sixth seat in the second row.  Prospective alternate

7      juror no. 1, juror no. 61.  Number 61, please take the second

8      seat closest to me in the last row.  Prospective alternate

9      juror no. 2, juror 59, 59.  Mr. 59, please take the second seat

10     in the last row.  I realize I just said Mr. 59, I apologize.

11     Alternate prospective juror no. 107.  Please take the third

12     seat in the last row.  And the last prospective alternate juror

13     no. 4, four, juror 106.  Number please take the seat in the

14     last row.

15            THE COURT:  Thank you, everyone.  As I said, I want

16     everybody to be listening to the questions because I'll be

17     asking some of you, without a doubt, to fill in a spot now and

18     again.  So a number of you will come from the back of the room

19     into the jury box and I will, at that time, ask you were there

20     any questions which I asked to which you had a yes answer.  So

21     you'll want to keep track of those on the back of your piece of

22     paper so that you can remember those.

23            Now, before I do that, I want to give you folks just

24     some preliminary instructions.  The purpose of these questions

25     is to enable us to select a jury that's going to be fair and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    6
    Fldgulbvdl                    Voir Dire

1    impartial in this case.  Now, my questions to you and your

2    answers to those questions are in no sense evidence in this

3    case and you shouldn't regard them or any thoughts that they

4    may raise in your minds as having any bearing on this case.

5            The questions are not meant to embarrass you in any

6    way, but just to elicit the basic kinds of information that we

7    need for the jury selection process.

8            Now, your oath obligates you to give fair and truthful

9    answers to the questions that I'm going to ask of you.  It's

10   your solemn duty to serve as a fair and impartial juror if

11   you're able to do so, but it is equally your solemn duty not to

12   serve if, for any reason, you cannot be fair and impartial in

13   this case.  Accordingly, you have to disclose to the Court any

14   fact or belief that might prevent you from being fair and

15   impartial in this case.

16           And there will be an opportunity if, after asking all

17   of the questions, you still think there's something that

18   prevents you from being fair and impartial, there will be an

19   opportunity for you to indicate that at the time.

20           Now, it's very important that you don't say anything

21   in open court about the parties in this case or about views

22   that you have that could tend to impair the open-mindedness of

23   the others around you.  So if you believe that one of your

24   answers to a question requires you to give more explanation,

25   then I'm going to have you come over to what we call side bar,

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

7

Fldgulbvdl                    Voir Dire

1    which is an area over to my right, and then the court reporter

2    comes over and we have you tell us that answer if it needs more

3    explanation privately with the lawyers and with me.

4              So if you feel like you need to give a fuller

5    explanation that might impair other's open-mindedness, don't

6    just blurt it out.  We'll have you come on over and do it at

7    side bar.

8              Now, as I said earlier, this is a criminal case, which

9    means that the defendant is punishable under the laws of the

10   United States if the jury finds him guilty beyond a reasonable

11   doubt of the crimes charged.  In a criminal case, the defendant

12   is presumed innocent until proven guilty.  It's the

13   government's burden of proof to establish the defendant's guilt

14   beyond a reasonable doubt.  And I'm going to instruct the jury

15   on what this burden of proof means after the evidence is

16   presented.

17             Now, the charges against a criminal defendant are

18   included in a document that we call an indictment.  An

19   indictment is merely an accusation.  It's a statement from the

20   government about what the government intends to prove at a

21   criminal trial.  It's not evidence against the defendant, and

22   you cannot draw any negative inference against him from its

23   existence.

24             The defendant here has pled not guilty to each of the

25   charges against him.  The accusations and the denial by the

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvdl                    Voir Dire

1    defendant of those accusations, that raises questions of fact

2    which a jury then is tasked with deciding.  The jury in a

3    criminal case decides the questions of fact, not the judge, the

4    jury.

5        The only evidence that you can consider as bearing on

6    a defendant's guilt is the evidence received in this trial,

7    which is going to consist of testimony of witnesses under oath

8    and exhibits that the Court receives into evidence.  I have no

9    knowledge of the facts of this case and nothing that I ever say

10   constitutes evidence.

11       Now, what I'm going to do is briefly summarize the

12   charges against the defendant now and then we're going to go on

13   to the questions I told you I would ask.

14       Now, as I told you, the indictment is simply an

15   accusation containing charges.  It is not evidence.  Here, the

16   indictment charges an individual by the name of Ross William

17   Ulbricht who the government alleges used the aliases Dread

18   Pirate Roberts or the three letters DPR and Silk Road.  The

19   indictment charges him in seven counts, all of the counts

20   concern the defendant's alleged operation and management of an

21   alleged black market Internet website known as Silk Road

22   between the years 2011 and 2013.

23       The government alleges that the defendant deliberately

24   designed and administered Silk Road to enable users to buy and

25   sell illicit drugs and other illegal goods and services,

(212) 805-0300

9

Fldgulbvdl                    Voir Dire

1    including computer-hacking tools and services and false

2    identification documents, and to do so anonymously and outside

3    of the reach of law enforcement.

4              Now, I want to assure you that while the facts in this

5    case involve a website and involve the Internet, you don't have

6    to have any particular expertise to serve as a juror on this

7    case because all of the evidence that you are going to need to

8    render a verdict will be evidence received into evidence at

9    this trial.

10             Now, Counts One through Four charge the defendant with

11   various narcotics offenses based on illegal drugs that were

12   allegedly sold on Silk Road.  Count Five charges the defendant

13   with conspiring to commit or help other commit computer-hacking

14   based on the alleged sale of computer-hacking tools and

15   services on Silk Road.  Count Six charges the defendant with

16   conspiring to traffic in false identification documents based

17   on the alleged sale of fake IDs, fake passports and other

18   fraudulent identification documents on Silk Road.  And finally,

19   Count Seven charges the defendant with conspiring to commit

20   money laundering based on the payment system used on Silk Road

21   which relied on Bitcoins, a form of digital payment.  The

22   government alleges that the defendant designed Silk Road's

23   particular payment system to facilitate the illegal

24   transactions that were conducted allegedly on Silk Road and to

25   conceal the proceeds of those transactions from law

                     SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

10
Fldgulbvd1                    Voir Dire

1    enforcement.  The defendant denies all of the charges in the

2    indictment and has pled not guilty to all of them.

3            Now, I'm going to start asking the questions.  So if

4    anyone has a yes answer who is in the jury box, please raise

5    your hand and I'll take you one by one.  If you're in the

6    audience and you have a yes answer to one of my questions, make

7    sure that you note it down using the piece of paper and the pen

8    that you have been provided.

9            Ladies and gentlemen, does any juror have any personal

10   knowledge or knowledge from other sources of the charges in the

11   indictment against this defendant?

12           Does any juror feel that he or she could not view a

13   case involving these charges fairly and impartially?

14           Does any juror believe that the actions involved in

15   such charges should not be a crime?

16           As I noted before, the defendant in this case is named

17   Ross William Ulbricht.  I'm going to ask the defendant, please,

18   sir, to stand.  Does any juror feel any bias or prejudice

19   against this defendant?  You may be seated, sir.  Thank you.

20           Does any juror know Mr. Ulbricht or has any juror or

21   have any of the juror's friends, relatives or associates that

22   you know of had any dealings with him, either directly or

23   indirectly?

24           Does any juror have any bias for or against the U.S.

25   government, the United States Attorney's Office or any federal

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    11
       Fldgulbvd1                  Voir Dire

1    or state law enforcement agency or for or against people who

2    work in law enforcement?

3              Does any juror have any opinion about the enforcement

4    of federal laws in general or federal cyber crime laws in

5    particular that might prevent you from being fair and impartial

6    in this case?

7              Does any juror have any opinion about the drug laws or

8    drug legalization that might affect your ability to be fair and

9    impartial in this case?

10             Has any juror served in the military, police,

11   intelligence or security services of any other nation, state or

12   political entity?

13             Now, this case is likely to receive ongoing media

14   attention.  The Court wants to make sure that this case is

15   decided solely on the evidence in the courtroom and not based

16   on things that are said outside of the courtroom.  Accordingly,

17   I will be advising you regularly, and indeed at every break,

18   that you must avoid speaking to anybody about the case and to

19   avoid reading about the case in newspapers, watching anything

20   on television, reading anything on the Internet about this

21   case.

22             Is there anybody who has a problem following those

23   requirements?  I'm sorry.

24             THE DEPUTY CLERK:  Number four.

25             THE COURT:  Number four, is it because you have

                         SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    12
      Fldgulbvdl                    Voir Dire

 1    already seen something about this case?

 2              JUROR:  No.  I can't make the four to six weeks.

 3              THE COURT:  You can't make the four to six weeks?

 4    Okay.  We're going to get to the timing issue in a few moments

 5    and then we'll have an opportunity for people to flag

 6    particular issues they may have.

 7              As it happens from time to time when a courthouse like

 8    this big federal courthouse is picking juries all over the

 9    courthouse, sometimes there are people out in front handing out

10    fliers and there may have been people out there today handing

11    out fliers.  Did any of the prospective jurors here in the box

12    take one of those fliers?

13              We have juror no. 6.  Anybody else?  Juror no. 7,

14    juror no. 8.  Anyone else?  Okay.  Six, seven, eight and

15    alternate number four.

16              Let me just start with juror no. 6, did you read the

17    flier?

18              JUROR:  No, not yet.

19              THE COURT:  Would you mind putting that flier to the

20    side and not reading it until you have been dismissed as a

21    juror or if you're retained as a juror not looking at it until

22    the conclusion of this case?

23              JUROR:  Okay.

24              THE COURT:  Juror no. 7, have you read the flier?

25              JUROR:  No.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

13

Fldgulbvd1                    Voir Dire

1          THE COURT:  Would you mind doing the same thing,
2   putting that flier aside, not reading it until you are either
3   dismissed or until the conclusion of this case?
4          JUROR:  Certainly.
5          THE COURT:  Juror no. 8, have you read the flier?
6          JUROR:  No.
7          THE COURT:  Would you mind doing the same thing,
8   putting it aside and not reviewing it until the conclusion of
9   this case?
10         JUROR:  No, I don't mind.
11         THE COURT:  What's that?
12         JUROR:  I don't mind.
13         THE COURT:  Thank you.  Alternate juror no. 4, have
14  you read the flier?
15         JUROR:  No.
16         THE COURT:  And would you mind also putting that to
17  the side and not reviewing it until you are dismissed or the
18  conclusion of this case?  Is that all right?
19         JUROR:  Yes.
20         THE COURT:  There's a glare right behind you because
21  you have, like, a halo effect because of the sun right behind
22  you; that's why I was asking you to repeat yourself.
23         There also were posters that were out in front of the
24  courthouse about potential matters going on in this courthouse
25  right now.  Did any of the prospective jurors see any of those

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

14

Fldgulbvdl                    Voir Dire

1    posters?

2              Alternate juror no. 1, did you read the poster?

3              JUROR:  In passing, driving, yeah, I read a couple of

4    them.  That's it.

5              THE COURT:  We'll take that up in a minute.  Did

6    anybody else?  All right.

7              Was anybody approached by anybody on their way into

8    the courthouse?  Somebody who attempted to have a conversation

9    with you or made comments to you about any case?  All right.

10             Number one, why don't you come on down, alternate

11   number one.  Why don't you come on down for one second?

12             JUROR:  Leave my stuff here?

13             THE COURT:  Yes, you can leave that.

14             (At the side bar)

15             (Juror present)

16             THE COURT:  Alternate number one, do you recall

17   anything about the content of the posters that you saw?

18             JUROR:  I saw something that said web hosting and like

19   WTF.  That was pretty much it.  I was kind of passing in the

20   car and just looking over really quickly.

21             THE COURT:  Okay.  And is there anything about that

22   which you connected with this case?

23             JUROR:  I knew what we were coming into and I figured

24   that that's probably what this was about but other than that,

25   no.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvdl                    Voir Dire

1              THE COURT:  Okay.  Did it have any meaning to you?

2              JUROR:  Not really.

3              THE COURT:  Now, it's very important that the jury,

4    once a jury is impanelled, and even during the jury selection

5    process, that people try to avoid reading anything about this

6    case, considering anything that's -- relates to this case in

7    any way that occurs outside of the courtroom.

8              Would you be able to follow that instruction?

9              JUROR:  I think so.

10             THE COURT:  Is there anything about what you saw on

11   that poster that makes you feel that it in some way may bias

12   you or give you a view about the merits of the case that you

13   now come into this courtroom with already?

14             JUROR:  No.

15             THE COURT:  Do you feel that you can be fair and

16   impartial in this case?

17             JUROR:  Yes, yeah.

18             THE COURT:  Counsel, is there anything else you'd like

19   to ask?

20             MR. DRATEL:  Just instruct her not to discuss this

21   with any other juror what she saw.

22             THE COURT:  All right.  It's very important that if

23   there are breaks and other things that occur as -- as we're

24   doing the jury selection process and at any other point in time

25   that you not share with any other juror what you've seen, and

(212) 805-0300

16

Fldgulbvdl                    Voir Dire

1    I'll be giving that same instruction to all jurors, all right?

2          JUROR:  All right.

3          THE COURT:  Can you follow that instruction?

4          JUROR:  Yes.

5          THE COURT:  Anything else?

6          MR. DRATEL:  Thank you.

7          THE COURT:  Thank you.  You may return.

8          (In open court)

9          THE COURT:  All right.  Has any prospective juror ever

10   used a website by the name of Silk Road?

11         Does any juror have any problem with hearing or vision

12   or any other problem that would prevent you from giving your

13   full attention to all of the evidence during this trial?

14         Is any juror taking any medication that would make it

15   difficult for you to give your full attention to the evidence

16   at this trial?

17         Does any juror have any difficulty reading or

18   understanding the English language?

19         Does any juror have any religious, philosophical or

20   other beliefs that would make you unable to render a guilty

21   verdict in this criminal case?

22         Has any juror had any legal or paralegal training?

23         As I mentioned before, this case is going to take four

24   to six weeks we expect to try.  Sometimes things go faster.

25   Sometimes they go a little bit slower, but that I think is a

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

17

Fldgulbvd1                    Voir Dire

1    pretty good estimate.  And we'll give you indications as we go

2    along if we think we're going to substantially beat that or if

3    we're going to miss that date, but four to six weeks is a

4    pretty good estimate.

5         Now, the right to a jury trial is obviously a very

6    important -- indeed, it's a critical right in our American

7    legal system, and it's very important that citizens serve on

8    juries to make that work.  If we don't have citizens who serve

9    on juries, the jury system simply cannot work.

10        We do know it's an inconvenience for people to sit on

11   juries and to often take out what are weeks from their

12   schedules and that there would be something else you'd be doing

13   today if you weren't sitting here or standing here in this

14   courtroom.  We appreciate that.  We understand that.

15        But is there any prospective juror who, as you sit

16   here right now understanding the importance of serving as a

17   juror nonetheless believes that you cannot serve for a case

18   that will potentially last four to six weeks?

19        Now, on the questionnaires, we asked about that time

20   frame.  Did any of you fill out that you did have a problem

21   that you were called?  Okay.  Number one and number seven,

22   eight, nine, ten and alternate one.

23        So we have alternate one, number one and who else, and

24   number four?  Who else?  Five, six.  Okay.  Raise your hands

25   again.  So I have no. 1, 4, 6, 7, 8, 9, 10 and alternate no. 1

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                              18
    Fldgulbvdl                    Voir Dire

1    and 4.  We're going to take you folks one by one down here.

2    We'll have you line up whenever you get down here line up we'll

3    tell you tell us your juror number and we'll go through it.

4    Thank you.

5               (At the side bar)

6               (Juror present)

7               THE COURT:  Whoever we have, we'll take you one by

8    one.  Come up here if you would, sir.

9               Give me the juror number you were given downstairs.

10              JUROR:  Fifty.

11              THE COURT:  So on the questionnaire, your

12   questionnaire didn't indicate that you had a hardship.  What's

13   the nature of your hardship?

14              JUROR:  I just recently signed in for college, so I

15   start the 28th.

16              THE COURT:  You start where?

17              JUROR:  The 28th for college.

18              THE COURT:  Oh, for college.

19              JUROR:  Yeah.

20              THE COURT:  Where are you going to be going to

21   college?

22              JUROR:  Bronx Community College.

23              THE COURT:  And are you going to be going at night or

24   during the day?

25              JUROR:  In the day.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                              19
Fldgulbvd1                 Voir Dire


1              THE COURT:  And when do you start?

2              JUROR:  The 28th, this month.

3              THE COURT:  Apart from college, is there any other

4    issue you've got?

5              JUROR:  No.  Nothing else.

6              THE COURT:  Okay.  We're going to have you stand back

7    to the side for a moment, okay?  Let's find out what the array

8    of issues are and let's get the next to person up, please.

9              (Juror present)

10             THE COURT:  Now, you are alternate no. 4?

11             JUROR:  Four.

12             THE COURT:  What's your juror number?

13             JUROR:  106.

14             THE COURT:  Now, you didn't fill out any hardship on

15   the questionnaire, I don't think.

16             JUROR:  No.

17             THE COURT:  So what's the nature of the issue?

18             JUROR:  It's, like, I'm a project manager in a hotel.

19   We just started remodeling, renovating the hotel on the 23rd

20   floor down.  And it's just, I'm really needed to help on the

21   job.  We do a lot of renovation down in the Westin Hotel, 43rd

22   Street, and we charge -- I'm in charge of the project.

23             THE COURT:  Has your employer indicated any problem

24   with you continuing to work if you --

25             JUROR:  Yeah.  She asked me when I was coming down

(212) 805-0300

F1dgulbvd1                    Voir Dire

1    here would I come here at night.  I said no.  It's too much, so

2    I don't know.  See what happens.  I don't know.

3              THE COURT:  She's given you an alternative where you

4    can go in at night?

5              JUROR:  No.  She told me to come out at night.  I have

6    to fill out things, but still, I'm not going at night.  Too old

7    for that now.

8              THE COURT:  All right.  But she's not indicated that

9    you would lose your job in any way?

10             JUROR:  No.

11             THE COURT:  All right.  We're going to have you just

12   step back there.

13             JUROR:  All right.

14             (Juror present)

15             THE COURT:  Come on up.  You are 102?

16             JUROR:  102.

17             THE COURT:  In the box, you are number six.

18             JUROR:  I have to ask, is it four weeks you said that

19   we have?

20             THE COURT:  It could be four weeks, five weeks or even

21   six weeks.  We're not sure yet.  It will be somewhere between

22   four and six weeks.

23             JUROR:  That's the reason why I'm asking, because if

24   it's six weeks, I can't do it.

25             THE COURT:  How come?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                        21
    Fldgulbvd1                    Voir Dire


 1                JUROR:  I have to go to work.  Who is going to take

 2      care of my bills when I go -- when I'm not working?

 3                THE COURT:  Well, now what job do you have?

 4                JUROR:  A home health aide.

 5                THE COURT:  And you understand you do get a jury fee

 6      for being here?  Has your employer told you that you would not

 7      get paid?

 8                JUROR:  I didn't ask him anything, but last time I

 9      served, they did give me money, yes.  They did pay me for the

10      day those dates.

11                THE COURT:  Do you think you can serve if the trial

12      lasts four weeks or five weeks?

13                JUROR:  Yes.  I'll try four weeks.

14                THE COURT:  All right.  So now, we can't make any

15      promises, but most people have jobs and most people end up with

16      a similar situation, and so we'll consider this, but almost

17      everybody's in the same boat.

18                JUROR:  Okay.

19                THE COURT:  All right.

20                JUROR:  All right.  Thank you.

21                (Juror present)

22                THE COURT:  All right.  You are seated four in the

23      box.

24                JUROR:  Four.

25                THE COURT:  What's your juror number?

                        SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                              22
Fldgulbvdl                    Voir Dire

1             JUROR:  Number 65.

2             THE COURT:  What's the nature of your issue?

3             JUROR:  I'm a student and I work as well.  My school

4    schedule starts January 28.  It's my last semester of school

5    and it's a clinical course.  I'll need to be in school Tuesdays

6    and Wednesdays the whole day.

7             THE COURT:  What time during the day?

8             JUROR:  Tuesdays, it's 6:00 to 8:40 p.m.  Wednesdays,

9    it's 8:00 a.m. to 8:00 p.m.  It's a clinical day for Wednesday.

10            THE COURT:  What kind of class, is it?

11            JUROR:  It's a nursing course.

12            THE COURT:  Is it a book course or is it a practical

13   course?

14            JUROR:  Practical.

15            THE COURT:  It's a course where you're actually

16   dealing with the people?

17            JUROR:  In the hospital; yes.

18            THE COURT:  Okay.  Why don't you step back over there

19   for a moment.

20            JUROR:  Thank you.

21            (Juror present)

22            THE COURT:  You are alternate number one?

23            JUROR:  Alternate one.

24            THE COURT:  What juror number are you?

25            JUROR:  61.

                     SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                              23
Fldgulbvdl                    Voir Dire

1            THE COURT:  What's the nature of your issue?

2            JUROR:  I have two things:  I mean, I'm a construction

3    company owner and I have to have payroll and all that, and I

4    don't have anybody to cover me for that time period.  Plus, I

5    have two young children in daycare.  My husband travels for his

6    job.  And I, you know, daycare closes at 6:30.  I live in

7    Westchester.  It took me two and-a-half hours to get here

8    today.  I mean, I don't know what the traveling situation is

9    going to be like.  And I don't have coverage to, you know, I

10   may not have coverage for my children at home.

11           THE COURT:  In terms of the job, we're not going to

12   sit on Fridays, so Fridays is not going to be a day when the

13   jury is going to sit.

14           JUROR:  Okay.

15           THE COURT:  Almost everybody's got a job.

16           JUROR:  I know, I understand that.

17           THE COURT:  So we have to find a way to have people

18   serve even when they have jobs.  In terms of the childcare, we

19   end on time every day.  And if we need to make sure that -- we

20   make sure that you're out by 5:00 on the dot and you can then

21   head off to pick up your kids, do you think with those things

22   you could find a way to make it work?

23           JUROR:  It's hard, like, in the morning, I get up 6:30

24   in the morning to get here at 9:00.  It's a little ridiculous.

25   I don't know.  Last time we got out at 12:00 and, I mean, I

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

24
Fldgulbvd1                    Voir Dire

1   made it back in, like, an hour, but with the 5:00 traffic, I

2   don't know it what's going to happen.

3            THE COURT:  What we'll do is there are --

4            JUROR:  And then there's an extended -- because I

5   usually pick them up at 5:30, so I have to pay now extra money

6   to keep them there until 6:30, and then they close at 6:30, so

7   that's an extra expense for me, too.

8            THE COURT:  I hear you.  Unfortunately, your situation

9   with childcare and with the job is no different than a bunch of

10  folks.

11           JUROR:  I understand.

12           THE COURT:  And it's not that the Court isn't

13  sympathetic to your situation; it's that we're going to try to

14  make it work, okay?

15           JUROR:  All right.

16           THE COURT:  Thank you.

17           (Juror present)

18           THE COURT:  Hi, there.  You were in the tenth seat?

19           JUROR:  Yes.

20           THE COURT:  What's your juror number?

21           JUROR:  140.

22           THE COURT:  And what's the nature of your issue?

23           JUROR:  I have an elder parent that I see.  She's in

24  California and I'm a New York City teacher.  I take my time out

25  to go see her and I would be going in February.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    25
    Fldgulbvd1              Voir Dire

 1              THE COURT:  What time in February?

 2              JUROR:  It's the week that we have off for winter

 3      break.

 4              THE COURT:  That would be the middle of February, the

 5      middle of the late February?

 6              JUROR:  Yes.

 7              THE COURT:  Around the President's Day weekend?

 8              JUROR:  Uh-huh.

 9              THE COURT:  Well, this case may be over by then.  I

10      can't predict it, though.

11              JUROR:  I don't have a problem with serving at all.  I

12      just don't -- I'm dedicated; I need to see her.  It's been a

13      year since I've seen her, so I do have to see her.

14              THE COURT:  Have you bought a ticket yet?

15              JUROR:  No.

16              THE COURT:  So, there are -- look, I understand about

17      your issue and we're sympathetic to your issue.  This case may

18      go from four to six weeks, and I can't promise you it's going

19      to be done before the six weeks is out, but we're hopeful it

20      will come in closer to the four-week time, but we don't know.

21      But at this point in time, there are any number of people who

22      have got childcare issues and --

23              JUROR:  I understand.

24              THE COURT:  -- parent issues and things like that.  So

25      we'll be as efficient as we possibly can, but with that said,

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvdl                Voir Dire

1    is there any way that you can nonetheless serve?  I'd be happy

2    to call your school and try to get some additional time off.

3              JUROR:  I just transferred to a new school, as well.

4    That's another thing.  I transferred to a different school.

5              THE COURT:  I can call them saying I'm a judge.

6              JUROR:  No, I would not be happy not to be able to see

7    her.

8              THE COURT:  No, I'm saying you might be able to see

9    her but take some additional time.  I would call school and get

10   some additional time for you to see her.

11             JUROR:  Oh, that would be fine, if they gave me

12   another week to go see her.

13             THE COURT:  Right.

14             JUROR:  Then that's not a problem.

15             THE COURT:  I would have to check that out with the

16   school.

17             JUROR:  All right.

18             THE COURT:  Why don't you go back.

19             JUROR:  Thank you.

20             THE COURT:  Was there anybody else who had their hand

21   up?  No.  All right.  Thank you.

22             JUROR:  Do you want me to sit down?

23             THE COURT:  You can go sit down.  As I understand it,

24   we have.

25             MR. DRATEL:  I thought there was one other, juror no.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

27

Fldgulbvdl                    Voir Dire

1    9 who said she had an issue.

2              THE COURT:  But she didn't come up when we asked.

3              MR. DRATEL:  Okay.

4              THE COURT:  In the Court's view, the issues come down

5    to juror no. 4 who has got the practical nursing situation,

6    which I think is difficult to replicate.  That's juror no. 65,

7    seated in the fourth position.  And otherwise, the others I

8    think --

9              MR. DRATEL:  Juror no. 1 is a student.  He's starting

10   class on the 28th.

11             THE COURT:  Starting class on the 28th.

12             MR. TURNER:  We believe so, too.

13             MR. DRATEL:  The only one other thing I want to ask,

14   and I know it's a loaded question and I'm not saying if they

15   answer yes they get excused, but just to see what their

16   response is for our purposes in terms of evaluating down the

17   road, ask them if it's going to have an impact on them if they

18   serve and if they are picked and they're on the jury, to what

19   extent are they going to be thinking about their job or their

20   kids or things like that.

21             THE COURT:  I think everybody thinks about their job

22   and their kids all the time, so I don't want it open-ended that

23   much, but let me do an inquiry.

24             Okay.  Folks, why don't we get the first fellow over

25   here.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    28
    Fldgulbvd1                    Voir Dire

 1              (Juror present)

 2              THE COURT:  You're going to be excused.

 3              JUROR:  Okay.

 4              THE COURT:  Get your stuff and Joe will give you back

 5      your information.

 6              (Juror excused)

 7              (Juror present)

 8              THE COURT:  Sir, we're going to ask you to stay on the

 9      jury.  Now, I understand your situation, and I want you to

10      understand that the Court is very mindful of the fact that you

11      have a job that you want to be at and that you've got this

12      remodeling project, but we have a lot of people out there who

13      have jobs and it's not so very different from a lot of them are

14      going through.

15              With that said, do you think that you'd be able to

16      serve on this jury in a fair and impartial way even though the

17      Court has heard your request to be excused?

18              JUROR:  Yeah, why not?  Yeah.

19              THE COURT:  Thank you, sir.

20              (Juror present)

21              THE COURT:  You're going to be excused and you can get

22      your paperwork from Joe.

23              JUROR:  Thank you.

24              (Juror excused)

25              MR. DRATEL:  That was 140 -- no, 165?  That was juror

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

29

Fldgulbvdl                    Voir Dire

1    no. 4.

2              THE COURT:  I think we're all set.  Thank you.

3              (In open court)

4              THE DEPUTY CLERK:  Prospective juror no. 1, juror no.

5    136, 136.

6              THE COURT:  As 136 is coming up filling in the first

7    spot, let me say that those of you who spoke to us over here

8    and didn't get excused, we heard you.  And for anybody else,

9    once you come in because we're now going to be filling in some

10   spots, in terms of the four- to six week period of time, look,

11   I understand that it's very inconvenient for some people, but I

12   want to make sure that if you believe you have a hardship, it's

13   a true hardship, not just a job that you would rather be at

14   than being here, something where it's really going to present

15   an insurmountable issue.  And if you need me to call somebody,

16   that's what I'm here for.  I'm a public servant.  I'm happy to

17   call somebody for you.

18             So when you're contemplating whether or not you raise

19   an issue, keep that very much in mind and only raise the issue

20   if you really need to.

21             THE DEPUTY CLERK:  Prospective fourth juror, juror no.

22   33, 33.  Number 33, take the fourth seat, the empty one in the

23   first row.

24             THE COURT:  Prospective juror no. 1 and I know you

25   have two numbers, everybody gets two numbers, one in the box

(212) 805-0300

30

Fldgulbvdl                    Voir Dire

1    and one elsewhere, where there any questions which I asked so

2    far to which you would have had a yes answer?

3              JUROR:  No.

4              THE COURT:  Thank you, sir.

5              Prospective juror no. 4?

6              JUROR:  Yes.

7              THE COURT:  Were there any questions that I asked in

8    which you would have had a yes answer?

9              JUROR:  Yes.

10             THE COURT:  Which ones?

11             JUROR:  It was early on around the third question, I

12   believe.  It had to deal with the things that were on the

13   website that he was selling.  The number one problem I have is

14   I'm an educator, I'm a teacher.  I have a problem with the fact

15   he was selling fake IDs and my students can possibly purchase

16   that.  It is a problem.

17             THE COURT:  Let me sort of have you think about this,

18   which is I want everybody to be absolutely clear that these are

19   allegations only.  The fact of the indictment does not mean

20   that the defendant has done anything at all.  He is presumed

21   innocent, and it's just the nature of the charges.

22             So the question is going to be when the evidence comes

23   in, can you look at the evidence in a fair way and say, hey,

24   does this evidence meet the elements of the crime in terms of

25   the law as the Court instructs you.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvd1                    Voir Dire

1          If you think just the nature of the charges cause you

2     bias, I need to know about it.  If you think you can listen to

3     the evidence fairly and impartially, tell me that.

4          JUROR:  I find some bias in it; yes.

5          THE COURT:  You are excused, sir.  Thank you very

6     much.  Let's fill in the fourth spot again, and I appreciate

7     your honesty.

8          THE DEPUTY CLERK:  Prospective fourth juror, juror no.

9     135, 135.  Juror no. 135, please take the seat that was

10    vacated.

11         THE COURT:  Prospective juror in the fourth seat, were

12    there any questions that I asked to which you would have had a

13    yes answer?

14         JUROR:  Yes.  The one about commuting, is it four- to

15    six weeks?  I live in Rockland County, Valhalla, New York, and

16    it's difficult getting over here.

17         THE COURT:  Unfortunately, in the Southern District,

18    we draw from that area all the time, and the requirement to

19    serve on a jury is equally applicable to folks up in Rockland

20    as it is to people who are in Westchester as to people in

21    Manhattan.  So that in and of itself wouldn't be a reason to

22    get off, all right?

23         JUROR:  All right.

24         THE COURT:  With that said, would you be able to put

25    any annoyance that you have aside when you're contemplating the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvd1                    Voir Dire

1     evidence, would you be able to look at the evidence and be able

2     to evaluate the charges based on the evidence?

3               JUROR:  Okay.

4               THE COURT:  Thank you.

5               Let's go on now.  In a moment, I'm going to ask that

6     the counsel for the parties introduce themselves and the other

7     folks at their table, and I'm going to ask you if you know of

8     any of these people.  And I'm going to ask also you folks at

9     the table to turn around because I want the folks out there

10    behind you to be able to see your faces.

11              Mr. Turner, why don't you introduce yourself, others

12    at your table and have everybody turn around.

13              MR. TURNER:  My name is Serrin Turner.  I represent

14    the United States in this matter.  My colleagues are Assistant

15    U.S. Attorney Timothy Howard, FBI Special Agent Vincent

16    D'Agostino and two paralegals on the case, Nicholas Evert and

17    Molly Rosen.

18              THE COURT:  Thank you.  Does anybody in the jury box

19    know any of the folks at the government's table?

20              Mr. Dratel.

21              MR. DRATEL:  Thank you.  Good morning.  I'm Joshua

22    Dratel.  I represent Mr. Ulbricht.  I'll let them introduce

23    themselves, as well, the lawyers at the table.

24              MS. LEWIS:  I'm Lindsay Lewis.   I represent Ross

25    Ulbricht.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    33
     Fldgulbvd1                    Voir Dire

 1              MR. HOROWITZ:  Josh Horowitz.  I represent Ross

 2    Ulbricht.

 3              MS. MARINO:  Linda Marino here on behalf of

 4    Mr. Ulbricht.

 5              MR. DRATEL:  And Mr. Ulbricht is here as well.

 6              THE COURT:  Ladies and gentlemen, does anybody know

 7    any of the individuals at the defense table?

 8              I'm going to read you certain names of potential

 9    witnesses here or individuals whose names may come up during

10    the trial just, because you know an individual by this name

11    doesn't mean you know the individual I'm talking about.  We'll

12    take it step by step.

13              The first name I'm going to spell for you after I try

14    to pronounce it, but it's a bit difficult is Jared

15    Der-Yeghiayan D-E-R Y-E-G-H-I-A-Y-A-N.  Raise your hand if you

16    know any of these folks.  Thomas Kiernan, K-I-E-R-N-A-N; Gary

17    Alford, A-L-F-O-R-D; Darren Critten, C-R-I-T-T-E-N; Ilhwan Yum,

18    I-L-H-W-A-N Y-U-M; Benedikt Grundal, B-E-N-E-D-I-K-T.

19              MR. TURNER:  I believe we have a more up-to-date

20    witness list.

21              THE COURT:  All right.  I always like up-to-date

22    witness lists.

23              MR. TURNER:  Just for the record, Mr. Critten, I

24    believe, is Diron Critten, not Darren.

25              THE COURT:  It was Darren Critten on the new list.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

34
Fldgulbvdl                    Voir Dire

1              MR. TURNER:  That's a mistake, your Honor.

2              THE COURT:  The next name is Christopher Beeson,

3     B-E-E-S-O-N; Richard Bates, B-A-T-E-S; Michael Duch, D-U-C-H;

4     Andrew Michael Jones; Brian Shaw, along with the others that I

5     have read.  All right.

6              Now, has anybody had any direct or indirect dealings

7     with any of those people, even if you don't know them or

8     wouldn't think you have a personal relationship with any of

9     them?  Do you know them at all?  No?  All right.

10             Now, I'm going to ask you some questions that also

11    relate not just to you but also to direct family members, close

12    relatives or associates.  So if you know somebody who is very

13    close to you who would answer yes to this question, then I want

14    you to answer it yes.

15             Has any juror had any dealings with or been employed

16    by the U.S. Attorney's Office or federal, state or local law

17    enforcement?

18             We have number seven, number nine, alternate one.  No.

19    7, 9, and alternate no. 1.  Anyone else?

20             Number seven, who is related to whom or who knows

21    whom?

22             JUROR:  My son works for the federal government.

23             THE COURT:  And what agency does he work?

24             JUROR:  TSA, Homeland Security.

25             THE COURT:  Do you know his job title?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

35

Fldgulbvdl                    Voir Dire

 1              JUROR:  Yes.  Special agent in charge.

 2              THE COURT:  And is he involved with cyber crime at

 3   all, do you know?

 4              JUROR:  No.

 5              THE COURT:  Is there anything about your son's

 6   employment by the TSA that makes you feel that you could not be

 7   fair and impartial in this case?

 8              JUROR:  No.

 9              THE COURT:  Is there anyone else that you wanted to

10   raise?

11              JUROR:  No.

12              THE COURT:  Prospective juror no. 9, who do you know?

13              JUROR:  My daughter.

14              THE COURT:  What is her position?

15              JUROR:  She's a police officer.

16              THE COURT:  NYPD?

17              JUROR:  Yes.

18              THE COURT:  And is she on any special task forces here

19   in the city?

20              JUROR:  No.

21              THE COURT:  Is she on street patrol?

22              JUROR:  Yes.

23              THE COURT:  Is there anything about your daughter's

24   position in law enforcement that makes you feel that you could

25   not be fair and impartial in this case?

(212) 805-0300

36

Fldgulbvdl                    Voir Dire

```
 1              JUROR:  No.
 2              THE COURT:  Alternate no. 1 number one, who do you
 3    know?
 4              JUROR:  I have two cousins that are police officers in
 5    the Ossining Police Department, as well as many friends and
 6    acquaintances also in the Ossining Police Department.
 7              THE COURT:  So you know a lot of folks from the
 8    Ossining Police Department?
 9              JUROR:  Yes.
10              THE COURT:  Is there anything about the fact that you
11    know people in the police department of Ossining that makes you
12    feel that you could not listen to the evidence in this case and
13    be fair and impartial in this case?
14              JUROR:  No.
15              THE COURT:  Anyone else that I missed?  Yes.  Number
16    eight?
17              JUROR:  My sister is a federal probation officer in
18    Brooklyn.
19              THE COURT:  Anyone else?
20              JUROR:  My ex-husband is a retired sergeant with the
21    NYPD.
22              THE COURT:  Is there anything about either your sister
23    or your ex-husband's employment that makes you feel you could
24    not be fair and impartial in this case?
25              JUROR:  No.
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

37

Fldgulbvdl                    Voir Dire

1              THE COURT:  Does any juror have any close friends or

2    do they themselves work as a prosecutor, a criminal defense

3    lawyer or a private investigator?  Yes, number one.

4              JUROR:  Yes.

5              THE COURT:  And what, is it you or your close friends?

6              JUROR:  Close friends.

7              THE COURT:  What position do they have?

8              JUROR:  Criminal defense lawyer.

9              THE COURT:  And are they here in New York City?

10             JUROR:  Yes.

11             THE COURT:  And do they deal with any particular type

12   of case or all manner of cases?

13             JUROR:  All manner of cases, I think.

14             THE COURT:  They deal with drug cases, assaults, the

15   run-of-the-mill, everything?

16             JUROR:  Yes.

17             THE COURT:  All right.  How close a friend is this?

18             JUROR:  Very close, very good.

19             THE COURT:  Somebody you see a lot?

20             JUROR:  Yes.

21             THE COURT:  On a weekly basis?

22             JUROR:  Yes.

23             THE COURT:  Would you be able to, during the course of

24   this trial, not share with that friend anything at all about

25   this case?

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

38
Fldgulbvd1                    Voir Dire

```
 1              JUROR:  Absolutely.
 2              THE COURT:  And is there anything about your friend's
 3    position as a criminal defense attorney that makes you feel
 4    that you would be biased either against the government or
 5    against the defendant in listening to the evidence in this
 6    case?
 7              JUROR:  No.
 8              THE COURT:  Do you believe you could be fair and
 9    impartial?
10              JUROR:  Yes.
11              (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

(212) 805-0300

                                                                    39
       Flddulbv2                    Voir dire

1                  THE COURT:  All right.  Anybody else?  All right.

2             Now, has any juror or any of your close friends or

3        associates been involved in any offense of the type that has

4        been charged in the Indictment here?

5             Now, have any of you been the victim of computer

6        hacking or identity theft?

7             All right.  Now, some witnesses for the government may

8        have past criminal convictions or may have been involved in

9        some of the crimes charged in the Indictment.  Those witnesses

10       have pled guilty and are testifying pursuant to lawful

11       cooperation agreements.  Some of these witnesses may be hoping

12       that their cooperation will result in a reduced sentence or

13       some benefit.  There is nothing unlawful about the government's

14       use of such witnesses.  Do any of you have any problems with

15       that type of witness that would make you unable to be fair and

16       impartial in this case?

17            Now, some of the evidence in this trial will come in

18       in the form of data obtained via pen registers or track and

19       trace devices which are used to monitor electronic

20       communications.  This data was intercepted without the

21       defendant's consent.  I instruct you now that this type of

22       evidence does not violate the rights of the defendant and that

23       it is perfectly proper for this type of evidence to be

24       introduced at this trial for your consideration.

25            With that in mind, do you have any feelings about the

                         SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                40
F1ddulbv2                    Voir dire

1    use of pen registers or track and trace devices or other forms

2    of electronic surveillance that would make it difficult for you

3    to consider such evidence fairly and impartially in this case?

4            Now, some of the evidence in this case may also come

5    from searches performed by law enforcement officers.  I

6    instruct you that these searches were legal and that the

7    evidence obtained from those searches is admissible in this

8    case, if a proper foundation is laid.

9            Does anyone have any strong feelings about searches

10   conducted by law enforcement officers, or the use of evidence

11   obtained from such searches at trial, that would make it

12   difficult for you to be fair and impartial in this case?

13           All right.  Now, under our system of law, the facts

14   are for the jury to decide and the law is for the Court.  These

15   two areas are separate and distinct.  At the end of the case it

16   is the judge's job to instruct the jury on the law, and you are

17   required to accept the law as I explain it to you.  It is the

18   jury's job to determine the facts, using the Court's

19   instructions on the law.  Is there any prospective juror who is

20   either unwilling or unable to apply the law as the Court would

21   explain it to you?

22           Now, the law provides that only evidence presented

23   here in court may be used by you to determine guilt or

24   innocence of the defendant.  Is there anyone who would have

25   difficulty with that instruction?

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

F1ddulbv2                    Voir dire

1           Now, under our system of laws, every defendant is

2    presumed innocent and he cannot be found guilty unless a jury,

3    having heard all of the evidence in the case, unanimously

4    decides that the evidence proves his or her guilt beyond a

5    reasonable doubt.  Is there anyone who has any difficulty

6    accepting that law?

7           Now, it is not pleasant duty to find another

8    individual guilty of committing a crime.  Is there any juror

9    who feels that even if the evidence established the defendant's

10   guilt beyond a reasonable doubt that he or she may not be able

11   to render a guilty verdict unrelated to the law or the

12   evidence?

13          Now, will each juror accept the proposition of law

14   that the question of punishment is for the Court alone to

15   decide and that possible punishment must not enter into the

16   deliberation of the jurors as to the guilt or the innocence of

17   the defendant?  Anyone can't accept that?

18          Now, the defendant is not required to call any

19   witnesses or to produce any evidence or to take the stand.  If

20   the defendant elects not to take the witness stand, you may

21   draw no unfavorable inference of any kind from the fact that he

22   has chosen not to do so.  That may not enter into your

23   decision.  Is there any juror who would be unable to accept and

24   follow that instruction?

25          Now, I have tried to direct your attention to possible

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

42

Flddulbv2                    Voir dire

1    reasons why you might not be able to sit as a fair and

2    impartial juror.  Apart from your answer to any question, I

3    want you now to ask yourself is there any fact, circumstance,

4    opinion, impression, attitude that you have, personal

5    experience that you may have that you believe would prevent you

6    if you're accepted as a juror in the trial of this case from

7    listening to the evidence with an open mind and deciding every

8    issue fairly and impartially solely upon the evidence as you

9    hear from the witnesses and in accordance with the Court's

10   instructions of the law?  Is there anything else you need to

11   tell me that would make you unable to be fair and impartial?

12            All right.  Now we are going to go on to the next

13   step, which is called peremptories.

14            Now, I want to just tell you -- let me do the

15   questionnaires first.  Before we get to the peremptories, you

16   will tell us a little bit about yourself.  But let me tell you

17   about the peremptory process.  There will undoubtedly, I

18   guarantee it, be some of you in the back who are going to fill

19   in up here, because after the folks in the box have an

20   opportunity to tell us a little bit about themselves, which

21   comes from just answering some of the questions on that final

22   questionnaire that you got handed this morning, after you have

23   done that, we'll have you stand up one by one.  Then there will

24   be an opportunity for the government and the defense to give

25   Post-Its to us and certain of you will be asked -- you will be

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
                                                 43
     F1ddulbv2                  Voir dire
```

1     excused.  You should not think twice about why.  You will just

2     take your card from Joe and you will return to the room and

3     another name will be spun out of this big old box here and that

4     person will be called into the box.  Do not think twice about

5     it.

6             All right.  So we are going to start with number one

7     and I'm going to ask you to take that --

8             MR. DRATEL:  Your Honor, one moment.

9             (Pause)

10            MR. DRATEL:  Just one moment, your Honor.

11            THE COURT:  Sure.

12            (Pause)

13            THE COURT:  You can turn over your bio questions

14    there, and we will have each of you stand up and tell us a

15    little bit about you.

16            MR. DRATEL:  Just one thing.

17            THE COURT:  You want a brief sidebar?

18            MR. DRATEL:  Yes.

19            THE COURT:  Let's have a brief sidebar while you folks

20    are looking at your bio questions and we will make it quick.

21            (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

44

Flddulbv2                    Voir dire


1              (At the sidebar)

2              MR. DRATEL:  I checked with my co-counsel just to be

3    sure I didn't miss it, but I don't think the Court asked some

4    questions about credibility in terms of law enforcement.  We

5    have a number of law enforcement officers testifying.

6              THE COURT:  I believe we asked that in the juror

7    questionnaire but let me ask.

8              MR. DRATEL:  I don't think so, no.

9              THE COURT:  No?  I am happy to ask it again.

10             MR. DRATEL:  It was not in the questionnaire.

11             THE COURT:  I will do it as for or against law

12   enforcement.

13             MR. DRATEL:  Yes.

14             THE COURT:  Anything else?  OK.  Thank you.

15             (In open court)

16             THE COURT:  One more question, ladies and gentlemen,

17   which is there are going to be a number of witnesses

18   potentially from law enforcement.  And does any prospective

19   juror believe that he or she would be biased for or against the

20   testimony of a law enforcement witness just because they are

21   from law enforcement?

22             (Pause)

23             In other words, will you give the police more

24   credibility or less credibility just by virtue of them being

25   the police or the DEA or other law enforcement?

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

F1ddulbv2                    Voir dire

 1              All right.  Thank you.

 2              Now, let's start with juror number one.  Why don't you

 3     tell us a little bit about yourself, sir?

 4              JUROR:  Do I have to stand.

 5              THE COURT:  Please stand up.

 6              JUROR:  My name is my (unintelligible).  I am a

 7     retired ambulatory surgery coder --

 8              THE COURT:  Let me just say that you don't have to say

 9     your number because we know what position you are in.  So you

10     could say your juror number.  That is an easier way than having

11     people have to go through all of that.  Go ahead, sir.

12              JUROR:  I am a retired ambulatory surgery coder at

13     Mount Sinai Hospital.  I have been retired for almost two

14     years.  I reside in Harlem.

15              What else?

16              THE COURT:  And are you married or significant other?

17              JUROR:  Significant other.

18              THE COURT:  Any kids?

19              JUROR:  Five kids.

20              THE COURT:  What does your spouse or significant other

21     do?

22              JUROR:  She is a nursing dispatcher at Montefiore

23     Hospital.

24              THE COURT:  And are your kids grown?

25              JUROR:  Yes.

(212) 805-0300

Flddulbv2                    Voir dire

1              THE COURT:  What do they do?

2              JUROR:  One is a pharm D in Maryland.  He works for

3      the federal FDA.  And my other son is a teacher, private

4      schoolteacher.  And that's it, basically.

5              THE COURT:  All right.  And do you read any newspapers

6      or periodicals on a regular basis?

7              JUROR:  I read a lot, yes.  I read The Times and a lot

8      of history.  I read a lot.

9              THE COURT:  All right.  Any TV shows you watch on a

10     regular basis?

11             JUROR:  Not really, just mainly the news.

12             THE COURT:  OK.  Thank you.

13             Number 2.

14             JUROR:  Hi.  I'm 42 years old.  I live in the Bronx.

15     I live with my husband and two children.  I'm a high school

16     guidance counselor.  I have worked for the New York City

17     Department of Education for 20 years.

18             My husband is -- he is a delivery driver for a bakery

19     and he is a painter.  My eldest is 23 and he works for

20     JPMorganChase.

21             I have a master's in history and a master's in

22     guidance and counseling.  And in my spare time I read, I cook.

23             Magazines and newspapers, I don't really read -- not

24     on a regular basis.  I don't read -- I usually -- CNN or maybe

25     I will read The Times on the Internet but that's about it.

(212) 805-0300

47

Flddulbv2                    Voir dire


1            And television programs, Modern Family.  I like to

2     watch Reliable Sources and GPS on the weekends.  That is about

3     it.

4            THE COURT:  Your son, is he on the banking side or

5     some other area?

6            JUROR:  He is doing data entry.  He just started.  He

7     just graduated last May.  It is very low level.

8            THE COURT:  Thank you.  Number 3.

9            JUROR:  I'm 31 years old and I lived in New York all

10    my life.  I live in Yonkers, although I lived in the Bronx most

11    of my life.  And I reside with my sister.

12           For the last five years I have been working as a

13    social worker.  And I have an ex-wife.  She is a school

14    administrator with CUNY.  I have a two-year-old daughter.

15    Highest level of education right now is I'm pursuing my

16    master's degree in social work.

17           I don't really have a lot of spare time.  I spend most

18    of my time with my daughter.  I don't really read newspapers or

19    magazines and I don't really own a television so I don't watch

20    TV either.

21           THE COURT:  What does your sister do?  Is she

22    employed?

23           JUROR:  She is a personal trainer.

24           THE COURT:  In terms of your social work, are you

25    specializing in any particular area?


                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

48

Flddulbv2                    Voir dire

1              JUROR:  Right now just clinical-based work and my grad

2    school studies, and at work I work with mental health and

3    youth.

4              THE COURT:  Thank you, sir.

5              Number 4.

6              JUROR:  Hi.  I'm 29 years old.  I'm from Rockland

7    County, born and raised in Nyack, New York.  I live in Spring

8    Valley now.

9              For the past five years I have been working for

10   Rockland Orthopedics, which is in Suffern.

11             I am not married, no kids.  I have a boyfriend who

12   works for -- he is an exterminator.

13             Education, I went to medical -- I completed medical

14   billing and coding in White Plains at Berkeley -- I'm sorry, at

15   Stamford.  In my spare time, I don't know, hang with friends,

16   things likes that.

17             Magazines, I don't really read newspapers, no.  And

18   TV, not really.  I listen to a lot of music.

19             THE COURT:  All right.  Thank you.  Number 5.

20             JUROR:  I am 51 years old.  I live in the United

21   States for 44 years.  I live in Manhattan, in Murray Hill.  I

22   work in the television industry.  I am the president and

23   general manager of a TV channel called Cooking Channel.  I

24   worked there for 17 years.

25             I am married to my wife, who I live here in the city

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

49
F1ddulbv2                  Voir dire

1    with.  We do not have any children.  My wife works in Social

2    Services.  She is an executive for a nonprofit.  And I have a

3    MBA in marketing and finance, and in my spare time I like

4    cycling, playing guitar, taking classes online.  I watch a lot

5    of television but that doesn't pay the bills, and that is it.

6              THE COURT:  All right.  In terms of the social

7    services that your wife does, does she concentrate in any

8    particular area?

9              JUROR:  In low income housing and shelters.

10             THE COURT:  Thank you.

11             All right.  Number 6.

12             JUROR:  I'm 65 years old.  I live in the Bronx.  I'm a

13   home health aide.  I work for the Bronx Home Attendant Service.

14             I am a widow.  I have three adult children.  One is a

15   carpenter.  One is a teacher.  One is a college student looking

16   for a job.

17             In my spare time I go to church.  I read my Bible.  I

18   watch television and the news.

19             THE COURT:  All right.  Thank you.

20             Number 7.

21             JUROR:  I am 47 years old.  I live in Westchester

22   County, Bronxfield.  My granddaughter lives with me while she

23   is attending college.  I am single.  And I am a retired chief

24   radiation therapist at one of the hospitals here in Manhattan.

25             And in my spare time I like to cook, go to the gym and

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

50

Flddulbv2                    Voir dire

1    read.

2            THE COURT:  What do you read?

3            JUROR:  I read like daily words.  I am reading the

4    Bible in chronological order and magazines.  I like magazines.

5            THE COURT:  All right.  Thank you.

6            JUROR:  Sure.

7            THE COURT:  Number 8.

8            JUROR:  I am juror number 143.  I am 47 years old.  I

9    was born and raised in New York City.  I live in Rockland

10   County with my ex-husband and my son and my daughter.  My

11   daughter is a student at -- a junior at Boston University, and

12   my son is a senior at Tapanzee High School in Rockland County.

13           I have been employed for almost eleven years -- I am

14   the executive assistant to a CEO for a company in Orangeburg.

15   We manufacture shelters for the military.  It is in Orangeburg.

16   I still live with my ex-husband.

17           And that is it.  I work fulltime.

18           THE COURT:  All right.  Do you read anything on a

19   regular basis?

20           JUROR:  Just the Huffington Post and things like that.

21           THE COURT:  Any TV that you watch regularly?

22           JUROR:  Just, you know, a lot of entertainment news

23   and Shopping Network.

24           THE COURT:  All right.  Thank you.

25           JUROR:  You are welcome.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

F1ddulbv2                    Voir dire

1              THE COURT:  Number 9.

2              JUROR:  I'm 49 years old.  I live in Harlem.  I've

3      lived in New York all my life.  I am a 911 operator for the

4      past 20 years.  Not married.  I have three adult children and

5      one 10-year-old.  The oldest --

6              THE COURT:  What do your adult kids do?

7              JUROR:  My oldest daughter, she is a doctor.  My

8      oldest son, he just started working at Morgan Stanley.  And my

9      third oldest son, he lives in Pennsylvania with his father.

10     And then the 10-year-old is in junior high school.

11             So I have taken online courses at the University of PA

12     in Human Resources, and in my spare time I spend it with my

13     family, church and movies, dinner.  That is about it.

14             I do read certain magazines, Essence, Money Magazine,

15     Triple A, and I watch the news and some children's shows with

16     my son.

17             THE COURT:  All right.  And then your child, I think

18     you said it was your son at Morgan Stanley?

19             JUROR:  Right.

20             THE COURT:  Is he in the banking area --

21             JUROR:  No.  He works in the gym area.

22             THE COURT:  All right.  And we talked about your

23     daughter at the NYPD before?

24             JUROR:  Right.

25             THE COURT:  That was the one you mentioned earlier?

                   SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    52
        Flddulbv2                    Voir dire

1              JUROR:  Right.

2              THE COURT:  All right.  Thank you.

3              Number 10.

4              JUROR:  I'm juror 140.  I am a teacher.  I worked for

5    the DOE for over 20 years.  I am born in California but I lived

6    in New York for the last 28 years.  I live in Upper West Side.

7    My husband is involved with the restaurants.  He is a

8    consultant.

9              I have four children.  The oldest is in logistics in

10   California.  A daughter is a baker in Oregon.  My son is an EMT

11   for NYFD, and my youngest son is a college student taking a

12   year off.  And I am not really a big TV watcher.  I watch some

13   news, Jeopardy.  I read mostly all educational things.  I study

14   French.  I speak Spanish.  I have two master's degrees.

15             THE COURT:  What are your master's degrees in?

16             JUROR:  Education, reading, early childhood.

17             THE COURT:  All right.  Thank you.

18             Number 11.

19             JUROR:  Hello.  I'm 64 years old.  I live in

20   Manhattan.  I live with my two children.  The first one is

21   working in business and makes her own jewelry, and my youngest

22   one doing -- she is with a designer.

23             And in my spare time I watch game shows and I go to

24   church and I help young children in church.

25             THE COURT:  All right.  Thank you.  And, I'm sorry,

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

53
Flddulbv2                    Voir dire

1    did you say what your job was?

2            JUROR:  Certified nursing assistant.

3            THE COURT:  All right.  Thank you.

4            OK.  Number 12, please, sir.

5            JUROR:  Hi.  I am 49 years old.  I have been in the

6    United States all my life.  I currently live in the Bronx.

7    Presently I live with my mother, brother and grandmother, and I

8    am going through a divorce.

9            Over the last five years, I have been an IT, an HR

10   manager for the company.  I have been there for like 27 years.

11           My ex-wife, she is a registered nurse.  She works in a

12   hospital.

13           My children are small.  I have a daughter who is 13

14   and a son, he is 9.  I have a bachelor's degree in computer

15   science.  In my spare time I play with the computer, listen to

16   music.  I don't read any newspapers.  Everything is done

17   electronically.  And I don't watch TV, really.  I don't really

18   have any time so mostly on the computer.

19           THE COURT:  All right.  Thank you.

20           Alternate Number 1.

21           JUROR:  Hi.  I am 39 years old.  I live in

22   Westchester.  For over 16 years now, I have been the owner of a

23   construction company with my brother.  I live with my husband

24   and my two small children, who are 2 and 3.  And I have a

25   master's -- I'm sorry, I have a bachelor's degree in business

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

54
Flddulbv2                    Voir dire

1    management.  I don't have much spare time with the two children

2    but when I do, I like to read, mostly novels, and I do like to

3    read magazines.  I do have a subscription to People Magazine.

4    Newspapers, I do read regularly at work.  We get the newspaper

5    every day.

6              THE COURT:  What kind of newspaper, which ones?

7              JUROR:  We get The Times and they also get the

8    Westchester Journal.

9              And as for television, I watch kids shows or whatever

10   else I can watch.  I watch a lot of Netflix also.

11             THE COURT:  Thank you.

12             Alternate number 2, sir.

13             JUROR:  I'm 56 years old.  I've lived in the United

14   States, I was born here, lived here all of my life.  I live

15   here also in Manhattan all my life.

16             I work as a doorman, night shift.  I work for a

17   company called PNG, who owns the building.  I have worked there

18   17 years.  I live alone.  I am not married.  And no children.

19             And in my spare time I catch up on some sleep because

20   I work the night shift, but when I am awake I watch a lot of

21   television, mostly like the History Channel, the TMC, Turner

22   Movie Classics, because I love old movies, and then Science

23   Channel.

24             As to reading, I am not much on newspapers and

25   magazines.  I also like to read mysteries and scary stories.

(212) 805-0300

55

Flddulbv2                    Voir dire

1              And that's about it.

2              THE COURT:  All right.  Thank you.

3              Alternate number 3, sir.

4              JUROR:  Hi.  I'm 67 years old.  I live in Westchester

5      County.  For the last 25 years I lived with my wife and my

6      15-year-old son.  Presently employed for a construction

7      management firm for the last 38 years.  Finished just

8      12th grade.  I like to work around the house.  Try to keep up

9      with the 13-year-old.  That is my weekend.

10             I love to read, work on the house, and take care of

11     three dogs and three cats.

12             THE COURT:  What kind of things do you read?

13             JUROR:  Mostly best seller list or history, and

14     attempt to rad the Sunday Times if I have time.

15             THE COURT:  Thank you.  What does your wife do?

16             JUROR:  She is a stay-at-home mom but she is a CPA.

17             THE COURT:  Thank you.

18             Alternate number 4.

19             JUROR:  Good morning.  My name is (unintelligible).  I

20     was born in the Carolinas.  I have been living here 17.  64

21     years old.  I work at the Plaza Hotel for 32 years, and I work

22     at the Westbrook now for nine years.  I am married for 40

23     years.  And my wife, she works for like a law firm.  It is not

24     a law firm.  She is a secretary, like writes all the

25     information.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

56
Flddulbv2                    Voir dire

1              And I am married.  I have two kids.  I've got a boy

2     and a girl.  My daughter, she went to university.  She is

3     working here as a manager, and now she works as a manager here

4     on 23rd Street Housing here and now she is pregnant.  She is an

5     at-home mom -- going to be a mom soon.  And my son is in his

6     30s and he is incarcerated now.  And he is 37 years old.

7              THE COURT:  Is there anything about your son's

8     experience with the criminal justice system that makes you feel

9     that you couldn't be fair and impartial in this case?

10             JUROR:  No.  What happened in this case is totally

11    different from that case, which maybe I think is good.  But

12    there is nothing more I could say.  Because is was with

13    somebody and picked up at a crime scene and like that was his

14    involvement in it.  One jury found him innocent and he has been

15    in New Jersey.

16             THE COURT:  OK.  So we will take that in just a

17    moment.  OK?  Actually, why don't we just have a sidebar to

18    discuss that other issue.

19             Was there anything else?  Do you read anything on a

20    regular base?

21    A.  No.  I would say I watch TV.  Mostly Sapphire, Chicago

22    Police, those kinds of pictures.

23             THE COURT:  Thank you.  Why don't you come on down and

24    we will just take up one issue.

25             (At the sidebar)


                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

57

Flddulbv2                    Voir dire

 1          THE COURT:  OK.  I couldn't quite hear.  What was the

 2    nature of the charge against your son?

 3          JUROR:  He went to New Jersey to pick up a friend and

 4    the friend committed a crime.  And so he went to court in

 5    Jersey, and they found him innocent, the jury.  And then the

 6    other defendant went to trial, and under New Jersey law if he

 7    is found guilty, he will be trial over again.  They tried him

 8    over and they found him guilty.  You know, it was like weird.

 9    The first jury found him innocent.

10          THE COURT:  So is there anything about your -- was

11    there any drugs involved in that issue?

12          JUROR:  No.  It was a home invasion or something.

13    Then when picked the guy up, they arrested him, too.

14          THE COURT:  Now, it sounds like your son had an

15    experience with juries.  Is there something about that

16    experience -- anything about that experience that makes you

17    feel that you couldn't be fair and impartial in this case?

18          JUROR:  It is New Jersey law but I don't know why the

19    first jury find him innocent and they find him guilty, the

20    second jury.  I don't understand that.

21          THE COURT:  Do you think that that would make you

22    biased in some way either in favor of or against defendants in

23    criminal cases here?

24          JUROR:  I don't like too much -- I'm not too familiar

25    with computers and stuff like that so I don't -- I couldn't

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

58
F1ddulbv2                    Voir dire

1  hear, you know what I am saying.  He is right now at Rutgers
2  University Law School.
3          THE COURT:  Let me just speak with counsel for a
4  moment.  Why don't you step over there.
5          JUROR:  OK.
6          (Prospective juror not present)
7          THE COURT:  I can't understand enough about what he is
8  saying to quite get whether or not there is an issue here or
9  not.  It sounds likes he is suggesting that there may not be an
10  issue, but he sounds like also, on the other hand he is
11  suggesting that he has had experience with the jury system and
12  he didn't quite understand.
13          Do counsel have any particular views about this?  The
14  fact that he isn't articulate doesn't mean that he can't serve
15  as a juror.
16          MR. DRATEL:  I think his answers with respect to this
17  case, that is different, and that he made a distinction.
18          MR. TURNER:  I guess I was a little troubled that he
19  wasn't able to give a clear answer to your Honor's question
20  about whether he has a bias.
21          THE COURT:  Let me ask one more question and then just
22  let him go back.
23          (Prospective juror present)
24          THE COURT:  OK.  So in this case there is going to be
25  evidence that will be presented, and as a member of the jury

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

59

F1ddulbv2                   Voir dire

1   you will be asked to evaluate that evidence as to this

2   particular defendant.  Do you think that given all your

3   experiences in life and also with your son --

4             JUROR:  I do it like three or four times.

5             THE COURT:  -- do you think you could be fair and

6   impartial?

7             JUROR:  Yes.

8             THE COURT:  OK.  Thank you.

9             (In open court)

10            THE COURT:  All right.  Ladies and gentlemen, what we

11  do next, we go to that peremptory round.  Now, there are --

12  just to get yourselves prepared, there are six rounds for the

13  peremptories as we get to the 12.  So right now, just to be

14  clear, we are only -- the peremptories are only against the

15  first 12.  We will have a separate round that I will then make

16  clear to everybody against the four.  So the four of you up

17  there, your names aren't going to be called.  Your numbers

18  aren't going to be called right now because we are going to do

19  the alternates separately.

20            All right.  So why don't you folks get your Post-Its

21  in line.

22            MR. DRATEL:  Could we take a short break, your Honor,

23  so we can discuss --

24            THE COURT:  We are going to.  We are going to go right

25  on through.  You all can gather around each other.  It is just

(212) 805-0300

60

F1ddulbv2                    Voir dire

1   the just the way we did it before.

2         MR. DRATEL:  As you know, your Honor, there is a lot

3   to it in terms of figuring out the composition.

4         (Pause)

5         THE COURT:  All right.  We will do another minute and

6   then we will collect the Post-Its.

7         (Pause)

8         All right.  Let's hand up the Post-Its now.

9         THE CLERK:  Jurors number 102, 154 and 143,

10  corresponding seats 6, 7 and 8.

11        THE COURT:  All right.  Ladies and gentlemen, what

12  we're going to be doing now is calling three of you from the

13  back, and you will then fill in the spots for in spots 6, 7 and

14  8, and I will be asking you if you would have answered "yes" to

15  any of the questions which I previously asked and then also to

16  give a brief bio.

17        OK, Joe.  Let's call 6, 7 and 8 to fill in those

18  spots.

19        THE CLERK:  Potential juror number 6, juror number

20  155.  155.  Will you please take the last seat in the first

21  row.

22        Potential juror number 7, juror number 43 --

23  four-three -- number 43, will you please take the first seat in

24  the second row closest to me.  It might make it easier, sir, if

25  you would like to walk around here that way.

(212) 805-0300

Flddulbv2                    Voir dire

 1          And potential juror number 8, juror number 171,

 2   one-seven-one.  171, please take the second seat in the second

 3   row.

 4          THE COURT:  All right.  Prospective juror number 6

 5   down there in the first row, were there any questions that I

 6   had asked before that you would have given a "yes" answer to?

 7          JUROR:  Please repeat number one.

 8          THE COURT:  The very first question I asked, yep.

 9          Does any juror have any personal knowledge or

10   knowledge from other sources of the charges in the Indictment

11   against the defendant?

12          JUROR:  No.

13          THE COURT:  Do you know anything about that?

14          JUROR:  No.

15          THE COURT:  Are there any other questions that you

16   would like to have repeated or that you think you would have a

17   yes answer to?

18          JUROR:  No.

19          THE COURT:  All right.  Do you want to stand up and

20   tell us a little bit about yourself?

21          JUROR:  I'm 20 years old.  I lived in this country for

22   20 years.  I live in the Bronx, New York, with my parents.  I

23   am currently a student at FIT.  Never been married.  Don't have

24   kids.  In my spare time I read a lot, like Complex magazine.  I

25   do not read the newspaper.  I watch some TV, mostly movies on

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

62

F1ddulbv2                    Voir dire

1   Netflix.

2          THE COURT:  What kind of magazines do you read?

3          JUROR:  Complex.

4          THE COURT:  Which newspapers do you read?

5          JUROR:  I don't read no newspapers.  I also do some

6   ice skating.  I play baseball back then, and that is pretty

7   much it.

8          THE COURT:  Thank you.  You may be seated.

9          Prospective juror number 7, were there any questions

10  that I asked before to which you would have had "yes" answers?

11         JUROR:  Yes, your Honor.  I did see someone holding a

12  poster as I came into the court this morning.

13         THE COURT:  OK.  And did you read the poser?

14         JUROR:  Yes, I did.

15         THE COURT:  OK.  We'll take that up in a minute.

16         Were there any other questions to which you would have

17  had a "yes" answer?

18         JUROR:  Yes.  I have had a number of family members

19  employed in law enforcement agencies here in New York.

20         THE COURT:  And which family members, which kinds of

21  agencies?

22         JUROR:  My father was a New York State -- supervisor

23  for the Division of Parole.  I had two uncles in U.S. Customs

24  and my brother is required from the United States Coast Guard.

25         THE COURT:  OK.  Now, were there any other questions

(212) 805-0300

63

F1ddulbv2                    Voir dire

1    to which you would have had a "yes" answer?

2              JUROR:  The last one would be I just recently had my

3    credit card numbers stolen apparently over the Internet and was

4    just called on it yesterday.

5              THE COURT:  OK.  Any others?

6              JUROR:  No.

7              THE COURT:  OK.  Now, in terms of the family members

8    that you got and had in terms of their positions in law

9    enforcement, is there anything about their positions that makes

10   you feel that you couldn't be fair and impartial in this case?

11             JUROR:  No, your Honor.

12             THE COURT:  Is there anything about their positions

13   that makes you feel you would biased for or against law

14   enforcement?

15             JUROR:  No, your Honor.

16             THE COURT:  In terms of your credit card number

17   stolen, as we know, that can happen in any variety of ways, was

18   there anything about that which makes you feel that at this

19   point in time you could not listen to the evidence in this case

20   fairly and impartially?

21             JUROR:  No, your Honor.

22             THE COURT:  All right.  Then we will take up the

23   poster in just a moment.

24             Let me just ask if, number 8, were there any questions

25   to which you would have had a yes answer?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Flddulbv2                    Voir dire

1               JUROR:  Yes.  My English is not -- you know, I could

2     speak it a little but I don't understand too much.  That is the

3     only one I have.

4               THE COURT:  OK.  All right.  Did you go to school in

5     this country?

6               JUROR:  Yes, ma'am, but --

7               THE COURT:  Did you --

8               JUROR:  I didn't do college, I went to ninth grade.

9               THE COURT:  To ninth grade?

10              JUROR:  Yes.

11              THE COURT:  You didn't take any college courses?

12              JUROR:  No.

13              THE COURT:  Do you read English?

14              JUROR:  A little bit.

15              THE COURT:  What is your job?

16              JUROR:  I am a golfer.  I work for American Golf

17    Company.

18              THE COURT:  For golf?

19              JUROR:  For 25 years for golf.

20              THE COURT:  OK.  All right.  You can be excused.

21              Let's fill in number 8, and then I am going to take

22    number 7 at sidebar after we have got number 8 in.

23              THE CLERK:  Prospective juror number 8, juror number

24    98 -- nine-eight.  Juror number 98, will you please take the

25    seat that was vacated.

(212) 805-0300

65

Flddulbv2                    Voir dire

```
 1              THE COURT:  All right.  Prospective juror number 8,

 2   were there any questions that I asked before to which you would

 3   have had yes answers?

 4              JUROR:  Just two.  I received a pamphlet which I

 5   didn't read and I have no problem putting aside.  The second is

 6   I have a brother who works for the federal government.

 7              THE COURT:  And what position does your brother have

 8   in the federal government?

 9              JUROR:  You works for the DOD.

10              THE COURT:  OK.  And is there anything about your

11   brother's position with the DOD that makes you feel you

12   couldn't be fair and impartial in this case?

13              JUROR:  No.

14              THE COURT:  Does your brother, to the best of your

15   knowledge, have any position at the DOD that involves cyber

16   issues?

17              JUROR:  I don't know.

18              THE COURT:  All right.  OK.  We'll come back to you

19   for your bio in a moment.  Let's take number 7 down here for a

20   second, please, sir.  Come on down.

21              There is one seat I can in the front row if there is

22   somebody who is dying to sit down, and there may be another

23   seat in the front row over there.

24              VOICE:  They went to the bathroom.

25              (At the sidebar)
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

66

F1ddulbv2                     Voir dire

1             THE COURT:  What poster did you see?

2             JUROR:  I saw a man holding a poster saying, "No

3    victim, no crime."

4             THE COURT:  And did you associate that in any way with

5    this case?

6             JUROR:  Immediately.

7             THE COURT:  OK.  And, now, the fact that you saw that,

8    are you going to be able to put that out of your mind and

9    listen to what the evidence is in this case?

10            JUROR:  I think so, your Honor.

11            THE COURT:  And to be fair and impartial in this case?

12            JUROR:  I think so, your Honor.

13            THE COURT:  OK.  When you say you think so, will you

14   be able to?

15            JUROR:  Yes, your Honor.

16            THE COURT:  All right.  Thank you.

17            And did you see anything else?

18            JUROR:  No.

19            THE COURT:  OK.  You didn't get one of the pamphlets?

20            JUROR:  No, I did not.  I didn't see anything.

21            THE COURT:  All right.  Thank you.

22            (Prospective juror not present)

23            MR. DRATEL:  Why did he associate it with this case?

24            THE COURT:  Because it has got the name.  All the

25   people are down there with the name on it.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                67
        F1ddulbv2                     Voir dire

1              Number 7, could you come back for one second?

2              (Prospective juror present)

3              THE COURT:  One more question, which is why did you

4       associate it with this case versus some other case?

5              JUROR:  Because in jury selection in the big jury room

6       last week, we were given the questions that you gave to us,

7       that you read to us, the same ones, so it was the only case

8       that I know of.

9              THE COURT:  So you just didn't know of another case?

10             JUROR:  I was wondering, it sounds like this case.

11             THE COURT:  OK.  But you don't know one way or the

12      other whether this case has victims or no victims or what

13      relevance that would have to the law?

14             JUROR:  No.  I don't know anything about the case

15      other than the questions that were given to us.

16             THE COURT:  You understand the Court would instruct

17      the jury on the applicable law at the end of the case?

18             JUROR:  Yes.

19             THE COURT:  You do.  Are you able to follow that law?

20             JUROR:  I think so, your Honor.  Yes, your Honor.

21             THE COURT:  Thank you.  You can step aside.

22             (Prospective juror not present)

23             THE COURT:  I don't see any reason to strike him.  How

24      about you folks?

25             MR. TURNER:  No, your Honor.

                        SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                68
F1ddulbv2                    Voir dire

1              THE COURT:  All right.  Let's return.

2              (In open court)

3              THE COURT:  Let's do the bio for number 7 and 8.

4              Stand up sir, number 7, and tell us a little bit about

5      yourself.

6              JUROR:  I'm 63 years old.  I was born here in

7      Manhattan, raised in the Bronx.  I lived there 20 years.  Moved

8      to Brooklyn, lived there 20 years.  Worked on Staten Island a

9      few years.  Worked in Queens for six years.  And now I live in

10     Manhattan, where I have now retired after having worked 20

11     years as a social work supervisor in the mental health field in

12     support of housing, specifically providing housing for formerly

13     homeless and mentally ill adults.

14             THE COURT:  Did you say -- do you have a spouse or

15     significant other?

16             JUROR:  I have a domestic partner for 20 years.

17             THE COURT:  What is their job?

18             JUROR:  He is an editor and a writer mostly for

19     nonfiction.

20             THE COURT:  OK.  Any particular area of nonfiction?

21             JUROR:  I really don't know, your Honor.

22             THE COURT:  OK.  All right.  And do you read books,

23     magazines on a regular basis?

24             JUROR:  I read some magazines.  I read The New York

25     Times most of the day.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
                                                    69
Flddulbv2              Voir dire
```

1            THE COURT:  What kind of magazines do you read?

2            JUROR:  National Geographic, Yankee.

3            THE COURT:  All right.

4            JUROR:  That is about it.

5            THE COURT:  All right.  Thank you.

6            Number 8.

7            JUROR:  I'm 43.  I am originally from Pennsylvania.  I

8    have been in White Plains for five years.  I am a

9    neurobiologist.  I run a medical research lab in White Plains.

10   I have been there for five years.

11           I am single.  I live alone.  I have no children.  I

12   have Ph.D.'s in molecular biology and genetics.  I don't have a

13   lot of spare time, but when I do I read primarily nonfiction

14   relating to technology, and I don't watch TV.

15           THE COURT:  All right.  And when you say science and

16   technology, do you read anything in particular to the computer

17   technology field?

18           JUROR:  Physics.

19           THE COURT:  All right.  OK.

20           We are into the second round for the peremptories, and

21   we are going to get through this.  In just a couple of minutes,

22   I will ask you folks for your Post-Its.

23           We will do about two minutes for this and then we will

24   pick up the Post-Its.

25           (Pause)

(212) 805-0300

                                                                    70
          F1ddulbv2                    Voir dire

1                THE COURT:  All right.  Let's get our Post-Its.

2                All right.  Here we go with round two.  Again, those

3        of you in the back, I am going to call up some of you and you

4        will fill in the empty spots.  Then what we'll do is we'll take

5        a quick break before we continue along with this same process.

6        Then there will be just a quick break.  People will be able to

7        stretch their legs, but hold on.

8                THE CLERK:  Jurors number 155, 63 and 155 -- excuse

9        me, 153, corresponding seats 6, 9 and 11.  155, 63 and 153.

10               THE COURT:  OK.  6, 9 and 11 are excused, and then

11       will pick three folks randomly to fill in those spots and we

12       will take our break.

13               When we take our break, I am just going to have you

14       folks -- there is a restroom in that jury room back there that

15       you can use.  There is also restrooms in the hall that you can

16       use.  And we'll just take about a five-minute break.  As

17       quickly as we can get out, get back in.  Try and take your own

18       place.  Those of you in the box, you will take your own spots

19       as soon as you get back in.

20               All right.  Joe, fill in spots, 6, 9 and 11.

21               THE CLERK:  Prospective Juror Number 6, Juror No.

22       11 -- one-one -- Juror No. 11, will you please take the last

23       seat in the first row -- well, not the last seat, the

24       second-to-last seat in the first row.

25               Prospective juror number 9, juror number 12, one-two,

                         SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Flddulbv2                    Voir dire

1    juror number 12, will you please take the third seat in the

2    second row.

3            And prospective juror number 11, juror number

4    five-five -- Juror 55 -- Juror 55, will you please take the

5    fifth seat in the second row.

6            THE COURT:  All right, everyone.  Now, what we're

7    going to do is we're going to take a short break.

8            Note, please, it is very, very important that you not,

9    any of the prospective jurors, those of you who are out in the

10   audience, those of who are in the box, all of you, no one speak

11   about this case to each other or to anyone else.  It's very,

12   very important that you not speak about this case.  All right?

13           So just take a quick break.  Come on back in.  Sit

14   down.  We're going to resume in five minutes right here.

15           Thank you.

16           THE CLERK:  All rise.

17           (At the sidebar)

18           THE COURT:  Now is an obvious time to talk amongst

19   yourselves and get yourselves organized for the next round.  I

20   just wanted to make sure that you understood the agenda for the

21   break.

22           MR. DRATEL:  I understand, your Honor.  It's just --

23           THE COURT:  Terrific.

24           MR. TURNER:  Your Honor, for scheduling purposes, we

25   are going to go straight through and then break for lunch?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                              72
F1ddulbv2                     Voir dire


1              THE COURT:  Yes.

2              MR. TURNER:  Thank you.

3              (Recess)

4              (In open court)

5              THE COURT:  All right.  Let's all be seated.

6              And we were going to start with number 6.  Hold on.

7    It is number 6 -- 6, 9 and 11.

8              Number 6, were there any questions that I've asked for

9    earlier to which you would have had a "yes" answer?

10             JUROR:  Yes.

11             THE COURT:  OK.  Which ones?

12             JUROR:  My cousin is a NYPD police officer.

13             THE COURT:  Who is it?

14             JUROR:  Cousin.

15             THE COURT:  Your cousin.  All right.  And are you

16   close to this cousin?

17             JUROR:  Yes.

18             THE COURT:  OK.  And do you believe that that would

19   make you biased in favor of or against law enforcement?

20             JUROR:  No.

21             THE COURT:  Do you believe you could be fair and

22   unbiased in this case?

23             JUROR:  Yes.

24             THE COURT:  All right.  And is your cousin on any kind

25   of special detail that you know of?


                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    73
    Flddulbv2                    Voir dire

 1              JUROR:  No.

 2              THE COURT:  No.  Anything else that you would have

 3    answered "yes" to?

 4              JUROR:  No.

 5              THE COURT:  All right.  Number 9, that is you.  Were

 6    there any questions that I had asked earlier to which you would

 7    have had a "yes" answer?

 8              (Pause)

 9              JUROR:  There is something.  It is the Justice

10    Department, something to do with the Justice Department.  And I

11    can't be more explicit.  I have a slight prejudice.  I think I

12    could be objective in this case but I'm not sure.

13              THE COURT:  All right.  Were there any other questions

14    to which you would have a "yes" answer?

15              JUROR:  No.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

74

Fldgulbvd3                    Voir Dire

1              THE COURT:  We'll take that in a moment.

2              No. 11, were there any questions that I asked earlier

3    to which you would have had a yes answer?

4              JUROR:  No.

5              THE COURT:  Let me get the bio of no. 6 and no. 11.

6    Stand up, no. 6 tell us a little bit about yourself.

7              JUROR:  I'm 46 years old, born and raised in New York

8    City.  I live in the East Village.  And I'm a bus operator for

9    nine years in the New York City Transit.  I'm married with two

10   kids and completed one year of college.  Spare time, I spend it

11   with the kids.  I like to exercise.  And I read the local

12   papers.

13             THE COURT:  What are your local papers that you read?

14             JUROR:  The News, the Post.

15             THE COURT:  And what did you study in college in those

16   courses?

17             JUROR:  Business management.

18             THE COURT:  Business management?

19             JUROR:  Yes.

20             THE COURT:  Thank you.  No. 11, tell us a little bit

21   about yourself.

22             JUROR:  I'm 40 years old.  I live in this country for

23   20 years.  I have three children.  I live with my girlfriend.

24   I work for a news local organization called News 12.  I went to

25   school for two years.  And I have an associate's degree in

                  SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

75

Fldgulbvd3                    Voir Dire

1    technology and I watch news.

2              THE COURT:  Is your girlfriend employed?

3              JUROR:  Right now, she's getting a job as accounting.

4              THE COURT:  In accounting?

5              JUROR:  Yes.

6              THE COURT:  Okay.

7              No. 9, why don't you come on down and we'll talk with

8    you over here at the side bar for a moment.

9              (At the side bar)

10             (Juror present)

11             THE COURT:  What is your juror number?

12             JUROR:  Pardon?

13             THE COURT:  What's your juror number?

14             JUROR:  Twelve.

15             THE COURT:  No. 12.  Okay.  So what's the nature of

16   your issue or concern or potential bias you said?

17             JUROR:  It's how they get --

18             THE COURT:  Keep your voice down.

19             JUROR:  How they get witnesses to testify.

20             THE COURT:  All right.  Is it generally speaking

21   something that you came to this court already thinking about or

22   was it triggered by one of my questions today?

23             JUROR:  It was triggered by what you mentioned about

24   witnesses.

25             THE COURT:  Okay.  It is the case that it's possible

                   SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

76

F1dgulbvd3                    Voir Dire

1    that there could be some witnesses who are what we call

2    cooperating witnesses --

3             JUROR:  Yes.

4             THE COURT:  -- in this case, and those are individuals

5    who may themselves be guilty of a crime and they may, in fact,

6    have been involved in incidents at issue, but the government

7    has made an agreement with them and they're going to cooperate

8    and testify.

9             JUROR:  Right.

10            THE COURT:  And that's a perfectly lawful thing for

11   the government to do.

12            JUROR:  Yes.

13            THE COURT:  Do you have some concern about the

14   government's use of witnesses like that and would you be biased

15   either for or against their testimony in some manner?

16            JUROR:  I know this is the way to do it and it's

17   usually justified in every way, but I also know -- I know

18   sometimes it's not.  It's just sometimes there can be that kind

19   of occasion.  I know that.

20            THE COURT:  Do you think in this case you'd be able to

21   listen to the evidence given by all witnesses, including

22   potential cooperator witnesses, and assess the credibility of

23   those witnesses according to who the witness is and at the time

24   as you hear them on the stand and whatever you assess about

25   them while they're on the stand as opposed to assuming

                SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
Fldgulbvd3                    Voir Dire
```

```
 1    credibility either for or against them because of who they are,
 2    either a cooperating witness?
 3            JUROR:  I think I can be objective.
 4            THE COURT:  You do?
 5            JUROR:  Yes.
 6            THE COURT:  Why don't you stand on the side for a
 7    moment.
 8            JUROR:  All right.
 9            (Juror not present)
10            MR. SERRIN:  Your Honor, I suppose I'm somewhat
11    concerned.  I mean, she's from a foreign country.  A lot of
12    times foreign countries have different regimes in terms of
13    cooperating witnesses.  She may have a much different
14    expectation.  And she did raise this on her own and she gave,
15    in response to your Honor's question, an affirmative answer,
16    but she did seem to have some serious hesitation at first about
17    the credibility of a cooperating witness and we have two of
18    them in this case.
19            THE COURT:  Mr. Dratel.
20            MR. DRATEL:  What she expressed is really not
21    inconsistent with the instruction that the Court told them
22    you're going to give the jury, which is, cooperating witnesses
23    are to be viewed with greater concern than average witnesses
24    and their credibility is to be determined by a special
25    standard.  It's not same.  She said she could be objective
```

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

78

Fldgulbvd3                Voir Dire

1    here.  She has been here 40 years.  I don't have to question

2    her.  She's from the UK.  It's not a particularly different

3    system and she understands precisely what is going on.

4              THE COURT:  I think it's a close-enough call that if

5    one of you wants to use your peremptory as to this particular

6    witness, you can do that, but I'm not going to strike her for

7    cause at this time.

8              MR. DRATEL:  Thank you.

9              MR. SERRIN:  Thank you.

10             (In open court)

11             THE COURT:  All right.  No. 9, why don't you, as

12   you're getting settled there, tell us a little bit about

13   yourself.

14             JUROR:  I'm 68 and I live in lower Manhattan, Nolita,

15   with my husband, and we don't have children.  And he is a

16   production editor for Harper Collins.  And I'm a writer and

17   freelance writer and teacher and I read the news.  I get my

18   news mainly from the Internet, but I read the New Yorker and I

19   read -- I read the headlines of the post.  I read the Wall

20   Street Journal, the Times.

21             THE COURT:  Thank you.

22             JUROR:  Thanks.

23             THE COURT:  Do you watch any TV on a regular basis?

24             JUROR:  Downton Abbey and Charlie Rose.

25             THE COURT:  Thank you.  Thank you.  Ladies and

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

79
Fldgulbvd3                    Voir Dire

1    gentlemen, let's to our third round of the peremptories.  Let's

2    try to make this one a little quicker.  Let's get the defense

3    Post-It.

4              THE DEPUTY CLERK:  Jurors no. 135, 11 and 12,

5    corresponding seats four, six and nine.

6              THE COURT:  Joe is, in a moment, going to call three

7    more names and fill in three more, folks.  That will allow

8    three more folks to sit down and get ourselves ready for the

9    fourth round.  We just had our third round.  We'll get ready

10   for our fourth.  Let's fill in four, six and nine.

11             THE DEPUTY CLERK:  Prospective juror no. 4, 134.

12   Juror No. 134, will you please take the fourth seat in the

13   first row.  Prospective juror no. 6, juror no. 97, will you

14   please take the sixth seat in the first row.  And prospective

15   juror no. 9, juror no. 93.  Juror No. 93, will you please take

16   the third seat in the second row.

17             THE COURT:  Prospective juror no. 4, were there

18   questions that I asked to which you would have had a yes

19   answer?

20             JUROR:  Yes.  Somebody gave me a flier when I was

21   coming in.

22             THE COURT:  Did you read it?

23             JUROR:  I put it aside.  I didn't read it yet.

24             THE COURT:  Could you put it aside until you are

25   either dismissed from the case and until the evidence is all in

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                                    80
       Fldgulbvd3                    Voir Dire

 1     and the case is completely over?

 2              JUROR:  Yes.

 3              THE COURT:  All right.  Anything else?

 4              JUROR:  No.

 5              THE COURT:  Any other questions you would have had a

 6     yes answer to?

 7              JUROR:  No.

 8              THE COURT:  All right.  No. 6, any questions you would

 9     have had a yes answer to?

10              JUROR:  Yes, your Honor.  I had previous law

11     enforcement work experience with them, and I saw the poster.  I

12     do have legal studies and time.

13              THE COURT:  And time meaning how long the trial is

14     going to be?

15              JUROR:  Yes.

16              THE COURT:  In terms of law enforcement, is it you

17     yourself or someone else?

18              JUROR:  I volunteer with them and I do know people.

19              THE COURT:  When you say volunteer, who do you

20     volunteer with?

21              JUROR:  NYPD.  I volunteer with them for a year

22     and-a-half.

23              THE COURT:  When was that?

24              JUROR:  Three years ago.

25              THE COURT:  Is there anything about your experience

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

81

Fldgulbvd3                    Voir Dire

1    with the NYPD that makes you feel that you would be biased

2    either in favor of or against law enforcement?

3          JUROR:  No.

4          THE COURT:  And in terms of legal studies, what were

5    you studies?

6          JUROR:  I am currently a student at Nyack College

7    studying criminal justice with a minor in psychology and

8    biblical studies.

9          THE COURT:  Is there anything about those studies that

10   makes you feel that you couldn't be fair and impartial in this

11   case and accept the instructions on the law that the Court

12   gives you?

13         JUROR:  I'm not sure.  I'm not completely sure.  I

14   have my own interpretation already of the law.  We studied the

15   laws already from the court and I'm not sure would I be

16   able --

17         THE COURT:  All right.  You can go.  Let's get a new

18   no. 6 in.  That's okay.  I want the honest answer.  The only

19   reason I do it quickly is so that we can move on.  Let's get a

20   new no. 6 and then we'll get to no. 9.

21         THE DEPUTY CLERK:  Prospective juror no. 6, Juror No.

22   146.  Ma'am, will you please take the sixth seat in the first

23   row.

24         THE COURT:  No. 6, were there any question that I

25   asked before that you would have had a yes answer to?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvd3                    Voir Dire

1              JUROR:  No.

2              THE COURT:  Thank you.

3              No. 9, any questions that I asked before that you

4    would have had a yes answer to?

5              JUROR:  No.

6              THE COURT:  Let's get a little bit of a bio from four,

7    six and nine.  Number four.

8              JUROR:  I'm 63 years old.  I was born and raised in

9    New York City.  I live in the lower east side right now for 40

10   years.  And I've been working for the post office in the City

11   Hall area for about 32 years.  I work as a sales associate and

12   currently a passport agent.  And I'm divorced and I live alone.

13   I have one grown son.  He's working for the headquarters for

14   Walgreens in Chicago.  And I completed two years of college,

15   but I didn't finish.  And on my spare time, I like to go to the

16   movie theaters and watch movies.  And I don't read any

17   particular magazines or -- regularly, but newspapers, I read

18   the free papers if that counts, the AM and the Metro, and I

19   watch television at home.

20             THE COURT:  What kinds?

21             JUROR:  Sometimes -- programs and business news,

22   regular news and sitcoms and some TCM, old movies.

23             THE COURT:  And you said that you're a sales agent.

24   Is that with a store?

25             JUROR:  No, no.  I'm a passport agent at the post

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                             83
    F1dgulbvd3                    Voir Dire

 1   office.

 2              THE COURT:  I see.  Are you a postal employee?

 3              JUROR:  Yes.

 4              THE COURT:  And so you're one of the individuals who

 5   accepts applications for passports?

 6              JUROR:  Yes.

 7              THE COURT:  Now, you heard earlier that I said that

 8   one of the allegations in this case that it will be the

 9   government's burden to prove is the possibility of false

10   identification documents.  Among those false identification

11   documents could be false or allegedly false passports.

12              Do you think that you would be able to view that

13   evidence fairly and impartially, even though you are yourself a

14   passport agent with the U.S. Postal Service?

15              JUROR:  Yes.

16              THE COURT:  Thank you.

17              JUROR:  Thank you.

18              THE COURT:  No. 6, tell us a little bit about

19   yourself.

20              JUROR:  I'm 45.  I've been in this country about 36

21   years.  In live in Westchester with my ex-husband and my three

22   children.  I'm a network analyst.  I have a bachelor in

23   computer science.  Right now, I work for a healthcare system

24   doing their code information management.  In my spare time, I

25   watch the Cooking Channel and football, and I think that's it.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

84
F1dgulbvd3                    Voir Dire

1               THE COURT:  Do you read anything in particular?

2               JUROR:  Not really, just things in general, any kind

3        of paper, books in passing.

4               THE COURT:  And did you say what your ex-husband does

5        or your husband?

6               JUROR:  He works for radio station.  He does their

7        broadcasting for a Caribbean station.

8               THE COURT:  Where are you from originally?

9               JUROR:  The Isle of Man.

10              THE COURT:  Thank you.

11              JUROR:  Thank you.

12              THE COURT:  No. 9.

13              JUROR:  I'm 39 and I was born in this country.  I live

14       in Westchester with my husband and daughter who is six.  I'm a

15       teacher for 15 years in Yonkers and my husband is an

16       educational consultant.  I have two masters degrees, one in

17       elementary education and one in reading.  In my spare time, I

18       spend it with my family, friends, exercising, traveling.  I

19       read Self magazine, Cooking Light.  I don't read any

20       newspapers.  And mostly, we watch comedies or sitcoms.

21              THE COURT:  Thank you.  All right.  Ladies and

22       gentlemen, we'll do the fourth round.  Let's get your Post-Its

23       in just a moment.

24              MR. DRATEL:  A brief side bar?

25              THE COURT:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                          85
    Fldgulbvd3                    Voir Dire

 1          (At the side bar)

 2          THE COURT:  Mr. Dratel.

 3          MR. DRATEL:  In addition to the charges in the case

 4   about the identification documents, there's also going to be

 5   evidence that the defendant himself received false

 6   identification documents and so I think if we can ask that

 7   juror, juror no. 4 I think it is, yeah, who is a post office

 8   employee about whether that might have an impact, because that

 9   may not be something that's contested necessarily.  So it's not

10   a question of evaluating the credibility of the evidence.  It's

11   really effectively the evidence itself that is going to come in

12   about the charges.

13          THE COURT:  I don't want to go into the nature of the

14   evidence here because it could get us down a morass.  I don't

15   think there's any basis for a cause strike right now.  If you

16   want to use a peremptory on that juror, you are welcome to.

17          Is there anything else?

18          MR. DRATEL:  No.  I was just thinking.

19          THE COURT:  Similar to what we had the other time with

20   the government, so you can use your peremptories as you see

21   fit.

22          (In open court)

23          THE COURT:  All right.

24          THE DEPUTY CLERK:  Juror no. 134, 98 and 55,

25   corresponding seats four, 11 and eight.

                   SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvd3                    Voir Dire

1              THE COURT:  So we're going to get three more folks to

2       come in and sit down, and then we're going to be getting

3       ourselves ready for the fifth round.  Two rounds left for this

4       part and then it's just the alternates after that.

5              Let's get our folks for seats four, eight and 11.

6              THE DEPUTY CLERK:  Prospective juror no. 4, juror no.

7       141.  Juror No. 141, please take the fourth seat in the first

8       row.

9              Prospective juror no. 8, juror no. 53, 53.  Juror No.

10      53, will you please take the second seat in the second row.

11             Prospective juror no. 11, Juror no. 111, 111.  Juror

12      No. 111, please take the fifth seat in the second row where the

13      lady is getting up.

14             THE COURT:  Prospective juror no. 4 four, were there

15      any questions I asked earlier to which you would have had a yes

16      answer?

17             JUROR:  No.

18             THE COURT:  Thank you.

19             Prospective juror no. 8, were there any

20      questions -- you're in the eighth spot.

21             JUROR:  Sorry.

22             THE COURT:  That's all right.  Prospective juror no.

23      8, were there any questions I had asked before to which you

24      would have had a yes answer?

25             JUROR:  No.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

87

Fldgulbvd3                    Voir Dire

1         THE COURT:  Prospective juror no. 11, were there any

2    questions before to which you would have had a yes answer?

3         JUROR:  No.

4         THE COURT:  Thank you.  Why don't you, no. 4, tell us

5    a little bit about yourself.

6         JUROR:  I'm 46.  I've lived in this country for 25

7    years.  In the Bronx now for 18 years.  I live with my two

8    grandchildren and granddaughter.  I currently work for Metro

9    North as a coach cleaner.  And I've never been married.  My

10   oldest son, he works as an magician and my daughter started

11   working for an answering service for doctors.  I have an

12   associate degree in hospitality management and in my spare

13   time, I babysit shop, read books and I also watch TV like

14   forensic science, whatever my granddaughter watches.

15        THE COURT:  What kinds of books do you read?

16        JUROR:  Like James Patterson, romance novels, stuff

17   like that.

18        THE COURT:  Thank you.  Prospective juror no. 8.

19        JUROR:  That's me.  I am 67.  I was born in Manhattan.

20   I presently live in midtown Manhattan.  I'm retired.  I was a

21   deputy city registrar for the Department of Health.  I signed

22   off on corrections to birth and death records.  I was married.

23   I have no children.  I'm divorced.  I went to Marymount and I

24   received a medical administration certificate.  I volunteer for

25   God's Love We Deliver food kitchens, that kind of thing, Ronald

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                            88
       Fldgulbvd3              Voir Dire

1     McDonald.  I watch Law and Order and the Cooking Channel, and
2     I don't -- I'm not really addicted to any newspapers or
3     anything like that.
4              THE COURT:  You're not addicted to them.  Do you
5     sometimes peruse them?
6              JUROR:  Not even sometimes.  Too depressing.
7              THE COURT:  All right.  What was your ex-husband's
8     position, job?  Profession?
9              JUROR:  Hairdresser.
10             THE COURT:  Now, juror no. 11, there you are, sir,
11    tell us a little bit about yourself.
12             JUROR:  Okay.  I am 59 years old, born and raised in
13    New York.  I live in Yonkers, New York.  I work in television
14    advertising sales for the past 30 years.  I have a domestic
15    partner of 13 years.  He is a retired Air Force lieutenant
16    colonel now working for Homeland Security TSA headquarters in
17    Virginia.  College graduate.  I read every newspaper I can get
18    my hands on, and if it's a documentary, that's what I watch on
19    television.
20             THE COURT:  Thank you.  Now, you had -- you said you
21    are retired Air Force?
22             JUROR:  My partner is.
23             THE COURT:  He's retired from the Air Force, and he is
24    currently employed by Homeland security?
25             JUROR:  TSA headquarters.  He develops the airport

                  SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

89

        Fldgulbvd3                    Voir Dire

1    security for all airports in the United States.

2                THE COURT:  All right.  Is there anything about his

3    position with Homeland Security that makes you feel that you

4    would be biased in favor of the government or against the

5    government in this lawsuit?

6                JUROR:  Not at all.

7                THE COURT:  Do you think you can be fair and unbiased

8    in this lawsuit?

9                JUROR:  Yes.  I can be fair.

10               THE COURT:  Thank you, sir.  You may be seated.

11               So we are into the fifth round, one and one.  Let's

12   get ourselves some Post-Its here.  We have one round after

13   that, then we go to the alternates.  Ladies and gentlemen, we

14   are getting there.  Let's get our Post-Its.

15               THE DEPUTY CLERK:  Juror nos. 141 and 111.  So we're

16   going to fill in two and then we're going to go get ready for

17   our sixth and last round of peremptories as to the 12, all

18   right?  Let's get somebody in seat number four and seat number

19   11.

20               Prospective juror no. 4, juror no. 124, 124, juror no.

21   124, please take the fourth seat in the first row.  And

22   prospective juror no. 11, juror no. 85, 85.

23               MR. DRATEL:  May we have a brief side bar.

24               THE DEPUTY CLERK:  Juror no. 85, take the fifth seat

25   in the second row.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

                                                           90
    Fldgulbvd3                    Voir Dire

 1          THE COURT:  Let me get through some of these

 2  preliminaries, and then we'll do that.  All right.

 3          We have a new person in seat four and somebody heading

 4  towards seat 11.  The person in seat four, were there any

 5  questions that I had asked before earlier today that you would

 6  have had yes answers to?

 7          JUROR:  No.  I don't have any problem with the

 8  questions that you asked.

 9          THE COURT:  So neither of you have any questions you

10  would have given yes answers to, is that right?

11          JUROR:  Yes.

12          JUROR:  No.

13          THE COURT:  So I'm getting answers of no

14  questions -- no "yes" answers to any of my questions from both

15  four and 11.  Before we get to your bios, let me take counsel

16  at side bar.  We're getting ready for our sixth and last round

17  of the 12 and then we have the alternates.

18          (At the side bar)

19          THE COURT:  Mr. Dratel.

20          MR. DRATEL:  Yes, on round four, which was a

21  two-round -- two challenge round and initially thought it was a

22  1-challenge round, so I had -- I think, I forget the

23  number -- I don't remember the number but the point was that in

24  the second one that I challenged it was not the juror I

25  intended to challenge, the two jurors who are sitting next to

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

```
                                                        91
    Fldgulbvd3                    Voir Dire
```

1   each other, one is 98, one is 93.  I challenged 98.  I intended

2   to challenge 93.

3          THE COURT:  Is 98 still there?

4          MR. DRATEL:  No.  I said I wrote 98.

5          THE COURT:  So 93 you meant to challenge?

6          MR. DRATEL:  Yeah.

7          THE COURT:  And they're currently in what seat?

8          MR. DRATEL:  They're in seat nine.

9          MS. MARINO:  Nine.

10         THE COURT:  You still have one peremptory left.  It's

11  not it a cause strike.

12         MR. DRATEL:  I'm just saying that it was a mistake.

13         THE COURT:  I hear you.  I can't give you any more

14  peremptories than the rules allow in this round.  You have one

15  more round, okay.

16         (In open court)

17         THE COURT:  So we have number four and 11.  Number

18  four, tell us a little bit about yourself.

19         JUROR:  I'm a registered nurse.  I've been doing that

20  for 25 years.  I came to this country in 1977.  I'm 47 years

21  old.  I don't have any spare time.  I'm not married.  I'm

22  single.  I have a degree, a Bachelor of Science.  No spare

23  time.  I don't read the paper, don't watch TV except for

24  Scandal and the Walking Dead.

25         THE COURT:  Thank you.  Number 11, tell us a little

(212) 805-0300

92

Fldgulbvd3                    Voir Dire

1    about yourself.  Stand up.  It would help to get a good sound.

2              JUROR:  I am 55 years old.  I work as a security

3    business.  I live with my -- well, my father lives with me in

4    the Bronx.  I was married for 20 years, divorced three years

5    ago.  Yes, I do love to read.  I like to read Sports

6    Illustrated, the Chief, the Daily News, and etc.

7              Also, on my spare time, I watch CNN and FOX.  I love

8    sports, okay, I have a son, 31 years old.  He works in the

9    Manhattan as a doorman.  That's about it.

10             THE COURT:  And you said you work in the security area

11   of -- in what capacity?  What's your job?

12             JUROR:  What I do is, I check the monitors at the -- I

13   work in the office.  I work and I check TV monitors in a

14   building.

15             THE COURT:  And you said your father lives with you.

16   Is he retired from a particular occupation?

17             JUROR:  Yes, he is, yes, he is.  He's 90 years old and

18   he came from Puerto Rico.

19             THE COURT:  What did he do when he was working?

20             JUROR:  He was a truck driver.

21             THE COURT:  Okay.

22             JUROR:  Okay.

23             THE COURT:  What did your wife do?

24             JUROR:  My wife, she was basically a house -- cooking

25   and stuff like that.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

93

Fldgulbvd3                  Voir Dire

1          THE COURT:  Stay-at-home mother?

2          JUROR:  Yes.

3          THE COURT:  Okay.  Let's go on to the last round of

4    the peremptories against the 12, and then we'll go to the two

5    rounds as to the alternates and then we're done.  All right.

6    Let's get the last Post-It as to the panel of 12.

7          THE DEPUTY CLERK:  Juror nos. 124 and 93,

8    corresponding seats four and nine.

9          THE COURT:  So we'll get two of you folks in just a

10   moment to come up and fill in; and we'll return our attention

11   to the filling of seats four and nine.

12         THE DEPUTY CLERK:  Prospective juror no. 4, juror no.

13   116, 116.  Juror No. 116, will you please take the fourth seat

14   in the first row.  And prospective juror no. 9, Juror No. 92,

15   92.  Ninety-two, will you please take the third seat in the

16   second row?

17         THE COURT:  All right, number four, were there any

18   questions I had asked earlier to which you would have had yes

19   answers?

20         JUROR:  I saw that there was picketing out front, but

21   I didn't see what it was about.

22         THE COURT:  Did you associate it for any particular

23   reason with this case?

24         JUROR:  No.  I had gone in the other entrance and it

25   was so backed up, they told us to come around here and I was

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

94

Fldgulbvd3                    Voir Dire

1    stressed about being late.

2         THE COURT:  Were there any other questions to which

3    you would have had a yes answer?

4         JUROR:  No.

5         THE COURT:  Thank you.  Number nine, any questions to

6    which you would have had a yes answer?

7         JUROR:  No.

8         THE COURT:  Why don't we hear a little about bit you,

9    number four.

10        JUROR:  I'm 48.  I lived in the United States all my

11   life, except for a couple of stints overseas.  I live in

12   Morningside Heights in Manhattan.  I live with my family, my

13   husband, who is an associate professor of history at Bronx

14   Community College, and I have two kids, ages nine and 11,

15   almost 12.  Over the last five years, I've been a writer and

16   editor in academic medicine here in New York.  And then I have

17   a master's in teaching social studies.  In my spare time, I do

18   things with my family, traveling locally, going to museums,

19   things like that.  We get the Times and I, you know, read it as

20   best I can, and we get the New Yorker and the New York -- and

21   New York magazine, which I scarcely have a chance to read.  I

22   read some books, and we don't have a TV, so I don't watch TV or

23   TV news.

24        THE COURT:  What kind of books to you read when you're

25   reading books?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

95
Fldgulbvd3                    Voir Dire

1            JUROR:  Mostly biographies.  And I'm reading mostly

2       biographies, histories of New York City, history mostly.

3            THE COURT:  All right.  Thank you.  You may be seated.

4            No. 9, tell us a little bit about yourself.

5            JUROR:  Okay.  I'm 26 years old.  I lived in this

6       country for 17 years.  I live in the Bronx with my mom and dad.

7       Over the last five years well.  I worked -- I'm currently

8       working with the Social Security Administration.  I've been

9       there for four years as a claims representative and I just

10      started as what they call a technical expert and the previously

11      before that, I was a college student.

12           Not married.  No children.  I have a Bachelor's of

13      Science in business administration and political science.  And

14      on my spare time, I'm with my friends, with my family.  I do

15      some cooking.  I usually just read Glamour magazine.  I don't

16      read newspapers unless they're in the office and might look

17      through them, but I don't really read them.  I do watch news

18      and just movies on TV.  That's it.

19           THE COURT:  And you said that you're now going to be a

20      technical expert.  Does that mean like a computer technical

21      expert?

22           JUROR:  Yes; similar to that, like, I'll fix any

23      problems from the office when needed.

24           THE COURT:  For the computer?

25           JUROR:  Yeah or for the staff overall.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

F1dgulbvd3                    Voir Dire

1           THE COURT:  Do you have some particular training in

2    that?

3           JUROR:  Not really.  I guess training comes with the

4    job over the years, so nothing specific.

5           THE COURT:  All right.  So you're like the IT help

6    desk?

7           JUROR:  Yes.  Pretty much.

8           THE COURT:  Thank you.  Alternates no. 1, 2, 3 and 4,

9    we had heard a little bit about you before, right?  We did the

10   bios.  Am I remembering this correctly?  Yes.  I remember

11   hearing from each of you, so I'm thinking I have heard about

12   you.  We're going to go into the rounds as to alternates one,

13   two, three and four only.  There are just two rounds of these,

14   one and one each round.  After this, we're going to take a

15   lunch break, so food is not far away.  Let's get our Post-Its

16   for the first round of the alternates.

17           THE DEPUTY CLERK:  Juror nos. 59 and 107,

18   corresponding seats alternate two and alternate three.

19           THE COURT:  So we're going to get two folks into

20   alternate spot two and alternate spot three, and then we'll go

21   into our last round all together, it's our last round for the

22   alternates and our last round for everyone.  Let's fill in two

23   and three.

24           THE DEPUTY CLERK:  Alternate juror no. 2, prospective

25   alternate juror no. 2, juror no. 173, 173.  Would you please

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

97

Fldgulbvd3                    Voir Dire

1    take the second or the third seat in the second row?

2              And prospective alternate juror no. 3, juror no. 156,

3    156.  Juror No. 156, will you please take the third seat in the

4    last row.

5              THE COURT:  Alternate no. 2.

6              JUROR:  Yes.

7              THE COURT:  Were there any questions I had asked

8    earlier that you would have had a yes answer to?

9              JUROR:  No.

10             THE COURT:  Alternate no. 3, were there any questions

11   earlier that I had asked to which you would have had a yes

12   answer to?

13             JUROR:  Yes.  Two questions.

14             THE COURT:  Which ones?

15             JUROR:  On did you serve in the military outside the

16   United States, that is yes.

17             THE COURT:  Which military did you serve in?

18             JUROR:  In Ovaya (ph) 30 something years ago.

19             THE COURT:  Is there anything about your military

20   service that makes you believe that you're unable to be fair

21   and impartial in this case?

22             JUROR:  No.

23             THE COURT:  Do you believe that your military service

24   would make you more biased towards law enforcement?

25             JUROR:  No.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

98
Fldgulbvd3                    Voir Dire

1            THE COURT:  Do you believe you can be unbiased here?

2            JUROR:  Yes.

3            THE COURT:  What's the other question or questions to

4     which you had yes answers?

5            JUROR:  I did pick up one of the fliers.  I didn't get

6     a chance to read it.

7            THE COURT:  Are you willing to put that to the side

8     until the close of the evidence and the termination of this

9     case?

10           JUROR:  Yes.  I don't possess it anymore.

11           THE COURT:  You threw it out?

12           JUROR:  Yes.

13           THE COURT:  Thank you.  Why don't you tell us,

14    alternate no. 2 first a little bit about yourself.

15           JUROR:  I'm 42 years old.  I was born in this country.

16    I reside in Manhattan right now.  I'm a Zumba instructor and a

17    health coach, so I have a -- I work with a product brokerage

18    company.  We do a lot of stuff on the Internet.  I have been

19    married.  I was married to an officer, divorced, getting a

20    divorce, in the middle of a divorce.

21           THE COURT:  When you say officer, do you mean NYPD?

22           JUROR:  Yeah.  He retired.

23           THE COURT:  Is there anything about the fact that you

24    were married to somebody in the NYPD that makes you feel like

25    you would be either biased for or against law enforcement?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

99
Fldgulbvd3              Voir Dire

1           JUROR:  No.  I have two children, one is in the Army
2      and I have a Bachelor's in English literature.  I work out.  In
3      my spare time, I take my dog for a walk, movies, dinner.  I
4      read a lot of books, a lot of motivational books, finance
5      books.  And I like to watch Modern Family and the Flash,
6      Gotham.  That's it.
7           THE COURT:  And does the fact that you have a son you
8      said in the Army --
9           JUROR:  Uh-huh.
10          THE COURT:  -- does that make you feel that you would
11     be unable to be fair and biased towards the U.S. government in
12     this case?
13          JUROR:  No.
14          THE COURT:  Do you feel like you can listen to the
15     evidence here fairly and impartially as to all parties?
16          JUROR:  Yes.
17          THE COURT:  Thank you.  Number three, alternate three.
18          JUROR:  I'm 53 years old.  I've lived in the United
19     States around 33, 34 years.  I live in Westchester with my wife
20     and two young children around ten and 12.  I am operating
21     engineer for an international regulation organization in
22     Manhattan.  I worked for them around seven years.  My wife is a
23     housewife.  She takes care of the kids.  I have graduated from
24     the State University of New York, Bachelor of Art, Humanities.
25     I also teach electricity, technical subjects.  I read

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

100

Fldgulbvd3                    Voir Dire

1    newspapers, the New York Times, Time magazine, nature and

2    National Geographic.  I haven't watched TV for a couple of

3    years since NetFlix became popular and when I watched TV prior,

4    basically it's nature shows.

5             THE COURT:  Thank you.  You may be seated, sir.

6             All right, ladies and gentlemen, we have our last

7    round, one and one as to the alternates.  Let's get our last

8    Post-It from folks.

9             THE DEPUTY CLERK:  Alternate juror no. 2, no. 173.

10            THE COURT:  So we'll get somebody to fill in that

11   spot.

12            THE DEPUTY CLERK:  Prospective alternate juror no. 2,

13   juror no. 81.  Juror no. 81, will you please take the vacated

14   seat.

15            THE COURT:  All right.  Alternate no. 2, were there

16   any questions that I had asked earlier that you would have had

17   a yes answer to?

18            JUROR:  No, no.

19            THE COURT:  All right.  And why don't you tell us a

20   little bit about yourself.  Stand up if you could.  Thank you.

21            JUROR:  I'm 64 years old.  I live in Westchester

22   County.  I'm single.  I served in the military and I work for

23   Merigold Fathers.  I have no children.  I have 14 years of

24   school.  I worked as a med tech.  That's about all.

25            THE COURT:  So does your service in the U.S. Army make

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvd3                    Voir Dire

1   you feel that you would be biased for or against the U.S.

2   government or law enforcement in this case?

3            JUROR:  No.

4            THE COURT:  Do you believe you could be fair and

5   impartial in this case?

6            JUROR:  Yes.

7            THE COURT:  You may be seated, sir.  Is the jury

8   acceptable to the government?

9            MR. SERRIN:  Yes, your Honor.  Thank you.

10           THE COURT:  Is the jury acceptable to the defendant?

11           MR. DRATEL:  Yes, your Honor.

12           THE COURT:  Ladies and gentlemen, I am pleased to say

13   that we have completed jury selection in this matter.  Those of

14   you who have not been accepted and did not need to be called as

15   jurors here, I want to thank you for being here and being

16   present.  It's only with the ability to call on folks to sit

17   and to serve that our jury system works.

18           Mr. Pecorino, will give you your cards and have you

19   return back down to wherever he tells you to go, the jury room.

20   And those of you who have been selected, just sit still for a

21   moment while Joe takes care of that paperwork.

22           We're going to read your juror numbers into the record

23   and then let you folks have some lunch, which we have already

24   got for you in the next room, and then they'll release you for

25   lunch.

                    SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

Fldgulbvd3                    Voir Dire

1          I'm going to have Mr. Pecorino read your numbers into

2    the record so we're sure we have all the right juror numbers in

3    the right spots and then we're going to spare you in.  All

4    right.

5          THE DEPUTY CLERK:  Juror no. 1, juror 136; juror no.

6    2, juror 49; juror no. 3, juror 181; juror no. 4, juror 166

7    (sic); juror no. 5, juror 101; juror no. 6, juror 146; juror

8    no. 7, juror 43; juror no. 8, juror 53; juror no. 9, juror 92;

9    juror no. 10, juror 140; juror no. 11, juror 85; and juror no.

10   12, juror 38.

11         Alternate juror no. 1, juror 61; alternate juror no.

12   2, juror 81; alternate juror no. 3, juror 156; and alternate

13   juror no. 4, 106.

14         JUROR:  I'm so sorry.  I'm 116.  Did I mishear you

15   when I was sitting down?

16         THE DEPUTY CLERK:  I apologize.  It's 116.

17         THE COURT:  That's why we do it.  Mr. Pecorino, will

18   you please swear in the jury.

19         THE DEPUTY CLERK:  Jurors, please rise.

20         (Continued on next page)

21

22

23

24

25

(212) 805-0300

F24dulb1                    Trial

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x                    EXHIBIT Z, Doc. 220

 3   UNITED STATES OF AMERICA,

 4              v.                    14 Cr. 68 (KBF)

 5   ROSS WILLIAM ULBRICHT,

 6              Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     February 4, 2015
 9                                   10:06 a.m.

10
     Before:
11
                     HON. KATHERINE B. FORREST,
12
                                     District Judge
13

14                      APPEARANCES

15
     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   BY:  SERRIN A. TURNER
          TIMOTHY HOWARD
18            Assistant United States Attorneys

19   JOSHUA LEWIS DRATEL
     LINDSAY LEWIS
20   JOSHUA HOROWITZ
          Attorneys for Defendant
21
              – also present –
22
     Special Agent Vincent D'Agostino
23   Molly Rosen, Government Paralegal
     Nicholas Evert, Government Paralegal
24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

F24dulb3                          Verdict

 1                THE CLERK:  Juror No. 9, is this your verdict?

 2                JUROR:  Yes.

 3                THE CLERK:  Juror No. 10, is this your verdict?

 4                JUROR:  Yes.

 5                THE CLERK:  Juror No. 11, is this your verdict?

 6                JUROR:  Yes.

 7                THE CLERK:  Juror No. 12, is this your verdict?

 8                JUROR:  Yes.

 9                THE COURT:  Juror No. 3, is this your verdict?

10                JUROR:  (Indicating)

11                THE COURT:  I need an audible --

12                JUROR:  Yes, your Honor.

13                THE COURT:  Thank you, sir.

14                THE CLERK:  The jury is polled, your Honor.

15                THE COURT:  Thank you, ladies and gentlemen.

16                Counsel, is there any reason not to dismiss the jury

17       at this time?

18                MR. TURNER:  No, your Honor.

19                MR. DRATEL:  No, your Honor.

20                THE COURT:  Ladies and gentlemen of the jury, I want

21       to thank you for your jury service.  I want to thank you for

22       coming each day and listening carefully to the evidence, to

23       doing that under circumstances that I know were difficult day

24       in and day out now over several weeks.

25                As I told you at the outset, having folks like you who

F24dulb3                    Verdict

 1    will take this role very seriously is an essential part of the

 2    American justice system.  Without it, without juries, we cannot

 3    have the system that we have.  So I want to thank you for doing

 4    your jury service so responsibly and so carefully.

 5            What we're going to do now is Joe is going to -- who

 6    could talk to you again -- Joe is going to lead you out and

 7    give you some final instructions.  You are now also released

 8    from your oath of silence and you may now talk to others,

 9    should you choose to do so, about this case.  However, you need

10    not talk to anyone should you choose not to talk to anybody.

11    Should you choose to be silent, that's entirely up to you.  You

12    need give no one your name.  You need give no one any

13    information at all.

14            The one thing that I do ask is if you do choose to

15    talk about this case, that when you're talking about your role,

16    that you talk just about yourself, and that you respect the

17    integrity and the secrecy of the jury process and that you not

18    speak for your other fellow jurors who may choose to be silent.

19            Again, I want to thank you.  And you are dismissed.

20            The jury may leave.

21            THE CLERK:  All rise as the jury leaves.

22            (Jury not present)

23            THE COURT:  All right, ladies and gentlemen.  Let's

24    all be seated.

25            The verdict form has been marked as Court Exhibit 2

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300